# EXHIBIT 2

**IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
IN AND FOR MONROE COUNTY, FLORIDA**

| | |
|---|---|
| JACKIE and ANTHONIE TALARICO, Each Individually and as Next Friends to A.T. and R.T.; SARAH and ANTHONY ALGER, Each Individually and as Next Friends to A.A. and E.A.; ANTHONY BAILLIE and CEANNA BLOOM-LEDOUX, Each Individually and as Next Friends to I.B.; ASHLEY BASTIAN, Individually and as Next Friend to W.B. and M.B.; MELISSA and LEE BRENNAN, Each Individually and as Next Friends to C.C., S.B., and C.B.; JAIME and LEVI BROWN, Each Individually and as Next Friends to E.B.; MAYRA and KENYATTA BRYANT, Each Individually and as Next Friends to K.A.B, K.D.B, K.D'W.B. and K.D'S.B.; WAYNE and LISA MARIE BUSH, Each Individually; KRISTI ANN CAPUTO and BRANDON ROMANSKY, Each Individually and as Next Friends to J.R. and C.R.; STEPHEN CATES, Individually; SHARON CATES, Individually; HANNAH CATES, Individually; ALLISON MARIE CHOCIANOWSKI, Individually and as Next Friend to P.C., K.C., and A.C; SAVANNAH DEIS, Individually and as Next Friend to A.E.D. and A.M.D.; KAYLEE JO and GRANT DOWELL, Each Individually and as Next Friends to D.D.; NELLIE FEENEY and JOEL A.H. REEVES, Each Individually and as Next Friends to I.C. and L.C.; AMANDA and MICHAEL FELLOWS, Each Individually and as Next Friends to M.F. AND G.F.; ZUKI and ALEJANDRO FIGUEROA, Each Individually; MCKAYLA and DUSTIN FOTHERGILL, Each Individually and as Next Friends to B.F.; BRITTANY and AARON FRATES, Each Individually and as Next Friends to A.F. and V.F.; HIRAM and ANA GONZALEZ, Each Individually and as Next Friends to A.R.; LINDSAY and ADAM GRAHAM, Each Individually and as Next Friends to R.G.; VIRGININA and CALEB GUESS, Each Individually and as Next Friends to S.W., C.W., L.G. and G.G.; CARLOS and JESSICA HERNANDEZ, Each Individually and as Next Friends to H.H.; RICK HESTER, JR., Individually | CASE NO. _____ |

and as Next Friend to L.H.; CAITLYN and
BRANDON HURD, Each Individually and as
Next Friends to R.H., W-C.H., P.H., and H.H.;
CANDACE and MATTHEW JOHNSTON, Each
Individually and as Next Friends to A.J.; ALBERT
KING, JR. and NATALIE KING, Each
Individually and as Next Friends to Ja.K., and
Jak.K.; AUBRINA KING, Individually;
SA'NAYVIA KING, Individually; JESSA and
KIMO LEE, Each Individually and as Next
Friends to K.L. and J.L.; LARISSA ANNE and
REFUGIO MARTINEZ, Each Individually and as
Next Friends to CHRISTIAN MARTINEZ;
DANIEL MASTRIANI, Individually and as Next
Friend to S.M. and E.M.; CHRISTOPHER and
MEG MCCARTHY, Each Individually and as
Next Friends to A.M., J.M., and R.M.; DEREK
MCQUAIG and CHELSEA JOHNSON, Each
Individually and as Next Friends to K.M., M.M.,
and N.M.; JUSTIN and MORGAN MELFORD,
Each Individually and as Next Friends to Z.M. and
B.M.; BRANDY RAE and DANIEL MITCHELL,
Each Individually and as Next Friends to C.M.;
FIONN CROCKETT, Individually; KAYLA and
JACOB MOODY, Each Individually and as Next
Friends to B.M.; KAYLA and STEPHEN
O'BRIEN, Each Individually and as Next Friends
to M.O. and R.O; LESLIE and SEAN PHILLIPS,
Each Individually; ANNALYN POTTER-SOZA
and LEVI POTTER, Each Individually and as
Next Friends to M.P.; MARIE ROBBINS,
Individually; SAMANTHA and JOSHUA
RODAS, Each Individually; DARCY SANCHEZ,
Individually; CHRISTOPHER SANCHEZ,
Individually; SYMONE SANCHEZ, Individually;
JELENA SANCHEZ, Individually; LYRIC and
ANTHONY SEATON, Each Individually and as
Next Friends to T.S.; PAIGE and CODIE SECHI,
Each Individually and as Next Friends to C.S.;
JULIE and ANTRANIG SEROP, Each
Individually; LEILAH and JASON SMITH, Each
Individually and as Next Friends to Ba.S. and
Bo.S.; JOHN STEVENS, Individually; TAYLOR
CHASE and JESSICA STROUD, Each
Individually and as Next Friends to L.L.S. and
L.K.S.; SHANNA and DEREK TAYLOR, Each

Individually and as Next Friends to M.F.;
JENNIFER TELFER, Individually and as Next
Friend to D.T., and S.T.; DREYDEN TELFER,
Individually; KAYLA TIMPONE and DAVID
DANFORD, JR, Each Individually and as Next
Friends to L.A.D. and L.J.D; ASTRID TROTTER,
Individually and as Next Friend to Ki.T. and
Ka.T.; MEGHAN KELLY-VANDERHOOF and
RICHARD JAMES VANDERHOOF, Each
Individually; COREY JAMES VANDERHOOF,
Individually; KIAN DOLAN VANDERHOOF,
Individually; MATTHEW VIGREN and
KENDRA ULRICH, Each Individually and as
Next Friends to C.V.; JANNINE and JOSHUA
VOILES, Each Individually and as Next Friends to
P.V., L.V. and C.V.; KILEY ANN and SAMUEL
WINTER, Each Individually and as Next Friends
to T.W. and D.W.; MICHELE and WILLIAM
WYLIE, Each Individually,

      Plaintiffs,

v.

BALFOUR BEATTY COMMUNITIES, LLC;
SOUTHEAST HOUSING LLC; BALFOUR
BEATTY MILITARY HOUSING
MANAGEMENT LCC; BBC MILITARY
HOUSING – NAVY SOUTHEAST LLC; and
BALFOUR BEATTY INVESTMENTS, INC.,

      Defendants.

# COMPLAINT

## NATURE OF THE ACTION

1.      For decades, Balfour Beatty Communities, LLC, and entities it controls have

profited from a multi-billion-dollar corporate military housing monopoly that abuses, sickens, and

traumatizes American military families. Pleas by these families to repair and remediate water-

damaged, and mold- and pest-infested homes, have been met with inadequate maintenance

practices and corporate indifference or ineptitude. In hearings before the United States Congress, Balfour executives and other representatives of the military housing cartel have been repeatedly forced to explain why military families continue to live in dangerous housing. By 2021, Balfour pled guilty to federal fraud charges over falsification of military housing repair records. Even after the fraud plea, a United States Senate report cited Balfour for "ongoing abuses" of military families in 2022. This Complaint further details below the litany of consequences of Balfour's leasing and management of military housing.

2.      Military families residing in Balfour housing at Naval Air Station (NAS) Key West are among those whose health, safety and financial security were put at serious risk by Balfour, which for at least a decade has failed or refused to address housing problems there.

3.      As detailed below, military families at NAS Key West have had to live with appalling conditions in their Balfour housing. Ceiling collapses, water damage, faulty air conditioning, structural defects, pest infestations, and exposure to toxic mold and asbestos were all part of these families' day-to-day existence at their Balfour homes. Predictably, these unsafe, unhealthy, and hazardous living conditions led to devasting health consequences for these families. These health effects can be traced to the mold and other environmental hazards to which the families were exposed every day. Understandably, the continuous stress the families experienced as a direct result of having to live with both the deplorable housing conditions they were subjected to by Balfour and the effects these conditions had on their physical health and well-being have also led them to suffer severe mental anguish and emotional distress.

4.      These types of nightmarish experiences with Balfour housing are, regrettably, no outlier. These ordeals were shared by dozens of service members and their families who moved into Balfour housing at NAS Key West. The service men and women stationed at NAS Key West

2

cannot be mission ready if they and their families are sick, distressed, and forced to cope with appalling conditions at what should be their refuge—their homes.

5.     That anguish and distress has been greatly compounded and multiplied by Balfour's indifference to the families' plights as exemplified by Balfour's failure to resolve or even meaningfully address the unsafe and unhealthy (and indeed inhumane) conditions of the families' homes, much less take responsibility for those conditions. Despite repeated requests and complaints from the families, Balfour not only failed to adequately redress the problems at the homes but sought to downplay, minimize, and conceal the serious nature of those problems.

6.     Plaintiffs are primarily military members and family members who leased housing in military housing communities located in Key West managed and operated by Defendants.

7.     This case concerns the unsafe and unhealthy conditions that military families living at NAS Key West have been exposed to, not because of lack of funding or resources, but because of the systematic neglect by Defendants. When families reported dangerous mold, water damage, and other serious unsafe conditions and defects in their homes, Balfour repeatedly failed to remediate the issues, falsely marked work orders as complete, and exposed residents to pests and to toxic substances including mold, asbestos, and lead-based paint. The physical, emotional, and financial harm suffered by the families living in those houses was the foreseeable consequence of Defendants' actions and omissions.

8.     Plaintiffs' homes were owned and managed by Balfour, which has contracted with the United States to provide housing for the United States military and their families. Balfour has earned millions of dollars from leasing and managing military housing.

9.     Balfour has failed to take basic steps to ensure that the housing is free from exposure to hazardous material, including mold. The condition of the housing has jeopardized the

3

health and safety of our nation's military service members and their families. Balfour has also repeatedly and systematically failed to address these dangerous housing conditions.

10.     Balfour concealed the horrific conditions from unsuspecting service men and women and their families. When these conditions were discovered and reported, Balfour systematically failed to properly repair and remediate significant problems in the homes, including water damage, mold, structural defects, HVAC, plumbing issues, electrical problems, and the presence of lead paint and asbestos. Balfour misled Plaintiff families into believing that repairs were made, knowing that families living in the homes would likely suffer serious health problems as a result of the conditions.

11.     All families have the right to expect landlords to provide safe and habitable homes. But it is especially unacceptable, and unconscionable, to subject those who serve and protect our nation to these conditions. The military families who serve our nation deserve safe, healthy housing that supports their mission readiness. Instead, they have experienced persistent health problems, deteriorating living conditions, and a housing provider that prioritized profits over their wellbeing.

12.     In addition to having to endure these unendurable conditions, Plaintiffs have suffered personal injuries and health problems as a result of Defendants' acts and omissions. These problems include asthma and other respiratory issues, sinusitis, migraines, memory loss, brain fog, blurred vision, compromised immune systems, and other serious health issues. Those physical injuries have also led to extreme stress and emotional and psychological injuries such as depression and anxiety. Plaintiffs have been left with lasting health fears about their own and their loved ones' physical conditions and stress about their living conditions and Defendants' knowing failure to redress them.

4

**13.**     Plaintiffs accordingly file this suit to hold Balfour accountable for its negligence, gross negligence, its deceit and misrepresentations, and its utter failure to provide the safe and habitable housing that military families deserve, and that Balfour was contractually obligated to provide. Tort law is designed to provide the remedies that they seek—not just compensation for the harm, but also deterrence for the wrongdoers. Only with accountability will these conditions change.

## THE PARTIES

14.     Plaintiffs ANTHONIE TALARICO and JACKIE TALARICO are individuals who reside in Key West, Monroe County, Florida. ANTHONIE TALARICO is also the parent and/or legal guardian of A.T. and R.T., minor children.

15.     Plaintiffs ANTHONY ALGER and SARAH ALGER are individuals who reside in Key West, Monroe County, Florida. SARA ALGER is also the parent and/or legal guardians of Plaintiffs A.A. and E.A., minor children.

16.     Plaintiff ANTHONY BAILLIE and CEANNA BLOOM-LEDOUX are individuals who reside in Key West, Monroe County, Florida. ANTHONY BAILLIE is also the parent and/or legal guardians of Plaintiff I.B., a minor child.

17.     Plaintiff ASHLEY BASTIAN is an individual who resides in Key West, Monroe County, Florida. ASHLEY BASTIAN is also the parent and/or legal guardian of Plaintiffs W.B. and M.B., minor children.

18.     Plaintiffs LEE BRENNAN and MELISSA BRENNAN are individuals who reside in Key West, Monroe County, Florida. MELISSA BRENNAN is also the parent and/or legal guardian of Plaintiffs C.C., S.B. and C.B, minor children.

19.     Plaintiffs JAIME BROWN and LEVI BROWN are individuals who reside in Key West, Monroe County, Florida. JAIME BROWN is also the parent and/or legal guardian of

5

Plaintiff E.B., a minor child.

20.    Plaintiffs MAYRA BRYANT and KENYATTA BRYANT are individuals who reside in Key West, Monroe County, Florida. MAYRA AND KENYATTA BRYANT are also the parents and/or legal guardians of Plaintiffs K.D'W.B., K.D'S.B., K.A.B., and K.D.B., minor children.

21.    Plaintiffs WAYNE BUSH and LISA BUSH are individuals who reside in Key West, Monroe County, Florida.

22.    Plaintiffs BRANDON ROMANSKY and KRISTI ANN CAPUTO are individuals who reside in Key West, Monroe County, Florida. BRANDON ROMANSKY and KRISTI ANN CAPUTO are also the parents and/or legal guardians of Plaintiffs J.R. and C.R., minor children.

23.    Plaintiffs STEPHEN CATES SHARON CATES, and HANNAH CATES are individuals, who at relevant times to the Complaint, resided in Key West, Monroe County, Florida.

24.    Plaintiff ALLISON MARIE CHOCIANOWSKI is an individual who resides in Key West, Monroe County, Florida. ALLISON CHOCIANOWSKI is also the parent and/or legal guardian of Plaintiffs P.C., K.C. and A.C., minor children.

25.    Plaintiff SAVANNAH DEIS is an individual who at relevant times to the Complaint resided in Key West, Monroe County, Florida. SAVANNAH DEIS is also the parent and/or legal guardian of Plaintiffs A.E.D. and A.M.D., minor children.

26.    Plaintiffs KAYLEE JO DOWELL and GRANT DOWELL are individuals who reside in Key West, Monroe County, Florida. KAYLEE JO DOWELL is also the parent and/or legal guardian of D.D., a minor child.

27.    Plaintiffs JOEL HINKLE REEVES and NELLIE FEENEY are individuals who at relevant times to the Complaint resided in Key West, Monroe County, Florida. NELLIE FEENEY

6

is also the parent and/or legal guardian of Plaintiffs I.C. and L.C., minor children.

28.     Plaintiffs AMANDA FELLOWS and MICHAEL FELLOWS are individuals who reside in Key West, Monroe County, Florida. AMANDA FELLOWS and MICHAEL FELLOWS are also the parents and/or legal guardians of M.F. and G.F., minor children.

29.     Plaintiffs ALEJANDRO FIGUEROA and ZUKI FIGUEROA are individuals who reside in Key West, Monroe County, Florida.

30.     Plaintiffs MCKAYLA FOTHERGILL and DUSTIN FOTHERGILL are individuals who reside in Key West, Monroe County, Florida. MCKAYLA FOTHERGILL is also the parent and/or legal guardian of B.F., a minor child.

31.     Plaintiffs BRITTANY FRATES and AARON FRATES are individuals who reside in Key West, Monroe County, Florida. BRITTANY FRATES is also the parent and/or legal guardian of A.F. and V.F., minor children.

32.     Plaintiffs HIRAM GONZALEZ and ANA GONZALEZ are individuals who at relevant times to the Complaint resided in Key West, Monroe County, Florida. ANA GONZALEZEZ is also the parent and/or legal guardian of Plaintiff A.R., a minor child.

33.     Plaintiffs ADAM GRAHAM and LYNDSAY GRAHAM are individuals who at relevant times to the Complaint resided in Key West, Monroe County, Florida. The LINDSAY GRAHAM is also parent and/or legal guardian of Plaintiff R.G., a minor child.

34.     Plaintiffs VIRGINIA GUESS and CALEB GUESS are individuals who reside in Key West, Monroe County, Florida. VIRGINIA GUESS is also the parent and/or legal guardian of S.W., C.W., L.G., and G.G., minor children.

35.     Plaintiffs CARLOS HERNANDEZ and JESSICA HERNANDEZ are individuals who reside in Key West, Monroe County, Florida. CARLOS HERNANDEZ and JESSICA

7

HERNANDEZ are also the parents and/or legal guardian of H.H., a minor child.

36.     Plaintiffs RICK FRANK HESTER, JR. is an individual who resides in Key West, Monroe County, Florida. Also, RICK FRANK HESTER, JR., is the parent and/or legal guardian of L.H., a minor child.

37.     Plaintiffs CAITLYN HURD and BRANDON HURD are individuals who at relevant times to the Complaint resided in Key West, Monroe County, Florida. CAITLYN HURD is also the parent and/or legal guardian of R.H., W-C.H., P.H., and H.H., minor children.

38.     Plaintiffs CANDACE JOHNSTON and MATTHEW JOHNSTON are individuals who reside in Key West, Monroe County, Florida. CANDACE JOHNSTON is also the parent and/or legal guardian of A.J., a minor child.

39.     Plaintiffs ALBERT KING Jr. NATALIE KING, AUBRIANA KING and SA'NAYVIA KING, are individuals who at relevant times to the Complaint resided in Key West, Monroe County, Florida. ALBERT KING is also the parent and/or legal guardian of Ja.K., and Jak.K., minor children.

40.     Plaintiffs JESSA LEE and KIMO LEE are individuals who reside in Key West, Monroe County, Florida. JESSA LEE is also the parent and/or legal guardian of K.L., and J.L., minor children.

41.     Plaintiffs LARISSA ANNE MARTINEZ and REFUGIO MARTINEZ are individuals who reside in Key West, Monroe County, Florida. LARISSA ANNE MARTINEZ is also the parent and/or legal guardian of CHRISTIAN MARTINEZ, her adult disabled son.

42.     Plaintiff DANIEL MASTRIANI is an individual who resides in Key West, Monroe County, Florida. DANIEL MASTRIANI is also the parent and/or guardian of S.M. and E.M., minor children.

8

43.     Plaintiffs CHRISTOPHER MCCARTHY and MEG MCCARTHY are individuals who reside in Key West, Monroe County, Florida. MEG MCCARTHY is the parent and/or legal guardian of A.M., J.M., and R.M., minor children.

44.     Plaintiffs DEREK MCQUAIG and CHELSEA JOHNSON are individuals who reside in Key West, Monroe County, Florida. CHELSEA JOHNSON is also the parent and/or legal guardian of K.M., M.M., and N.M., minor children.

45.     Plaintiffs JUSTIN MELFORD and MORGAN MELFORD are individuals who reside in Key West, Monroe County, Florida. MORGAN MELFORD is also the parent and/or legal guardian of Z.M. and B.M., minor children.

46.     Plaintiffs DANIEL MITCHELL, and BRANDY RAE MITCHELL are individuals who at relevant times to the Complaint resided in Key West, Monroe County, Florida. DANIEL MITCHELL and BRANDI RAE MITCHELL are also the parents and/or legal guardians of C.M., a minor child.

47.     Plaintiff FIONN CROCKETT, is an individual who at relevant times to the Complaint resided in Key West, Monroe County, Florida.

48.     Plaintiffs KAYLA MOODY and JACOB MOODY are individuals who reside in Key West, Monroe County, Florida. KAYLA MOODY and JACOB MOODY are also the parents and/or legal guardians of B.M., a minor child.

49.     Plaintiffs KAYLA O'BRIEN and STEPHEN O'BRIEN are individuals who reside in Key West, Monroe County, Florida. KAYLA O'BRIEN and STEPHEN O'BRIEN are also the parents and/or legal guardians of M.O. and R.O., minor children.

50.     Plaintiffs SEAN PHILLIPS and LESLIE PHILLIPS are individuals who reside in Key West, Monroe County, Florida.

9

51.     Plaintiffs LEVI POTTER and ANNALYN POTTER-SOZA are individuals who reside in Key West, Monroe County, Florida. LEVI POTTER and ANNALYN POTTER-SOZA are also the parents and/or legal guardians of M.P., a minor child.

52.     Plaintiff MARIE ROBBINS is an individual who resides in Key West, Monroe County, Florida.

53.     Plaintiffs JOSHUA RODAS and SAMANTHA RODAS are individuals who at relevant times to the Complaint resided in Key West, Monroe County, Florida.

54.     Plaintiffs DARCY SANCHEZ, CHRISTOPHER SANCHEZ, SYMONE SANCHEZ, AND JELENA SANCHEZ are individuals who reside in Key West, Monroe County, Florida.

55.     Plaintiffs ANTHONY SEATON and LYRIC SEATON are individuals who at relevant times to the Complaint resided in Key West, Monroe County, Florida. ANYTHONY SEATON and LYRIC SEATON are also the parents and/or legal guardians of T.S., a minor child.

56.     Plaintiffs CODIE SECHI and PAIGE SECHI are individuals who at relevant times to the Complaint resided in Key West, Monroe County, Florida. CODIE SECHI and PAIGE SECHI are also the parents and/or legal guardians of C.S., a minor child.

57.     Plaintiffs ANTRANIG SEROP and JULIE SEROP are individuals who reside in Key West, Monroe County, Florida.

58.     Plaintiffs JASON SMITH and LEILAH SMITH are individuals who reside in Key West, Monroe County, Florida. JASON SMITH and LEILAH SMITH are also the parents and/or legal guardians of B.S. and B.S., minor children.

59.     Plaintiff JOHN STEVENS is an individual who resides in Key West, Monroe County, Florida.

10

60.     Plaintiffs TAYLOR STROUD and JESSICA STROUD are individuals who reside in Key West, Monroe County, Florida. TAYLOR STROUD and JESSICA STROUD are also the parents and/or legal guardians of L.L.S. and L.K.S., minor children.

61.     Plaintiffs DEREK TAYLOR and SHANNA TAYLOR are individuals who reside in Key West, Monroe County, Florida. DEREK TAYLOR and SHANNA TAYLOR are also the parents and/or legal guardians of M.F., a minor child.

62.     Plaintiffs JENNIFER TELFER and DREYDEN TELFER are individuals who reside in Key West, Monroe County, Florida. JENNIFER TELFER is also the parent and/or legal guardian of D.T. and S.T., minor children.

63.     Plaintiffs DAVID DANFORD, JR. and KAYLA TIMPONE are individuals who reside in Key West, Monroe County, Florida. DAVID DANFORD, JR., and KAYLA TIMPONE are also the parents and/or legal guardians of Plaintiffs L.A.D. and L.J.D., minor children.

64.     Plaintiff ASTRID TROTTER is an individual who at relevant times to the Complaint resided in Key West, Monroe County, Florida. ASTRID TROTTER is also the parent and/or legal guardian of Ki.T. and Ka.T., minor children.

65.     Plaintiffs RICHARD VANDERHOOF and MEGHAN KELLY-VANDERHOOF, COREY VANDERHOOF and KIAN VANDERHOOF are individuals, who reside in Key West, Monroe County, Florida.

66.     Plaintiffs MATTHEW VIGREN and KENDRA ULRICH are individuals who reside in Key West, Monroe County, Florida. MATTHEW VIGREN is also the parent and/or legal guardian of C.V., a minor child.

67.     Plaintiffs JOSHUA VOILES and JANNINE VOILES are individuals who reside in Key West, Monroe County, Florida. JOSHUA VOILES and JANNINE VOILES are also the

11

parents and/or legal guardians of P.V., L.V. and C.V., minor children.

68.    Plaintiffs SAMUEL WINTER and KILEY ANN WINTER are individuals who reside in Key West, Monroe County, Florida. SAMUEL WINTER and KILEY ANN WINTER are also the parents and/or legal guardians of T.W. and D.W., minor children.

69.    Plaintiffs WILLIAM WYLIE and MICHELLE WYLIE are individuals who reside in Key West, Monroe County, Florida.

70.    Defendant BALFOUR BEATTY COMMUNITIES, LLC ("BBC") is a Delaware limited liability company authorized to do business in Florida and with a principal office located at One Country View Road, Suite 100, Malvern, Pennsylvania. Upon information and belief, BBC is a subsidiary, either directly or through other wholly owned entities, of Balfour Beatty, PLC, a United Kingdom based company. BBC may be served with process through its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

71.    Defendant SOUTHEAST HOUSING LLC ("Southeast Housing") is a public-private venture between the United States Department of the Navy and BBC Military Housing – Navy Southeast LLC. Southeast Housing was created to lease the land, to assume title to the improvements, and to demolish, reconstruct, maintain, and operate the housing units at NAS Key West. Southeast Housing may be served with process through its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

72.    Defendant BALFOUR BEATTY MILITARY HOUSING MANAGEMENT LLC, ("BB Military Housing") is a Delaware limited liability company authorized to do business in Florida and with a principal office located at One Country View Road, Suite 100, Malvern, Pennsylvania. Upon information and belief, BB Military Housing is a subsidiary, either directly or through other wholly owned entities, of Balfour Beatty, PLC, a United Kingdom based

12

company. BB Military Housing may be served with process through its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

73.     Defendant BBC MILITARY HOUSING – NAVY SOUTHEAST LLC is a Delaware limited liability company with a principal office located at One Country View Road, Suite 100, Malvern, Pennsylvania. Defendant BBC MILITARY HOUSING – NAVY SOUTHEAST LLC is the managing member of Southeast Housing LLC. Upon information and belief, BBC is a subsidiary, either directly or through other wholly owned entities, of Balfour Beatty, PLC, a United Kingdom based company. BBC MILITARY HOUSING – NAVY SOUTHEAST LLC may be served with process through its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

74.     Defendant BALFOUR BEATTY INVESTMENTS, INC. is a Delaware limited liability company authorized to do business in Florida and with a principal office located at One Country View Road, Suite 100, Malvern, Pennsylvania. Defendant BALFOUR BEATTY INVESTMENTS, INC. is a subsidiary, either directly or through other wholly owned entities, of Balfour Beatty, PLC, a United Kingdom based company. BALFOUR BEATTY INVESTMENTS, INC., may be served with process through its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

75.     Plaintiffs will refer to the Defendants collectively as "Balfour," "Defendants," or "Balfour Defendants."

76.     The Balfour Defendants are joint tortfeasors, agents of the other, joint venturers, and/or engaged in a joint enterprise of leasing and managing military housing at NAS Key West, as well as the conduct, acts and omissions alleged herein. At all relevant times herein, there existed a unity of interest and ownership among Defendants, their predecessors, agents, and parents, such

13

that each entity is the alter ego of each other entity.

## JURISDICTION AND VENUE

77.     This Court has subject matter jurisdiction over this case pursuant to Article V, Section 5(b) of the Florida Constitution and Fla. Stat. § 26.012, as this is a civil action in which the amount in controversy exceeds $50,000, exclusive of interest, costs, and attorney's fees and is therefore not cognizable by county courts.

78.     Venue is proper in Monroe County, Florida pursuant to Fla. Stat. § 47.011, because the cause of action accrued in this county.

79.     This Court has personal jurisdiction over the Balfour Defendants because some or all of the acts or omissions complained of herein occurred at NAS Key West. Fla. Stat. § 48.193 (1)(a)2. Defendants have been "operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." § 48.193 (1)(a)1. Defendants have significant contacts with Florida such that they are subject to the personal jurisdiction of this Court. Defendants are also subject to personal jurisdiction because they have engaged in substantial, systematic, and continuous contacts with the State of Florida by regularly conducting and soliciting business in this State and by deriving substantial revenue from services provided to persons in this State.

## FACUTAL ALLEGATIONS

### The Military Housing Privatization Initiative

80.     In 1996, Congress enacted the Military Housing Privatization Act (MHPI). The MHPI was intended to improve the housing experience for service members and their families by allowing professional housing companies to bring their resources and experience to existing and new military housing.

81.     Under the MHPI, a private contractor is granted a long-term real property lease of

14

military base grounds. The military department generally conveys the existing homes on the leased land to the private contractor for the duration of the lease. The private contractor is responsible for constructing new homes and renovating existing homes and then leasing this housing. The MPHI contractor serves as landlord or owner of the home under the lease.

82.     The MHPI contractor is responsible for the design, development, management, operation, maintenance, renovation, and rehabilitation of the housing units.

83.     Typically, an MHPI contractor is a limited liability company composed of one or more private companies. In some cases, the military department may also be a member of the limited liability company.

84.     In return, the federal government provides the MHPI contractor with a share of initial funding and incentivized financing payments. Significantly, the federal government also typically directly pays to the MHPI contractor the Basic Allowance for Housing ("BAH") to which the service member who rents the home is entitled.

85.     Military families pay the BAH automatically through deductions from the service members' pay. The BAH rates are based on several factors, including the geographic location where the military member is stationed; the military member's pay grade; and whether the military member has dependents.

86.     The MHPI contractor typically collects the full amount of their residents' BAH regardless of the size or condition of the home.

87.     In addition, MHPI contractors receive performance incentive fees, payable upon approval of the military department, here the United States Navy. In order to obtain incentive fees, MHPI contractors are required to submit proof that they have satisfied performance objectives, which include, *inter alia*, maintenance of housing communities and resident satisfaction. The Navy

15

relies on these submissions in deciding whether to approve the payment of relevant performance incentive fees.

### MHPI Housing at NAS Key West

88.    In 1999, GMH Communities Trust (GMH) (now known as Balfour Beatty Military Housing LLC) was selected by the Department of Defense (DOD) to serve as a partner in the Military Housing Privatization Initiative. GMH became the private sector partner for the design, development, construction, renovation, and management of military housing at NAS Key West in Monroe County, Florida.

89.    In furtherance of the project, the Navy and GMH formed the joint public-private entity Southeast Housing.

90.    GMH and Southeast Housing became the lessor and manager of NAS Key West. The property management agreement states that the property is owned by Southeast Housing, which is a joint venture between the Navy and GMH and managed by GMH Military Housing.

91.    In the spring of 2008, Balfour Beatty, plc through Balfour Beatty Communities, acquired all of GMH's military housing assets, including NAS Key West, in a $350 million transaction.

92.    Upon information and belief, Balfour, either directly or through its subsidiaries or affiliates, Balfour Military Housing Management LLC, Southeast Housing LLC, and BBC Military Housing – Navy Southeast LLC, assumed all obligations, as the MHPI contractor, for on-base housing at NAS Key West.

93.    Defendant Balfour leases and manages over 43,000 homes across 55 United States military installations. This includes over 700 homes at NAS Key West.

94.    In addition to the rent paid by the housing occupants, the Navy pays Balfour for

16

management and maintenance of the property. These payments consist of (1) a month base fee, and (2) an incentive fee payment upon achieving certain performance criteria. The monthly base fee amounts to two percent of total rent revenue. When earned, the incentive fee payment equals up to another two percent of total rent revenue.

95.    To obtain the incentive fee payment, Balfour submits documentation and a statement that it satisfied the performance criteria, including objectives related to maintenance work orders and customer satisfaction.

96.    As the MHPI contractor, Balfour is obligated to comply with state and local building codes and is subject to Florida law.

**Military Housing Conditions Remained Poor Under the MHPI**

97.    While the MHPI has led to some improvements in military housing in some areas, it has also been plagued by reports of MHPI contractors, including Balfour, prioritizing profits over their obligation to provide safe and habitable housing to service members and their families.

98.    In 2019, military families testified to the Senate Armed Services Committee about their substandard military housing conditions. Issues included black mold, rodents, termites, lead paint, and broken HVAC units. They discussed their difficulties in getting the private housing partners to take their complaints seriously – even as black mold was growing out of walls, floors, and ceilings, and entire families were getting sick.

99.    Reports of mold were the number one tenant complaint in Marine Corps and Navy Housing.    Project    on    Government    Oversight,    October    24,    2024, https://www.pogo.org/investigations/operation-counter-mold-the-hidden-battle-in-military-homes.

100.    This issue is pervasive and well-documented. Reuters has dozens of articles

17

describing military families' dissatisfaction with housing and the health hazards found in military homes. Reuters, https://www.reuters.com/investigates/section/usa-military/

101.    In response to these concerns, the 2020 National Defense Authorization Act created a MHPI Tenant Bill of Rights. The Bill of Rights specifies that military families have the right to reside in a housing unit that meets applicable health and environmental standards. They have the right to reside in a housing unit that has working fixtures, appliances, and utilities. They have the right to receive property management services provided by a landlord that meet or exceed industry standards and that are performed by professionally and appropriately trained, responsive and courteous customer service and maintenance staff. *See* 10 U.S.C. sec. 2890.

102.    In March 2020, the Government Accountability Office (GAO) released its investigation of reports of mold and pest infestations in privatized military housing. The GAO found, among other things, that MHPI performance metrics do not offer meaningful information on housing conditions, and that maintenance data are not recorded reliably or consistently. United States Government Accountability Office, March 26, 2020, https://www.gao.gov/products/gao-20-281.

103.    In April 2022, the DoD released a report of medical conditions among privatized military housing residents. It estimated that 58 percent of housing units with open work orders had a condition that was unsafe or unhealthy. Significantly, DoD noted that hazards such as dampness or microbial growth, lead-based paint, and asbestos have the potential to cause adverse health effects, including asthma, cancer, and developmental delays. United States Department of Defense,  April  1,  2022,  https://media.defense.gov/2022/Dec/12/2003130831/-1/-1/1/DODIG-2022-078.PDF.    United    States    Congress,    January    1,    2021, https://www.congress.gov/116/plaws/publ283/PLAW-116publ283.pdf.

18

104.    These problems with military housing are ongoing. Since October 2022, there have been over 20,000 mold-related work orders in Army housing units alone. Project on Government Oversight, October 24, 2024, https://www.pogo.org/investigations/operation-counter-mold-the-hidden-battle-in-military-homes.

105.    In July 2024, the Congressional Research Service found that cumulative DOD contributions to the MHPI contractors to date total over $28 billion. Congressional Research Service, July 25, 2024, https://crsreports.congress.gov/product/pdf/R/R48137.

**NAS Key West Housing**

106.    NAS Key West housing is comprised of three neighborhoods: Trumbo Point, Truman Annex, and Sigsbee Park. Trumbo Point consists of officer housing with three and four-bedroom homes. Truman Annex consists of two-, three- and four-bedroom, single or duplex homes, many of which were built in 1962. Sigsbee Park consists of over 500 two- and three-bedroom townhouse units, many of which were built between 1962 and 1965.

107.    Military families sign leases directly with the MHPI contractor, in this case, Southeast Housing, which is listed as the "Owner" in the lease.

108.    Plaintiffs in this matter, except for the non-resident Figueroa Plaintiffs, signed leases with Southeast Housing.

109.    The property is managed by BB Military Housing.

110.    The leases are governed by the law of the State of Florida.

111.    The leases provide that prior to moving in or within three business days of moving in, tenants and representatives of Defendants are to conduct a walk-though inspection of the unit.

112.    Defendants are also required [by the Navy] to provide maintenance history for the preceding seven years, including mold and asbestos addenda

19

113.     The leases provide that Defendants have the responsibility to provide residents with premises that are in a habitable condition.

114.     Under the lease agreements, residents are not permitted to alter or repair the interior, exterior, or the structure of the premises in any way without the express written consent of Balfour. The MHPI Tenant Bill of Rights ("Tenant Bill of Rights") is expressly incorporated in many of the lease packets.

**Balfour's Prior Misconduct**

115.     In December 2021, Balfour Beatty Communities LLC pled guilty to committing major fraud against the United States and was ordered to pay $65.4 million in fines and restitution for misconduct relating to its MHPI programs and activities. Balfour also agreed to pay $35,200,000 to resolve a False Claims Act civil suit brought by the United States.

116.     The fraudulent activity included Balfour employees altering or manipulating work order data in order to falsely inflate Balfour's performance metrics to obtain performance incentive fees. Balfour employees also manipulated maintenance reports so that reports falsely indicated that Balfour had met maintenance goals.

117.     According to a Department of Justice press release issued on December 22, 2021: "Specifically, Balfour employees altered or manipulated data in property management software and destroyed and falsified resident comment cards to falsely inflate these metrics and, ultimately, to fraudulently induce the service branches to pay performance incentive fees which Balfour had not earned. As a result, according to court documents, there were lengthy and unnecessary delays in the resolution of maintenance issues to the detriment of servicemembers and their families. In addition, the military service branches were provided an inaccurate assessment of the state of Balfour's military housing communities and were unable to assess, and potentially correct,

20

Balfour's performance." Office of Public Affairs | Justice Department Announces Global Resolution of Criminal and Civil Investigations with Privatized Military Housing Contractor for Defrauding U.S. Military | United States Department of Justice.

118.    Then-Deputy Attorney General Lisa O. Monaco stated: "Instead of promptly repairing housing for U.S. servicemembers as required, Balfour lied about the repairs to pocket millions of dollars in performance bonuses[.] This pervasive fraud was a consequence of Balfour's broken corporate culture, which valued profit over the welfare of servicemembers."

119.    As part of the plea agreement, Balfour agreed to, *inter alia*, implement an ethics and compliance program to detect and deter violations of anti-fraud law.

120.    A year later, in April 2022, the Senate Permanent Subcommittee on Investigations released a Staff Report titled, *Mistreatment of Military Families in Privatized Housing*. The Subcommittee found "ongoing mistreatment of [] service members and their families and mismanagement by one of the largest private military housing companies – Balfour – that has put the health and safety of military families at risk."

121.    Among the key findings of the Subcommittee:

a.      "Balfour's staff at Ft. Gordon frequently ignored or delayed responding to urgent requests from military families to address conditions such as mold and roof leaks that threatened the families' health and safety."

b.      "The Subcommittee uncovered numerous examples of inaccuracies and omissions in Yardi, Balfour's internal work order data tracking system after 2019, when the company initially vowed to correct these problems."

c.      "A senior Balfour executive acknowledged to the Subcommittee that she was made aware of concerns of inaccurate and incomplete work order data at Ft. Gordon after

21

2019 but failed to ensure that Balfour took any action to investigate or correct these concerns, highlighting ongoing internal oversight weaknesses at Balfour."

        d.     The "Subcommittee found that as of late 2021, significant gaps in compliance procedures continued to exist at Balfour."

**In Key West, Balfour's improper maintenance led to dangerous living conditions**

122.    Despite multiple investigations and admissions of guilt by Balfour entities, Defendants continued the same dangerous course of conduct with respect to military housing at NAS Key West. Their improper maintenance exposed Plaintiffs to unsafe conditions. These unsafe conditions included exposing residents to toxic mold, asbestos, cockroach, termite, ant and other pest infestations, lead-based paint, and faulty wiring leading to electrocutions.

123.    Key West is a hot, humid region where mold grows rapidly in a home if any sort of leaks or water exposure occur. This makes it crucial to minimize moisture intrusion and respond immediately to wet materials—which Balfour failed to do again and again.

124.    Balfour employees ignored work orders even when residents called daily. When they did respond, Balfour technicians and contractors provided grossly subpar maintenance, and often made matters much worse. This included covering wet and drooping ceilings with shiplap and painting over mold rather than remediating it.

125.    Defendants' "maintenance" was often worse than subpar—it was dangerous. At times, Balfour employees opened up walls or ceilings to remove mold, in the process exposing the residents to asbestos.

126.    Balfour employees would also often close work orders early, at times without even entering the home. Employees sometimes uploaded photos of other homes to work orders to provide fraudulent evidence that the work order was completed

22

127.    Due to these conditions, Plaintiffs' homes were not reasonably fit to be lived in.

128.    Plaintiffs' homes would be considered unsafe or unfit under Key West's housing ordinances. Sec. 14-71; 14-75, *et seq*.

129.    The homes would be considered unsafe under the Monroe County housing code. Sec. 6-27.

130.    Across the military housing at NAS Key West owned and managed by Defendants, dozens of ceilings have caved in due to water damage. Even as residents warned of bubbling in the ceiling and signs of the ceiling caving in, Balfour employees continued to ignore concerns, leading to scenes at numerous homes such as this collapsed ceiling at the Potter Plaintiffs' home.



131.    Residents had to call multiple times for Balfour technicians to address ceiling concerns like these. Rather than addressing the root cause, Balfour employees instead often covered the areas with shiplap.

**Balfour knowingly exposed plaintiffs to toxic mold.**

132.    Balfour refused to follow its own mold policies, despite knowing very well that failure to do so leads to the growth of toxic mold.

23

133.    Environmental testing of Plaintiffs' homes revealed extremely elevated levels of toxic mold. Multiple homes tested positive for millions of spores per cubic meter of toxic mold (including Aspergillus/Penicillium) compared to outside controls.

134.    Mold is a fungus that reproduces by creating spores or microscopic cells. The spores and cells generate in large numbers and in chains that easily disperse into the air. Mold spores are generally invisible to the human eye. If adequate moisture is present when a mold spore lands on a suitable carbon-containing food source, such as the paper on drywall, furniture, clothing, and furnishings, it begins to grow. Mold can grow with liquid water and even simply due to the presence of high relative humidity in the air.

135.    When certain species of mold grow and process nutrients, they produce chemicals called mycotoxins and excretory chemicals. Mycotoxins are known to be used as chemicals in biological warfare. These microbes and their chemistries can be toxic to human cells and to cause immune and other organ inflammation, injury, and disease. Mycotoxins attack the nervous, respiratory, immune, and muscular systems and can enter the body either via ingestion, inhalation or direct skin contact and can lodge in the digestive tract, lungs, or brain. The mycotoxin aflatoxin is a listed human carcinogen.

136.    Toxic mold is known to harm human health. Medical and toxicology organizations agree that all occupants of moldy buildings have an increased risk for respiratory problems such as asthma.

137.    The National Institutes of Health (NIH) recognizes that mold is linked to asthma, cognitive problems such as memory loss and dizziness, mental health issues such as depression and anxiety, and immune effects and inflammation. Mold | National Institute of Environmental Health Sciences.

24

138.     The U.S. Centers for Disease Control and Prevention (CDC), the Institute of Medicine of the U.S. National Academy of Sciences, the American Academy of Allergy, Asthma & Immunology (AAAAI), and the World Health Organization (WHO) all agree that living or working in a building with mold-damaged building materials results in increased health risks to its occupants.

139.     Several mold species, including Stachybotrys, Aspergillus, Chaetomium, and Penicillium produce a wide variety of mycotoxins that are poisonous or toxic to virtually all persons who come in contact with them. Apart from being toxic, exposure to these microbes and chemistries is known to cause inflammation and immune system injury or dysfunction. Often, due to the latency periods between exposure and disease, one may be harmfully exposed, but the symptoms and disease may not be apparent for years. Medical monitoring is essential to deal with the effects of the chemical and microbial assault.

140.     Symptoms of mold and microbe exposure can include upper respiratory infections, coughs, sore throats, headaches, nausea, fibromyalgia, fatigue, hemorrhaging, convulsions, skin irritation, cancer, and organ and tissue damage including liver, kidney, neurological and immunological disease.

141.     For all these reasons, water damage and mold must be immediately and properly remediated. At a minimum, proper remediation requires the removal of the water damage and mold source. In general, the process includes (i) identification of the mold source; (ii) containment of the affected area; (iii) removal of the mold and contaminated materials under containment; (iv) cleaning the contaminated area; and (v) clearance testing.

142.     Defendants' grossly inadequate housing maintenance practices—and their conduct thereafter—have resulted in extraordinary injuries to the Plaintiffs, including illness, economic

injury, and emotional distress.

**Balfour knowingly exposed plaintiffs to asbestos**

143.    Cleaning up water damage and leaks related to mold often requires drilling into walls. Despite knowing of presumed positive asbestos-containing materials in the walls at Plaintiffs' homes, Balfour regularly drilled or cut into walls during mold remediation without following critically important asbestos abatement procedures.

144.    Balfour then sent letters to residents to not put screws in the ceilings because of asbestos. For plaintiff Michelle Wylie, this letter came after maintenance dropped her ceiling multiple times without containment.

145.    Balfour failed to follow its own asbestos policies. Balfour ignored warnings of presumed positive asbestos-containing materials and drilled into walls regardless.

146.    Asbestos is known to harm human health. Asbestos exposure increases the risk of serious lung diseases including lung cancer, mesothelioma, and asbestosis.

**Balfour knowingly exposed plaintiffs to lead-based paint.**

147.    Balfour hired Lead Consultants of America, Inc. to assess lead-based paint in NAS Key West housing. The lead consultants tested over 600 residences in 2008. Testing found that lead-based paint was present all over the subject buildings. It was found inside and outside homes on walls, ceilings, doors, windows, shelving, and baseboards.

148.    This report was submitted to Balfour in April 2012, giving Balfour ample warning to remediate lead-based paints in NAS Key West housing. Over a decade later, Balfour's homes continue to expose residents to lead-based paints.

149.    Lead is known to harm human health. It causes serious brain damage, cardiovascular problems, decreased kidney function, and developmental issues in children.

150.    Due to Defendants' grossly inadequate housing maintenance practices, multiple

26

Plaintiffs were exposed to lead from chipping and peeling paint, including paint that was caused to chip and peel because of water leaks and mold infestation.

### Family Narratives

### The Talarico Family

151.    The Talarico family, consisting of active-duty service member Anthonie Talarico, his wife, Jackie Talarico, and their children R.T. and A.T., moved into their Key West home, in November of 2021, after signing the lease with Balfour.

152.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Talarico family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Talarico family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Talarico family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

153.    After moving in, the family was exposed to water leaks from the water heater, HVAC, garbage disposal, and dishwasher. In addition, the Talarico family was exposed to mold growth though the walls and on the baseboard; mold in the drain lines and on walls of the HVAC room, asbestos, HVAC issues, extreme levels of moisture in the home, bubbling ceiling paint, and a ceiling cave-in their daughter's room. See, for example, visible mold growth on the Talarico

27

family's AC vent.



154.    Balfour failed to fix the leaks and properly remediate the mold. Instead of inspecting the problems with the HVAC unit, including persistent water leaks, Balfour suggested the Talarico's take a number of steps to solve the problem, none of which worked. When Balfour finally came out to look at the HVAC, 7 months later, Balfour agreed that the entire unit needed to be replaced. When Balfour maintenance technicians arrived to treat the mold in the master bathroom, they dismissed the suggestion there was a leak and just re-caulked the bathroom. Two weeks later, the mold reappeared.

155.    Later, during a subsequent remediation process, a contractor removed 65 square feet of asbestos containing materials and approximately 10 square feet of other material. During this process underlying leaks were discovered which confirmed that the previous leak-related work orders had been fraudulently marked as completed. The family was never asked to leave the home during the remediation. Contractors never set up a containment area in the home, despite the presence of the family, including the children, exposing the family to mold and asbestos

156.    It took two months for Balfour to respond to a dishwasher leak. They repaired the dishwasher but never treated the water damage behind the cabinets. Balfour adopted the same

28

approach after the HVAC leak. They fixed the unit but never treated the areas with water damage.

157.    During a Moisture Reading Inspection "MRI" inspection of their daughter's bedroom, Balfour's vendor began to throw mold covered fiberglass insulation all over their bedroom, citing that the mold was just dirt, without using containment or precautions. A mold inspector hired by the family determined that there was mold on the insulation.

158.    The Talarico family, who had always been healthy, noticed a clear change in their health. A myriad of symptoms including respiratory issues, muscle and joint pains and cramping, intestinal distress, nausea, headaches, and fevers started to become common for each family member. Jackie Talarico suffered from skin irritation. Her son developed a speech delay and struggled with fits of rage, making doctors question whether he had autism. Her daughter had frequent nosebleeds and nightly vomiting.

159.    When the Talarico family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Talarico family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

160.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, and structural damage to the Talarico family's home. Balfour knew or should have known that these representations were false and misleading. The Talarico family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

161.    Defendants concealed the conditions of their housing and failed to properly

29

remediate the problems despite repeated requests.

162.    The Talarico family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Alger Family

163.    Coast Guard Lieutenant Anthony Alger, his wife Sarah Alger, and their children, A.A. and E.A., moved into their Balfour home Mitscher Drive, Key West, FL, Trumbo Point, in April 2022, after signing a lease with Balfour. After moving in they began experiencing serious health and safety concerns due to persistent water intrusion, water damage, mold growth, pest infestations, and electrical hazards.

164.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Alger family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Alger family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Alger family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

30

165.    Anthony Alger repeatedly reported severe maintenance issues, particularly concerning water intrusion from the ceiling due to an overflowing AC drain line. Despite numerous work orders beginning in May 2022, Balfour failed to resolve these critical problems for over a year. Mold growth occurred around air vents and in water-damaged areas, but Defendants repeatedly dismissed these concerns, refusing to conduct proper testing or remediation.

166.    Balfour scheduled termite treatments inconsistently and often closed work orders without clear confirmation of completed work. On June 1, 2022, a work order for biological growth was cancelled, with notes that the order was placed accidentally. An initial work order regarding a ceiling leak in the master bathroom was reported on June 4, 2022, and marked completed on July 7, 2022, however by October of that year, visible water damage and cracking in the kitchen ceiling confirmed the issue had not been properly resolved. Balfour did not perform the MRI of the damaged ceiling. Electrical hazards, including exposed wiring and malfunctioning outlets, further compromised the family's safety.

167.    On October 3, 2023, Lt. Alger emailed the Balfour management team with detailed concerns about continued mold, water damage, infestation, and the ongoing hazardous conditions in the home. Despite this, a November 16, 2023, work order showed leaks in the home remained.

168.    These unsafe living conditions led to significant health issues for the entire family. Anthony Alger suffered vertigo and an ischemic event in his brain. Sarah Alger experienced cysts in her breast, which were discovered in June 2022. Both she and the children suffered chronic headaches, skin issues, and respiratory problems.

169.    When the Alger family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Alger family relied on Balfour's representation when signing the lease. Had they

31

known that the Balfour home was not habitable, they would not have signed the lease.

170.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Alger family's home. Balfour knew or should have known that these representations were false and misleading. The Alger family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

171.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

172.    The Algers suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Baillie Family

173.    Anthony Baillie, Ceanna Bloom-Ledoux, and their child I.B., moved into 1106A Truxton Road in the Sigsbee Park housing community at Naval Air Station Key West in January 2022, after entering into a lease agreement with Balfour Beatty.

174.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Baillie family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Baillie family suffered significant harm. Balfour

32

perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Baillie family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

175.   Soon after moving in, the Baillie family began experiencing serious issues within the home. They observed ants and debris entering through damaged concrete, their HVAC system failed without proper repair, and repeated smoke detector malfunctions were traced to water infiltration.

176.   Mold was later discovered in both linen closets and in the closet of their young daughter I.B.'s room, where the wall began to cave in. Additional signs of mold were observed in the dining room, kitchen entrance, and other structural areas. The family reported these issues to Balfour Beatty, but responses were either delayed, incomplete, or entirely ineffective.

177.   Despite a walkthrough with Balfour Beatty and Navy Housing in January 2025 confirming excessive moisture and the need for wall and ceiling replacements, the repairs that followed were superficial. The Baillies were displaced from their home for one week in February 2025, during which time Balfour Beatty claimed to conduct repairs. However, upon their return, many of the original issues remained unresolved, with additional mold discovered and damaged areas untouched.

178.   Throughout their tenancy, Balfour Beatty concealed the true extent of the unsafe conditions and failed to provide effective remediation, despite repeated and timely requests from the Baillie family.

179.   As a result of their prolonged exposure to mold and hazardous living conditions,

33

Anthony Baillie developed chronic flu-like symptoms, brain fog, and fatigue. Ceanna Bloom-Ledoux experienced a persistent cough, breathing difficulties, and extreme tiredness. Their daughter suffered from respiratory issues, ongoing coughing, nightmares, and irritability.

180.    The Baillies were ultimately forced to leave the home they had been displaced from in February and permanently moved out in March 2025. Upon vacating the residence, they discovered mold contamination in their belongings and structural deterioration, including rusted nails and water bubbles in the ceiling. They were forced to discard of numerous items of clothing and furniture due to contamination.

181.    When the Baillie family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Baillie family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

182.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Baillie family's home. Balfour knew or should have known that these representations were false and misleading. The Baillie family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

183.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests

184.    The Baillie family suffered serious health problems and economic damages (including loss of personal property and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home,

34

Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## The Bastian Family

185.    Ashley Bastian and her children, W.B. and M.B., moved into their Balfour home at 1111A Truxton Road in July 2023 after signing a lease with Balfour. They immediately experienced serious health and safety concerns due to mold contamination and exposure.

186.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Bastian family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Bastian family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Bastian family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

187.    Despite complaints and maintenance requests, Defendants failed to properly address the hazards, with maintenance technicians claiming, for example, that the mold observed in the HVAC vents was merely dust.

188.    These unsafe living conditions led to significant health issues for each member of the family, who experienced, among other problems, unexplained persistent allergy-like symptoms with little to no relief.

189.    On September 12, 2024, while in the home, a technician acknowledged the

35

growth's presence and referred to it as "that 'M' word we're not supposed to say." Yet by September 23, 2024, no action had been taken, with the Bastian family being told to simply "be patient." In an October 30, 2024, email Navy Housing official Jeffrey Fluker questioned whether work had actually been performed on the home, as the corresponding work order had been marked closed on September 16, 2024.

190.    The family has been forced to remain in unsafe conditions as Balfour officials have continually refused to acknowledge the severity of the problems and have offered no accountability despite clear evidence of neglect and misconduct.

191.    When the Bastian family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Bastian family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

192.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Bastian family's home. Balfour knew or should have known that these representations were false and misleading. The Bastian family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

193.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

194.    The Bastians suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home,

Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## The Brennan Family

195.    Melissa and Lee Brennan and their children, C.C., S.B., and C.B., moved into their Balfour home at 2034 Halsey Drive in September 2022, after signing a lease with Balfour. After moving in, the Brennan family experienced serious health and safety concerns due to mold contamination and exposure.

196.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Brennan family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Brennan family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Brennan family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

197.    The Brennans have experienced repeated AC leaks, which caused significant water damage in the kitchen and bedroom. Balfour repeatedly failed to follow up on work orders. On September 10, 2023, the family reported these issues to the maintenance team, and while a technician initially responded, he placed a fan on the saturated carpet and never returned. The Brennan family continued to file work orders for unresolved HVAC failures, dehumidifier malfunctions, and mold contamination. Balfour repeatedly failed to follow up on work orders. On

37

September 23, 2024, the Brennan family submitted another work order, stating that previous requests had been ignored. When a technician arrived on September 24, 2024, he dismissed concerns about mold, and claimed an MRI test was needed, but provided no follow up.

198.    In August 2024, a maintenance technician finally acknowledged the problem and admitted the family had been overlooked for months. Even after Balfour claimed to have addressed this issue, the HVAC system continued leaking, and mold concerns remained. Defendants dismissed visible mold as "dirt" and merely painted over affected areas.

199.    The family suffered significant health impacts, including chronic headaches, brain fog, eye irritation, worsened anxiety, eczema, and frequent illnesses. Despite their efforts to seek proper remediation, Balfour's neglect led to continued exposure to hazardous conditions.

200.    When the Brennan family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Brennan family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

201.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Brennan family's home. Balfour knew or should have known that these representations were false and misleading. The Brennan family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

202.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

203.    The Brennans suffered serious health problems and economic damages (including

38

loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Brown Family

204.     Levi Brown, his wife Jaime, and their child E.B., moved into their Balfour home at 1076A Farragut Road in April 2022, after signing a lease with Balfour. For over two years, they experienced ongoing maintenance issues with Defendants, including mold and moisture damage.

205.     Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Brown family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Brown family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Brown family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

206.     On August 5, 2024, the Brown family discovered visible mold, moisture damage, and a mildew odor in their linen closet, along with a soft spot in the master bedroom wall. Jaime Brown immediately submitted a maintenance request, and a Balfour maintenance technician visited the home the same day, taking photos but failing to provide a timeline for repairs.

207.     On August 8, 2024, Balfour and Navy Housing representatives Lee Tysinger and

39

Dawn Kissell conducted an MRI, to determine the level of moisture in the home's building materials. The MRI confirmed high moisture levels in the linen closet, master bedroom wall, and bathroom shower. However, Balfour informed the Browns that repairs would be delayed due to a backlog and the need for external contractors. Despite multiple follow-up emails from Jaime, Balfour failed to provide clear updates or a repair schedule.

208.   The Brown family remained in a home contaminated with mold and asbestos, receiving inconsistent and delayed responses from BBC. Their ongoing exposure to hazardous conditions caused prolonged stress and uncertainty, with no clear resolution in sight.

209.   On September 12, 2024, an email between Housing Director Charity Coffman and Balfour management representatives Arlen Dieguez and Courtney Collier detailed the family's desire to move out of the home due to work orders in the home being completed without proper remediation and the need for asbestos remediation.

210.   When the Brown family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Brown family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

211.   Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Brown family's home. Balfour knew or should have known that these representations were false and misleading. The Brown family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

212.   Defendants concealed the conditions of their housing and failed to properly

40

remediate the problems despite repeated requests.

213.    The Browns suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## The Bryant Family

214.    Mayra and Kenyatta Bryant, along with their four children, K.A.B., K.D.B., K.D'W.B., and K.D'S.B., moved into their Balfour home at 1231B Stephen Mallory Rd. in August 2022. Shortly after, they began experiencing severe issues concerning the condition of their home, which Balfour failed to properly address.

215.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Bryant family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Bryant family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Bryant family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

216.    Moisture damage appeared in the ceilings and walls, leading to a crack in the ceiling and leaks from the AC unit in their converted master bedroom.

41

217.    The Bryants filed multiple work orders. Balfour failed to resolve the issues, offering vague explanations rather than repairs.

218.    At one point, Mayra's husband, Kenyatta, accidentally put his hand through a weakened wall, exposing mold growth that was later confirmed by a maintenance worker.

219.    The family endured escalating health problems. In August 2023, Mayra was diagnosed with Graves' disease and hyperthyroidism, suffering rapid weight loss, an alarmingly high resting heart rate, and later extreme weight gain. Her husband endured an unexplained, immobilizing illness lasting over a month. Their children exhibited symptoms ranging from speech difficulties and breathing issues to persistent skin conditions and behavioral changes.

220.    Chipped lead paint throughout the home raised further safety issues. The family's attempts to secure maintenance were repeatedly dismissed, leaving them exposed to hazardous living conditions. As their health has deteriorated, they have continued to face ongoing stress and uncertainty, with no clear resolution or accountability from Balfour.

221.    When the Bryant family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Bryant family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

222.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Bryant family's home. Balfour knew or should have known that these representations were false and misleading. The Bryant family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

42

223.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

224.    The Bryants suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Bush Family

225.    Wayne Bush and his wife Lisa Bush moved into their Balfour home at 2056 Halsey Drive on August 24, 2021, after signing the lease with Balfour. The Bush family has experienced mold due to water damage in their home.

226.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Bush family, concealing serious safety hazards and defects. A work order history of the home showed that prior tenants had complained of mold in October 2019 and in December 2020. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Bush family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Bush family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

43

227.    Upon their August 2021 move in, the family identified mold and water damage and reported the issues to Balfour. Despite raising concerns, Balfour failed to take meaningful action to remediate the hazards.

228.    Additionally, the Bush family began experiencing severe health issues, which they later suspected were caused by environmental hazards in their residence. Wayne experienced unexplained sickness, low blood platelets, anxiety, and recurring nightmares, while Lisa suffered from severe allergies, migraines, kidney stones, and ultimately was diagnosed with breast cancer while living in the home.

229.    When the Bush family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Bush family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

230.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Bush family's home. Balfour knew or should have known that these representations were false and misleading. The Bush family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

231.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

232.    The Bushes suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home,

44

Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## The Caputo Family

233.     Brandon Romansky and his wife Kristi Caputo, with their two children, J.R. and C.R., moved into their Balfour home at 1236A David Porter Rd in September 2022, after signing the lease with Balfour. After moving in, family was exposed to mold, insect infestation, structural issues, and leaks.

234.     Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Caputo family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Caputo family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Caputo family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

235.     Upon moving in, Kristi Caputo noticed mold in the shower and reported the mold, but Balfour did not take immediate action. The family encountered significant structural and maintenance issues, including leaks, deteriorating floor panels, termite droppings, and a ceiling hole discovered in October 2024. Balfour initially downplayed the mold concerns, but a third-party inspection on November 19, 2024, confirmed the presence of mold.

236.     On March 4, 2025, industrial hygienist, Mike Posson, hired by Defendants,

45

inspected the home. During the inspection, Mr. Posson examined two attic spaces and the area between the two bathrooms. Upon reviewing the mold pictures provided by the family, he dismissed concerns, claiming the visible mold was merely "black paper" and that the area was simply "dirty" rather than contaminated. He further stated that the space between the bathrooms appeared to be in good condition, downplaying any potential issues. Despite these assurances, Mr. Posson acknowledged he had been hired by Defendants and therefore could not share any findings directly with the family.

237.    The family suffered significant health issues due exposure to mold and other environmental hazards, including headaches, fatigue, brain fog, respiratory symptoms, and fertility complications. Kristi endured extensive medical testing, including ultrasounds and bloodwork, as she searched for explanations for her worsening health. A mycotoxin panel revealed mold derivatives in her body.

238.    Facing ongoing uncertainty and unaddressed hazards, the family decided to leave the home by March 2025. The failure of Balfour to adequately address the mold and maintenance concerns left them with lasting health fears and stress about their living conditions.

239.    When the Caputo family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Caputo family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

240.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Caputo family's home. Balfour knew or should have known that these representations were false and misleading. The Caputo family relied on these representations and stayed in their home

46

waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

241.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

242.    The Caputos suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Cates Family

243.    Stephen and Sharon Cates, along with their adult daughter Hannah, moved into their Balfour home at 1234A David Porter Road in March 2020, after signing the lease. After moving in, they began noticing unsafe and unhealthy conditions, including leaks, soft walls, and recurring mold growth.

244.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Cates family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Cates family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Cates family, who were left with no choice

47

but to continue living in dangerous conditions with no apparent path to resolution.

245.    The bathroom ceiling developed dark stains due to moisture, which Balfour attempted to conceal by painting over them. When the stains reappeared, Balfour performed repeated patchwork instead of addressing the underlying issue. Eventually, the entire bathroom ceiling had to be replaced. Other persistent issues included loose hardware, failing sink piping, and moisture-compromised walls.

246.    All three family members experienced respiratory symptoms, with Hannah Cates suffering the most severe health effects. Approximately one month after moving in, she developed chronic coughing, congestion, and puffy eyes. Although Hannah Cates tested negative for COVID-19, her symptoms became debilitating, forcing her to leave her job at Balfour's leasing office.

247.    When the Cates family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Cates family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

248.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Cates family's home. Balfour knew or should have known that these representations were false and misleading. The Cates family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

249.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

250.    The Cates family suffered serious health problems and economic damages

48

(including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## The Chocianowski Family

251.    Allison Chocianowski and her children, P.C., K.C., and A.C., have lived in a Balfour home at 1217A Gilmore Drive, Sigsbee Park, NAS Key West since July 2022 after signing a lease with Balfour. After moving in they experienced serious health and safety concerns due to persistent water damage, mold growth, structural defects, and air quality issues.

252.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Chocianowski family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Chocianowski family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Chocianowski family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

253.    Despite being aware of the history of moisture damage in this home, Defendants leased the home to the Chocianowski family without disclosing the history. The family was

49

exposed to mold caused by moisture damage and continuous leaks.

254.    In May 2023, the family reported a saturated wall and leaks from their dining room window any time it rained. By September mold was reported on the split HVAC unit in that same area. The family hired a local vendor to conduct independent testing. Unusually high mold growth was discovered on the air handler of the HVAC system.

255.    Defendants repeatedly told the Chocianowski family that the home was safe, even as conditions worsened. The family was subsequently displaced for two weeks while their HVAC unit was replaced, and multiple walls and ceilings were claimed to be assessed.

256.    On October 31, 2023, during Halloween preparations, the family uncovered extensive mold damage when removing picture frames from the walls—the backs of the frames were entirely covered in mold. They immediately called in a maintenance request, and Balfour responded and completed an MRI reading. However, instead of addressing the underlying cause, Balfour claimed that hanging items on the walls caused the mold to appear.

257.    When Balfour maintenance returned a week later, they conducted another MRI, which registered just one point below their threshold. The home was declared safe. Meanwhile, the moisture problem persisted, leading to ongoing leaks through the same wall.

258.    Repeated inspections revealed that the roof contained an open hole left from a failed solar panel installation, which had been collecting water and causing puddles in the living room. Despite multiple maintenance visits, the leaks continued, prompting yet another roof inspection, during which a roofer confirmed that the padding under the solar panels was missing, exacerbating the issue.

259.    Over the next year, the home was subjected to multiple, yet the necessary repairs were delayed and dismissed. It was only in January 2025—more than a year after the initial

50

discovery of mold—that Balfour finally agreed to replace the damaged wall.

260.    These unsafe living conditions led to significant health issues caused by living in the Balfour house. Allison suffered from chronic respiratory problems, headaches, sleep disturbances, and skin irritation. The children, P.C., K.C., and A.C., developed severe respiratory conditions, intestinal issues, and, in K.C.'s case, lung and heart complications. The illnesses were so severe that doctors monitored their condition closely, and specialists at Nickolas Children's Hospital and a Miami lung clinic became involved in their care.

261.    When the Chocianowski family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Chocianowski family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

262.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Chocianowski family's home. Balfour knew or should have known that these representations were false and misleading. The Chocianowski family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

263.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

264.    The Chocianowski family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at

51

their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## The Danford-Timpone Family

265.    David Danford and Kayla Timpone, along with their children L.A.D. and L.J.D., moved into 1166B Gilmore Dr, Key West, FL, in Balfour housing at Sigsbee Park in August 2023, after signing the lease with Balfour. Upon moving in, they immediately faced hazardous living conditions, including severe mold contamination, asbestos exposure, water damage, structural defects, insect infestations, and ongoing HVAC failures.

266.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Danford-Timpone family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Danford-Timpone family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Danford-Timpone family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

267.    The Danford-Timpone home's ceilings cracked, buckled, and were hastily braced with plywood, exacerbating insect infestations. The HVAC system leaked persistently, leading to moisture buildup and further mold growth.

52

268.    The family submitted multiple maintenance requests, but Balfour repeatedly failed to resolve the issues, instead making temporary fixes that did not address the root problems. Despite continuous complaints, work orders were closed without resolution, leaving the family in an increasingly unsafe environment.

269.    Preventative maintenance, supposedly performed, was later revealed to have been falsely recorded. When confronted, Balfour management acknowledged labor errors in logging technician work but took no corrective action.

270.    These hazardous conditions in the housing took a severe toll on the family's health. Kayla developed chronic respiratory issues, severe eczema, and debilitating joint pain. By December 2024, she was diagnosed with Kienbock's Disease, Carpal Tunnel Syndrome, and DeQuervain's Tenosynovitis, resulting in necrotic wrist bones, requiring multiple surgeries, and leaving her with a lifelong disability. Their son suffered from recurring hives, eczema, and nasal congestion, while their daughter endured persistent headaches and frequent illness. David experienced respiratory distress, skin problems, hair loss, and depression. The family's quality of life deteriorated. Fearing for their safety and unable to obtain adequate assistance from Balfour, the family was forced to relocate in October 2024 at their own expense.

271.    When the Danford-Timpone family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Danford-Timpone family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

272.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage

53

to the Danford-Timpone family's home. Balfour knew or should have known that these representations were false and misleading. The Danford-Timpone family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

273.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

274.    The Danford-Timpone family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Deis Family**

275.    Savannah Deis and her children A.E.D. and A.M.D. moved into military housing at 1250B David Porter Road, Sigsbee Park, in August 2021, after signing a lease with Balfour. After moving into their Balfour home, they began experiencing serious health and safety concerns due to structural hazards, mold exposure, lead contamination, and unaddressed maintenance issues.

276.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Deis family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Deis family suffered significant harm. Balfour

54

perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Deis family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

277.   Despite being aware of persistent insect infestation, structural hazards, mold exposure, lead contamination, and unaddressed maintenance issues, Balfour leased the home to the Deis family without revealing these issues and health risks. Upon moving in, the Deis family discovered thousands of dead ants, which Balfour dismissed as "sawdust."

278.   Despite making repeated complaints and maintenance requests, Balfour failed to properly address the hazards. Work orders were either closed without resolution or inadequately resolved, and the family was repeatedly told their home was safe, even as conditions worsened. Balfour also falsely claimed there was no lead in the paint, despite medical evidence confirming acute lead poisoning in her young son's bones.

279.   When the Dies family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Dies family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

280.   Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Dies family's home. Balfour knew or should have known that these representations were false and misleading. The Dies family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that

55

Balfour would not properly repair and remediate the home they would not have done so.

281.   Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

282.   The Dies family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Dowell Family

283.   Grant Dowell, wife Kaylee Dowell, and their child D.D., live at 1072B Farragut Road since August 30, 2023, after signing a lease with Balfour. After moving they began experiencing serious health and safety concerns due to persistent water intrusion, water damage, mold growth, and toxic exposure.

284.   Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Dowell family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Dowell family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Dowell family, who were left with no choice

56

but to continue living in dangerous conditions with no apparent path to resolution.

285.    Mold was rampant in the bathroom grout, under the sinks and around the vents. Despite numerous complaints and maintenance requests, Balfour failed to properly address the hazards. A Balfour representative inspected under the kitchen sink, dismissed staining as residue from cleaning chemicals, and painted over the wet spot present. Within 24 hours the spot reappeared, confirming an active leak. Balfour responded by painting over it for a second time rather than addressing the source, assuring the family the growth they were observing was harmless. Water damage caused by a flooded HVAC unit was never remediated.

286.    The family was eventually offered a newly renovated home, only to discover HVAC leaks within days, followed by roof leaks within weeks.

287.    The health impacts of the Dowell family's prolonged exposure to the unsafe conditions in their Balfour home were severe. The family suffered from recurring illnesses. Kaylee, pregnant in 2024, began losing hair in clumps, and her scalp was covered in painful sores. D.D., once a healthy toddler, developed respiratory issues, rashes, and behavioral changes. Both Grant and Kaylee's mental health suffered. Grant started experiencing depression. In December 2024, Kaylee gave birth to their second child, K.D., who was diagnosed with birth defects laryngomalacia and sacral dimple.

288.    The strain extended beyond physical and mental health, as relocation costs and property damage drained their savings. Once financially stable, the military family found themselves in a permanent state of struggle after living in military housing, now living paycheck to paycheck.

289.    When the Dowell family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and

misleading. The Dowell family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

290. Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Dowell family's home. Balfour knew or should have known that these representations were false and misleading. The Dowell family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

291. Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

292. The Dowell family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Feeney Family

293. Joel Hinkle Reeves and Nellie Feeney along with their two children, I.C. and L.C., moved into 1176A Gilmore Dr. on July 26, 2021, after signing a lease with Balfour. After moving in they began to experience serious health and safety concerns due to water leaks, water intrusion, water damage, mold growth, and insect infestations.

294. Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this

critical information when leasing the home to the Feeney family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Feeney family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Feeney family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

295.    After moving in the Feeney family quickly encountered significant safety and maintenance concerns that ultimately defined their three-year ordeal. The plumbing system leaked continuously, leading to excessive moisture buildup, mold growth, and persistent disrepair. The home's poor insulation and ventilation systems exacerbated the problem caused by the plumbing leaks, allowing mold to spread along the electrical outlets and walls. The family discovered insect infestations in the house. Even as the family documented and reported these issues to Balfour maintenance and management personnel, repairs were either delayed or inadequately addressed.

296.    The family experienced a sharp decline in their health after moving into their Balfour home. Within weeks, Nellie was suffering from severe anxiety attacks, while Joel developed chronic migraines. Their children were enduring frequent fevers, respiratory issues, and developmental stagnation. One of their sons, previously excelling academically, suddenly struggled in school, prompting concerns about environmental toxicity affecting his cognitive function.

297.    By Fall 2023, the family's health complications escalated. One child required an emergency appendectomy, while the entire family suffered from recurring infections, chronic

59

fatigue, and unexplained neurological symptoms. Both Nellie and her son were experiencing ocular migraines and blackouts, conditions they had never encountered before.

298.    Medical visits became routine. Doctors prescribed antibiotics, pain management treatments, and neurological evaluations, yet their conditions persisted. In April 2024, an optometry and neurological evaluation confirmed that environmental factors were likely triggering these health issues. The brain scans showed no hereditary causes, reinforcing concerns that exposure to mold, chemical adhesives, and poor air quality played a role in their declining health.

299.    In April 2024, Balfour announced plans to brace the ceilings in the home, claiming it was necessary for structural integrity. When Nellie requested proper asbestos testing and permits, Balfour failed to provide documentation. An inquiry with the Florida Environmental Protection Agency (EPA) revealed that no asbestos removal permit had been filed.

300.    After relocating from their Balfour home in May 2004, the family experienced immediate improvements in their health. The constant migraines, infections, and neurological symptoms subsided, confirming that their prior living conditions played a significant role in their suffering.

301.    When the  Feeney family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Feeney family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

302.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Feeney family's home. Balfour knew or should have known that these representations were false and misleading. The Feeney family relied on these representations and stayed in their home

60

waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

303.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

304.    The Feeney family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Fellows Family

305.    Active Duty servicemember Michael Fellows, his wife Amanda Fellows, along with their children M.F. and G.F., moved into their Balfour home at 2043 Halsey Drive in July 2021, after signing the lease with Balfour. After moving in, they encountered severe maintenance issues, including mold growth, persistent leaks, and falsified work orders.

306.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Fellows family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Fellows family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide

61

financial compensation, or offer meaningful assistance to the Fellows family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

307.    Shortly after moving in, water intrusion in the upstairs bathrooms led to rapid mold growth in the Fellows home. Balfour assured the family that an attic inspection had been completed, but no records were provided. Instead of properly treating the mold, Balfour applied a surface cleaner and assigned an unlicensed contractor to patch drywall. A year later, the same problem recurred, proving the initial repairs were ineffective. Further mold contamination emerged in June 2024, affecting air vents in all bedrooms. Balfour again failed to provide adequate remediation. Security footage later revealed that a technician had lied about completing necessary work. Balfour knew that it did not properly remediate the mold and mislead the Fellows family into believing that the house was safe, habitable, and adequately repaired.

308.    As Amanda's health deteriorated, she sought medical treatment for symptoms consistent with mold exposure, including brain fog, fatigue, and dizziness. Her husband and son suffered from chronic allergy symptoms while inside the home. By February 2025, the home had become uninhabitable, forcing them to relocate.

309.    When the Fellows family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Fellows family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

310.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Fellows family's home. Balfour knew or should have known that these representations were false and misleading. The Fellows family relied on these representations and stayed in their home

62

waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

311.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

312.    The Fellows suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Fothergill Family**

313.    Active Duty servicemember Dustin Fothergill, along with his wife McKayla, and their child B.F., moved into their Balfour home at 1239B David Porter Road in July 2023, after signing a lease with Balfour. Within months, they identified water damage, ceiling cracks, and structural concerns. Despite immediate reporting to Balfour, initial maintenance visits dismissed the severity of the issues. By mid-2024, the damage had worsened, with visible bubbling and soft spots appearing in the ceiling.

314.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Fothergill family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Fothergill family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root

63

causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Fothergill family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

315.     On July 19, 2023, days before their scheduled move in, a Balfour representative, Alexa Mills, informed the family that new floors had been installed in the home and that Defendants' maintenance team, and a subsequent vendor, inspected the drywall to ensure there were no potential moisture-related issues within the home.

316.     Despite this shortly after moving in on July 28, 2023, the family identified water damage, ceiling cracks and structural concerns. Soft spots and visible bubbling appeared in the ceiling. On November 10, in response to a community wide email about ceiling issues and moisture concerns in homes, the family discovered and reported a crack in their dining room ceiling. That day, a Balfour maintenance technician arrived. He inspected the ceiling and claimed the crack was of no concern. Later, maintenance returned to inspect the walls in each room. The family was once again assured that the home was in safe condition.

317.     Later, the family discovered bubbling and soft spots in the ceiling of their bedroom and a growing crack in their son's room. A maintenance technician was sent out the same day but stated there was nothing he could do and that he was only there to observe the degree of severity. The family was told they would hear back in three days for an MRI, but no follow-up occurred.

318.     The family ultimately relocated to a hotel while Balfour purported to make repairs to the home and conducted a ceiling abatement in August 2024.

319.     When the family asked about mold in the home and the repairs, Balfour provided evasive and misleading answers to questions about the conditions of the Balfour home and the remediation efforts. In an August 28, email exchange with the family, Balfour representative Lee

64

Tysinger, stated there was no mold in the home.

320.    The following day, Dustin Fothergill arrived at the home and spoke to a contractor hired by Balfour. The contractor confirmed mold was present, and that it had been remediated.

321.    Balfour refused to allow entry, even to Navy inspectors, raising concerns about undisclosed hazards. Prior to returning home in September 2024, during a walkthrough, with Balfour officials Lee Tysinger and Dawn Meredith**,** the Fothergills directly asked if mold was present in their home. Both claimed mold remediation was unnecessary unless it exceeded a 10x10 square. When questioned about why the Navy was denied access, Tysinger and Meredith dismissed the Navy's inspection methods as unreliable. Meredith stated to the family that any mold exposure would be prevented from layers of paint existing in the home.

322.    Balfour's vendor, AMRC, Environmental Engineering Contracting, who was responsible for the abatement work, confirmed they were hired to conduct mold and asbestos remediation. The vendor refused to provide a detailed report on the work performed, claiming all properties were billed collectively rather than individually documented.

323.    As they returned home in September 2024, the family remained anxious about their living conditions. Balfour's misleading statements and refusal to provide transparent documentation left them feeling trapped in an unsafe environment. With no feasible alternative housing, they were forced to move back into a home where critical health concerns remained unresolved and ceiling issues have persisted.

324.    When the Fothergill family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Fothergill family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

65

325.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Fothergill family's home. Balfour knew or should have known that these representations were false and misleading. The Fothergill family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would have left sooner.

326.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

327.    The Fothergills suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Frates Family**

328.    Active Duty servicemember Aaron Frates, his wife Brittany, and their two children, A.F. and V.F., and their beloved pet moved into Apartment B, 1233 David Porter Rd on August 18, 2022, after signing a lease with Balfour. After moving in they began experiencing serious health and safety concerns due to water damage, mold, construction debris, improperly connected gutters, sewage backups, pests, AC failures and vermin.

329.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Frates family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe,

66

properly maintained, and in livable condition, the Frates family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Frates family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

330.    After moving in, the Frates family discovered discoloration on a bedroom ceiling. Testing revealed severely high moisture levels, and that the bedroom ceiling was at risk of collapsing. Wet spots, visible sagging, and creasing of the ceiling worsened, and the risk of collapse grew daily. Despite multiple requests, and a significant amount of testing, the Frates lived in the home for 2 years awaiting a solution.

331.    Balfour was aware of the health and safety risk associated with leasing this house and did not disclose them to the Frates. The Frates relied on Balfour's materially false and misleading representations that the house was safe, habitable, and properly remediated and repaired.

332.    After additional moisture testing, alarmingly high moisture readings were yet again observed throughout the entire home, in every single room. It was determined that there was a risk of full collapse in the home. Balfour representatives informed Brittany Frates that Balfour would attempt to move the family into Trumbo Housing immediately. That same day, reports of vermin in their ceiling prompted a call to pest control. However, the pest control team refused to enter the attic due to the presence of mold and the structural instability of the ceiling.

333.    Balfour representatives later confirmed the denial of a transfer option to Trumbo Housing, citing a firm decision from the NAS Key West Commander. Also, on August 6, 2024,

67

Balfour representatives conducted another inspection. He advised the family that repairs would not take place while the family remained in residence due to the risk posed by the ceilings. Subsequent room testing further confirmed the danger of potential ceiling collapse in high-risk areas. Recognizing the severity of the issue, the Frates family formally submitted their notice to vacate on August 7, 2024, citing the lack of safe accommodation.

334.    As a result of their extensive housing issues, the Frates' home was selected for a Navy Housing Inspection on August 28, 2024. A team from the Department of Defense and Naval Facilities Engineering Systems Command (NAVFAC) Southeast attended the inspection. The findings were so extensive, and so concerning, that they, along with the other homes inspected at this time, resulted in a 207-page report detailing the deficiencies in the residences.

335.    Brittany developed rashes, with broken skin and blisters covering her hands, which was later diagnosed as dyshidrotic eczema. She suffered significant hair loss and increasingly frequent headaches, muscle pain, and spasms, among other health effects. One of the children inexplicably developed enlarged tonsils.

336.    On September 6, 2024, the Frates family formally vacated their home and turned over the keys. However, the emotional and financial toll of the ordeal remained.

337.    When the Frates family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Frates family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

338.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, and structural damage to the Frates family's home. Balfour knew or should have known that these representations

68

were false and misleading. The Frates family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

339.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

340.    The Frates family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## The Gonzalez Family

341.    Hiram and Ana Gonzalez, along with their daughter A.R., lived in two separate residences managed by Balfour in Key West from August 2017 to June 2021, after signing their leases with Balfour. . From August 2017 until June 2021 the family resided in their 1102B Dewey Rd address, before moving into 1091B Dewey Rd, where they lived until they left Key West. Throughout their residency, they endured persistent structural issues, excessive humidity, and repeated exposure to mold growth.

342.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Gonzalez family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Gonzalez family suffered significant harm.

69

Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Gonzalez family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

343.    Despite their continual reports to Balfour, mold was merely painted over rather than properly remediated; and structural concerns, including ceiling joist issues, remained unaddressed. Balfour continued to mislead the Gonzalez family by representing that adequate repairs were performed.

344.    The family suffered from chronic respiratory issues, including unexplained coughing, allergies, and nasal congestion. Sleep deprivation and discomfort became routine as the home's environmental conditions worsened. Although the Gonzalez family raised concerns immediately upon discovering problems, Balfour failed to take appropriate action.

345.    When the Gonzalez family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Gonzalez family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

346.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Gonzalez family's home. Balfour knew or should have known that these representations were false and misleading. The Gonzalez family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

70

347.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

348.    The Gonzalez family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Graham Family

349.    Since 2015, the Graham family, Adam, Lyndsay, and R.G.,, lived in multiple Balfour homes at NAS Key West, including 1188B Gilmore Dr, 1156A Gilmore Dr, and 1533D Batfish Ct., each plagued by hazardous living conditions. After moving into their Balfour home at 1227A Stephen Mallory Rd., after they signed a lease in June 2023 with Balfour, they immediately faced health and safety concerns due to mold, water damage, structural defects, and possible asbestos exposure.

350.    Though Balfour was fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Graham family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Graham family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Perhaps most egregious was Balfour's practice of failing to document numerous complaints

71

reported by the family, effectively erasing their maintenance history and preventing any record of these issues from being created. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Graham family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

351.    Despite receiving repeated maintenance requests from the Graham family, Balfour failed to properly address the hazards. Work orders were either dismissed without resolution or inadequately repaired. The family was repeatedly assured that their home was safe, even as conditions deteriorated. Black goo seeped from floor tiles, mold overtook air ducts, and a persistent leak in the upstairs bathroom led to severe moisture damage, mildew odors, and even a termite infestation. When plaster collapsed from the bathroom wall, maintenance initially claimed asbestos was present, requiring mitigation, only to later contradict this and proceed with simple repairs.

352.    In and around mid-July 2023, Balfour performed an inspection of the HVAC unit. During the inspection, Balfour observed the unit actively and rapidly dripping water despite multiple layers of black duct tape. The inspection team flagged the unit for repair. During re-inspection, despite assurances that the unit was repaired, the HVAC unit was not repaired.

353.    These unsafe living conditions severely impacted the Grahams' health. Lindsay, Adam, K.G., and R.G., all suffered from migraines, respiratory issues, dizziness, nausea, fatigue, and chronic sleep disturbances. After exhausting all avenues for help, the family was forced to relocate multiple times, moving in and out of Balfour homes between 2015 and 2024, only to encounter similar conditions. Despite clear evidence of neglect and misconduct, Balfour offered no accountability, no financial relief, and no meaningful support.

354.    When the Graham family signed the lease, Balfour represented that their home was

72

in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Graham family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

355.     Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Graham family's home. Balfour knew or should have known that these representations were false and misleading. The Graham family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

356.     Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

357.     The Graham family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Guess Family**

358.     Caleb and Virginia Guess, along with their children, S.W., C.W., L.G., and G.G, moved into military housing at 1104A Truxton Rd., in June 2022, after signing a lease with Balfour. Their home soon became a source of unimaginable hardship, marked by fraudulent practices, hazardous living conditions, and devastating health effects on their family.

359.     Though Balfour was fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural

73

integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Guess family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Guess family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Perhaps most egregious was Balfour's practice of failing to document numerous complaints reported by the family, effectively erasing their maintenance history and preventing any record of these issues from being created. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Guess family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

360.    Virginia Guess, a skilled construction manager, began working for Balfour in August 2023 as a Service Center Coordinator. Virginia quickly recognized alarming patterns of negligence in housing maintenance. She discovered reports and complaints of widespread mold contamination, with some cases dating back to 2022. She also discovered that current vendors were not familiar with Lead-Based Paint (LBP) or asbestos protocols as they worked in homes. Only one vendor held an LBP Certification.

361.    Virginia Guess observed through her employment with Balfour that, rather than prioritizing the health and safety of military families, management consistently obscured these hazards. In early February 2024, The Guess home's ceilings started to crack, which Virginia reported directly to the call center and Balfour's Regional Facilities Director, yet true to form, Balfour delayed any meaningful repairs and simply braced the ceiling. By June 2024, the home's

condition deteriorated further. Water intrusion continued, and mold growth became apparent. Despite repeated work orders, Balfour neglected to complete urgent repairs.

362.    On July 15, 2024, an independent Moisture Reading Inspection (MRI), attended by Caleb Guess's Navy Senior Chief, Navy Advocate Jeff Fluker, a third-party Mold inspector, and the community manager, detected   severe mold contamination. Yet, Balfour management attempted to shift blame, attributing the mold to "dog hair" and excessive "pasta boiling." Additionally, Balfour personnel falsely claimed they were able to appropriately remediate the home through vendors whom Virginia quickly discovered were not certified to conduct mold remediation.

363.    Within months of moving into the home, the children developed the "Sigsbee cough," which was described to Virginia by neighbors and local teachers as common for children who lived in Key West's military housing.

364.    As the housing conditions worsened, the Guess family suffered severe health consequences. Their children experienced persistent respiratory issues, chronic infections, and unexplained allergic reactions. L.G., previously healthy, developed chronic nosebleeds, hives, and severe facial swelling.

365.    S.W., an ambitious and well-known high school student aspiring to serve her country by joining the United States Air Force and leading into a career with NASA, suffered from recurrent pneumonia and required daily medication and steroids to maintain her oxygen levels. After being forced to move to a hotel, in order to avoid the toxic conditions in her home. her symptoms vanished within two weeks. Upon learning that her respiratory issues could jeopardize her dreams of joining the Air Force as a Pilot, S.W. suffered emotionally. She became resentful, believing that the military forced her into an environment that compromised her future by

75

remaining silent in the face of the fact that the people responsible for maintaining the living quarters housing military families were not living up to their obligations.

366.    C.W. endured relentless coughing, vomiting, sleep disturbances, bone pain, and behavioral issues. Each time he visited his biological father, his symptoms disappeared, only to return when he came back to his Key West home. G.G., the youngest child, born in Key West, suffered from chronic ear infections and delayed speech development. He never spoke at home, but after relocating to a hotel, he began talking within two weeks.

367.    Virginia and Caleb also experienced respiratory distress, ocular migraines, exhaustion, allergic reactions, and unrelenting stress. Whenever they left their home for extended periods, their symptoms subsided, confirming that their military housing was the root cause of their health decline.

368.    The emotional toll deepened after Virginia Guess left her position with Balfour. She fell into a state of depression, grieving both the betrayal by her employer and the impact on her family.

369.    When the Guess family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Guess family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

370.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, and structural damage to the Guess family's home. Balfour knew or should have known that these representations were false and misleading. The Guess family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that

76

Balfour would not properly repair and remediate the home they would not have done so.

371.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

372.    The Guess family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Hernandez Family

373.    Carlos and Jessica Hernandez, and their child H.H., moved into 1109A Truxton Road in the Sigsbee Park housing community at Naval Air Station Key West in 2020, after signing a lease with Balfour. Later they moved to a second address.

374.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Hernandez family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Hernandez family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Hernandez family, who were left with no choice but to continue living in dangerous conditions with no apparent path to

77

resolution.

375.     After approximately one year in the Truxton residence, the Hernandez family began experiencing serious water damage issues. In June 2021, they discovered significant swelling in the ceiling near the main door, with visible water collecting in the light fixture. The conditions deteriorated quickly, and the damage ultimately caused the ceiling to cave in. Upon reporting the issue to maintenance, the family was moved into another home at 1126B Gilmore Drive.

376.     In December 2024, while living at the Gilmore address, they again experienced swelling and water leakage—this time through a wall in their living room—forcing them to temporarily vacate and stay in a vacation rental while repairs were made.

377.     Despite multiple reports to Balfour, Balfour  failed to perform timely or effective repairs and continued to misrepresent the safety and integrity of the properties. The Hernandez family remained in homes that posed serious risks to their health and safety.

378.     Both Carlos and Jessica suffered health effects due to their prolonged exposure to these conditions. Carlos experienced frequent sinus issues, while Jessica endured chronic headaches, allergies, and recurring sinus infections. Their child, H.H., was also exposed to these hazardous living environments.

379.     When the Hernandez family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Hernandez family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

380.     Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Hernandez family's home. Balfour knew or should have known that these representations

78

were false and misleading. The Hernandez family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

381.   Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

382.   The Hernandez family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Hester Family

383.   Rick "RJ" Hester and his young son, L.H., moved into his Balfour house at 1150 B Gilmore Drive in late December 2022, after signing a lease with Balfour.

384.   Though Balfour was fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Hester family, concealing serious safety hazards and defects. Placing their trust in Balfour deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Hester family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Perhaps most egregious was Balfour's practice of failing to document numerous complaints reported by the family, effectively erasing their maintenance history and preventing any record of

79

these issues from being created. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Hester family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

385.    After moving in, R.J. Hester and his son encountered water-related damage, mold growth, and electrical problems.

386.    After problems were reported and Balfour scheduled maintenance crew, they would often fail to show up. When they did, they failed to properly fix and remediate the issues in the home.

387.    RJ Hester reported visible mold growth on the wall in the kitchen cabinets. He called Balfour repeatedly but was simply told to take a photo. RJ Hester followed up with more phone calls, after which an MRI was conducted at his home. The results of the MRI were not shared with him.

388.    On August 12, 2024, RJ Hester was notified via phone that he and L.H. had to move out that day because the unit was a fire hazard due to unrepaired ongoing issues with the electrical outlets

389.    During the meeting with a Balfour Customer Experience Manager, Dawn Meredith, RJ Hester was asked if he would like to move back into his home once repairs were completed. He brought up their denial of the presence of mold, even after he had shown them photographic evidence. The representatives insisted the mold he photographed could be dust. When he pushed for mold testing, he was told that mold testing was against Balfour company policy and was told he was welcome to move out permanently if he did not like living there.

390.    A subsequent Armor DIY mold test confirmed the presence of two species of mold:

80

Rhodotorula and Penicillium, which were known to be among the most toxic molds. RJ left this report for Ms. Meredith on her desk on September 17 and subsequently emailed it to her to ensure it was seen.

391. In September 2024, RJ Hester and L.H. moved into a Balfour "Patriot home," 1134B Gilmore Drive, which is temporary housing on NAS-Key West. Represented as a safe alternative, the home proved to be anything but. Vermin, moisture, and electrical issues were soon discovered. RJ Hester reported sounds of animals in the attic, but a corresponding maintenance report stated the noises were dripping noises and condensation. While in the home, however, the maintenance technician refused to go in the attic.

392. Shortly afterward, ORKINPest Control visited the home. Their representative explained to RJ Hester that they had been advised not to enter attics on the base due to lead, mold, and asbestos. The ORKIN representative briefly looked in the attic with a camera and then closed the work order.

393. RJ Hester reported mold in the Patriot home's bathroom, around the vent. He took pictures, which he sent directly to Ms. Meredith.

394. Little L.H.'s health started to suffer. A doctor's note from L.H.'s pediatrician stated that mold presence could have adverse health effects on all occupants and advised mold removal. L.H. was sick frequently and needed special breathing treatments to combat his constant coughing. His coughing was so persistent it interrupted his sleep and woke him during the night. Most mornings, RJ Hester found his son crying and in distress. After leaving their 1150 Gilmore address, L.H.'s health noticeably improved. His coughing lessened, and he became increasingly well-rested.

395. When the Hester family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and

81

misleading. The Hester family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

396.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, and structural damage to the Hester family's home. Balfour knew or should have known that these representations were false and misleading. The Hester family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

397.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

398.    The Hester family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour homes, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Hurd Family**

399.    The Hurd family, consisting of active-duty service member Brandon Hurd, Caitlyn Hurd, and their children R.H., W-C.H., P.H., and H.H., moved into their Balfour home at 1195B Gilmore Drive in September of 2020, after signing a lease with Balfour.

400.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this

82

critical information when leasing the home to the Hurd family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Hurd family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Hurd family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

401.    After moving in, the Hurd family was exposed to toxic mold issues, HVAC issues and insect infestation. There was a cockroach infestation in the nursery and bathrooms, and a hole in the ceiling of a bedroom closet. They also discovered mold in the air vents, as shown below. They discovered water seepage around windowsills, mold detaching from the walls, and mold growing out of light switches and sockets.



402.    Despite voicing their concerns, the family received little or no assistance. The Hurd family reported these issues through the maintenance portal, but many times they received no

83

assistance or Balfour Beatty maintenance only responded by stating the vents were "just dirty" and that they would clean them by wiping them off. The mold and water damage were not addressed.

403.   A month after moving in, Caitlyn Hurd became very ill, suffering from fainting spells, respiratory issues, and vertigo. Brandon Hurd also began to feel unwell and experienced symptoms that he described as possible depression.

404.   In February of 2023, both of the young children fell seriously ill for nearly two months and required multiple hospital visits without a clear diagnosis from Lower Keys Hospital. The children exhibited symptoms such as nausea, vomiting, and diarrhea, and both displayed significant developmental delays, being non-verbal and lagging in cognitive functions. They began receiving Occupational Therapy, ABA Therapy, and Speech Therapy, consulting multiple specialists. Both children were diagnosed with Autism Spectrum Disorder.

405.   Both R.H. and W-C.H. are now forced to spend countless hours receiving care from multiple offices, including speech therapy, as well as ABA (Applied Behavior Analysis) and occupational therapy. Additionally, they travel to Tacoma and Madigan Hospital to see their autism specialist. Both children have also begun attending a Developmentally Delayed School several days a week. Since moving into his safe home, R.H. has shown some improvement and is now speaking in broken sentences. However, W-C.H. remains non-verbal.

406.   When the Hurd family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Hurd family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

407.   Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage

84

to the Hurd family's home. Balfour knew or should have known that these representations were false and misleading. The Hurd family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

408.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

409.    The Hurd family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Johnston Family

410.    Matthew Johnston, his wife, Candace Johnston, their 2-year-old daughter A.J., and their pet Sadie, moved into their Balfour house at 1067A Farragut Road, Key West, Florida home in October of 2023, after signing a lease with Balfour.

411.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Johnston family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Johnston family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root

85

causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Johnston family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

412.    After moving in, the family was exposed to electrical issues, crumbling walls, asbestos exposure, and active mold growth in the HVAC system. The roof leaked into the bathroom, caused soft wet walls and ceiling throughout the house, and ants infested the home. In addition, the sagging walls cracked and separated. Shortly after moving in, their pet was electrocuted by a faulty electrical box. The electrical wires were described by an electrician as a "fire hazard."  Repair work to the wire was halted due to concerns about asbestos. The walls were left open for months while the family lived there.

413.    Balfour representative Samantha Lyons conducted three MRIs in the home, yet the conditions in the home continued to worsen as the roof leaked and ants infested the home. Despite reporting these problems, Balfour continued to offer inadequate solutions such as scheduling restrictions, lack of supplies, and that materials needed were not available to fix the home. Balfour refused requested mold tests. On multiple occasions the work orders were falsified and marked completed within the maintenance portal, eventually, Balfour locked the family out of the maintenance portal.

414.    On June 11, 2024, the Johnstons has a meeting with Balfour employees, including Paula Cook, Arlen Dieguez, Dawn Meredith, and Samatha Lyon, along with Navy Housing employee Jeff Fluker. During this meeting, the Johnstons were told multiple times that the active mold growth was "just dust" and that mold precautions were not necessary.

415.    In July of 2024, the family was forced to relocate to another home on 1164A Gilmore Drive. They discovered records revealing past asbestos contamination and improper

86

maintenance of the home. The new home had similar issues, including glue and water seepage from the floor tiles. The family was told they could not replace the floors due to potential asbestos. Management offered them a rug instead.

416.    The family experienced serious health problems caused by living in Balfour housing. Candace Johnston faced infertility and breast lumps, while Matthew Johnston developed respiratory issues, brain fog, and nosebleeds. A.J. experienced stuttering, hair loss, breathing problems, full-body hives, fevers, and developmental regression. A.J. received treatment at a Children's Hospital in Miami Florida, including Gastroenterology, Orthopedic, Rheumatology, and Allergy Immunology. Significantly, A.J. has been referred to see an Infectious Disease doctor for mold toxicity.

417.    When the Johnston family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Johnston family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

418.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Johnston family's home. Balfour knew or should have known that these representations were false and misleading. The Johnston family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

419.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

420.    The Johnston family suffered serious health problems and economic damages

87

(including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Kelly-Vanderhoof Family

421.     Richard and Meghan Kelly-Vanderhoof, along with their children Corey and Kian, have lived in multiple Balfour properties in Key West since 2012.

422.     Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Kelly-Vanderhoof family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Kelly-Vanderhoof family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Kelly-Vanderhoof family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

423.     Over the years, the family encountered persistent mold contamination, electrical hazards, and structural failures. The ceiling at the Balfour home at 1264 A Matthew Perry Road began to deteriorate. Peeling paint and moisture damage worsened. Meghan Kelly-Vanderhoof ordered an independent mold test, which confirmed contamination.

88

424.     Despite repeated reports, Balfour ignored the issues, closed work orders without proper repairs, and used unqualified vendors for temporary fixes. Balfour attempted superficial fixes, and downplayed results from testing. Including, falsely claiming the affected area was only 1-2 square feet, when lab results confirmed 11 square feet of mold growth.

425.     As a former Balfour employee, Meghan Kelly-Vanderhoof was responsible for conflict resolution and maintenance oversight. When she discovered fraudulent work orders and unethical vendor use, she reported her concerns to Federal Real Property Agency (FRA) and Balfour management. In response, she faced retaliation, obstruction, and an increasingly hostile work environment.

426.     On July 12, 2024, Balfour leadership canceled mold remediation despite earlier commitments, leaving the family exposed to hazardous conditions.

427.     As a result of their exposure to the toxic conditions inside their Balfour home, Meghan and Richard Kelly-Vanderhoof suffered from chronic fatigue, cognitive dysfunction, and respiratory issues. Their son Corey Kelly-Vanderhoof was hospitalized three times for rhabdomyolysis, a severe muscle breakdown condition that nearly resulted in a heart attack at age 20.

428.     When the Kelly-Vanderhoof family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Kelly-Vanderhoof family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

429.     Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage

89

to the Kelly-Vanderhoof family's home. Balfour knew or should have known that these representations were false and misleading. The Kelly-Vanderhoof family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

430.   Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

431.   The Kelly-Vanderhoof family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## King Family

432.   Albert King, his wife, Natalie King, and their children Aubriana King, Ja.K., and Jak.K., moved into 1228B Stephen Mallory Road, in the Sigsbee Park housing community at Naval Air Station Key West in July 2021, after signing a lease with Balfour.

433.   Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the King family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the King family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting

90

superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the King family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

434.   Upon moving in, the family quickly observed troubling signs of structural deterioration, including soft spots in the walls. When concerns were raised, Balfour  responded with superficial inspections and reassurances, insisting the conditions were safe. Despite these claims, the situation worsened.

435.   Black mold became visible around the windows, mold was discovered in the HVAC closet, and eventually, following a storm, the ceiling collapsed in the boys' bedroom. Even after that incident, the family was not relocated. They were forced to remain in an unsafe home as dangerous conditions compounded.

436.   Every member of the family experienced negative health effects while living in the home. Albert developed red, irritated eyes and persistent allergy symptoms. Natalie experienced alarming symptoms including a racing heart, fainting spells, and low potassium levels. These issues were resolved after she left the home.

437.   Their children also suffered. Their 16-year-old reported constant illness and developed allergies and psychological symptoms including dissociation and insomnia. Their youngest child, age 10, suffered the most. Previously healthy, the child became perpetually ill, developing hives and other unexplained symptoms while living in the Sigsbee home.

438.   Despite these issues and repeated reports to Balfour Beatty, no meaningful action was taken to remediate the conditions. Due to the condition of the home, the family was ultimately forced to move out of 1228B Stephen Mallory Road in June 2023.

91

439.    When the King family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The King family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

440.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the King family's home. Balfour knew or should have known that these representations were false and misleading. The King family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

441.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

442.    The King family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Lee Family

443.    Kimo Lee, Jessa Lee, and their children K.L. and J.L. moved into their Balfour home, after signing a lease with Balfour.

444.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this

92

critical information when leasing the home to the Lee family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Lee family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Lee family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

445. Upon inspection of their home, they discovered visible mold and mildew on their patio. Concerned, they reported the issue to maintenance, who acknowledged the problem and assured them it would be addressed. However, no follow-up action was taken. Their three-year-old regularly played on the patio, and the family had not fully realized the extent of the issue until recently.

446. The Lee family hired a professional to inspect their HVAC system and assess their indoor air quality. While the air quality report indicated normal conditions, it also confirmed the presence of active mold growth within the HVAC system.

447. When the Martinez family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Lee family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

448. Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, and structural damage to the Lee family's home. Balfour knew or should have known that these representations

93

were false and misleading. The Lee family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

449.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

450.    The Lee family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## The Martinez Family

451.    Retired US Air Force Tech Sergeant Refugio Martinez, Larissa Martinez, and his adult special needs son Christian Martinez, moved in their Balfour home in Sigsbee Park in 2024, after signing a lease with Balfour.

452.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Martinez family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Martinez family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Martinez family, who were left with

94

no choice but to continue living in dangerous conditions with no apparent path to resolution.

453.     Shortly after they moved in, the Martinez family faced significant housing challenges. The paint began bubbling on walls, water would seep through the windows, multiple areas of the floors would bubble and become softer. Walls throughout the home were soft to touch. The home was infested with termites, pests, water intrusion, and mold. In addition, their possessions were damaged and destroyed due to mold exposure.

454.     Despite multiple requests, Balfour failed to remediate and repair the damage. Balfour ignored emails and requests for assistance and did not respond to work order requests.

455.     Throughout the 2024 hurricane season, water would seep in through the home's windows. Larissa Martinez would mark each area of water damage with red marker, take photos, and send an email inquiring about a response to her maintenance requests. Balfour ignored her emails.

456.     In August 2024, Balfour sent an inspector to the home. Larissa Martinez showed the inspector the bubbling floors, and that the walls were soft to the touch. She also showed the inspector a video of water pouring into her house through a closed door from the lanai area. She was informed her family would be displaced from the home. Mrs. Martinez was unable to move the family belongings with her husband away, forcing her to leave them in the mold contaminated home. All of their possessions become covered in mold and unsalvageable. Balfour refused to reimburse the family for the lost possessions.

457.     In addition to the tremendous inconvenience, stress, and financial impact, both Larissa Martinez and her husband experienced health issues. Refugio Martinez suffers from nightly headaches and fatigue. Larissa Martinez, who has autoimmune conditions, experienced worsening pain and fatigue while in the home. Mrs. Martinez fell ill with a respiratory infection

95

and body rash, for which she was prescribed antibiotics and steroid cream. Larissa Martinez was forced to be out of work for six days.

458.    When the Martinez family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Martinez family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

459.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Martinez family's home. Balfour knew or should have known that these representations were false and misleading. The Martinez family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

460.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

461.    The Martinez family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Mastriani Family**

462.    Daniel Mastriani and his children, S.M. and E.M., moved into their Balfour home in Sigsbee Park in August 2024 after signing a lease with Balfour.

463.    Though Defendants were fully cognizant of the widespread problems plaguing

NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Mastriani family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Mastriani family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Mastriani family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

464.    After moving in, the family immediately noticed structural issues, including unsecured walls. The problems only escalated. A rainstorm caused significant flooding, with water pooling three to four feet from the wall. Drywall and baseboards sustained damage, and the walls continued to bow. There were significant additional issues as well, including asbestos, water damage, mold growth, and ongoing structural defects. The foundation remained exposed and cracked, and moisture buildup increased mold growth in the walls and ceiling.

465.    Balfour maintenance ignored remediation requests. When maintenance arrived, necessary repairs were not made.

466.    When the Mastriani family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Mastriani family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

467.    Balfour also represented that its representatives would adequately repair and

97

remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, and structural damage to the Mastriani family's home. Balfour knew or should have known that these representations were false and misleading. The Mastriani family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

468.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

469.    The Mastriani family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The McCarthy Family**

470.    Christopher "Chris" McCarthy, a 15-year service member, his wife, Meg McCarthy, and their three children, A.M., J.M., and R.M. moved in their Balfour home in Trumbo Point in June 2023, after signing the lease with Balfour.

471.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the McCarthy family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the McCarthy family suffered significant harm.

Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the McCarthy family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

472.    Shortly after moving into the Balfour home, the family began experiencing insect infestation, water leaks, collapse of the garage ceiling, and pervasive mold growth.

473.    On July 1, 2023, a water leak in the garage caused a section of the ceiling to collapse. The visible mold exposed by the ceiling collapse was not addressed by Balfour. Balfour did not perform an MRI test of the affected drywall.

474.    Less than a year later, in April 2024, another section of the garage ceiling collapsed revealing more mold, water damage, as well as decaying trusses and extensive termite tunnels directly below the area of the floor with severely cracked tiles. The trusses supporting the floors were rotting and infested.

475.    On May 17th, 2024, the family was notified to leave the home. In the middle of the first night in temporary housing provided by Balfour, the family woke up covered in bugs. The home provided as a safe alternative was also infested with termites. With no safe alternative they returned to their home.

476.    In October 2024, water poured from the kitchen's light fixtures, saturating the kitchen ceiling, dripping down the walls, and seeping through the cabinets. The high humidity in the home, which was between 60-70%, caused floors and beds to stay damp. The McCarthy family continued making efforts to get these issues repaired. They asked maintenance to look at the kitchen's condition, but maintenance claimed everything looked normal. The Balfour report notes

99

that, "The mold looks good."

477.    The entire family began suffering from the health effects. Meg McCarthy experienced bouts of depression, anxiety, muscle and joint pain, hormonal disruptions, migraines, and severely worsened endometriosis, which ultimately leads to a hysterectomy in November 2023. Chris McCarthy, typically healthy, developed depression, anxiety, and joint pain. Each of the children developed skin conditions and anxiety.

478.    Chris's professional performance suffered, as he was constantly responding to constant housing issues managing maintenance calls. Frequent interruptions at work cost him productivity, and he struggled to support his supervisor adequately. From a financial perspective, the family was tremendously impacted, and suffered losses of irreplaceable items, including the family piano that A.M. learned to play on.

479.    After requesting a new assignment, Chris was ready to pack his family up and leave, regardless of the impact on his 15-year career. The McCarthy family is now haunted by the realization that their experience and hardship was preventable, had Balfour chosen to act reasonably from the start.

480.    When the McCarthy family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The McCarthy family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

481.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the McCarthy family's home. Balfour knew or should have known that these representations were false and misleading. The McCarthy family relied on these representations and stayed in their

100

home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

482.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

483.    The McCarthy family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The McQuaig-Johnson Family

484.    Derek McQuaig and Chelsea Johnson  and their three children, K.M., M.M., and N.M, moved into their Balfour home Sigsbee Park in  after signing the lease with Balfour.

485.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the McQuaig-Johnson family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the McQuaig-Johnson family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the McQuaig-Johnson family, who were left with no choice but to continue living in dangerous conditions with

101

no apparent path to resolution.

486.    After moving in the family faced severe health and safety concerns due to persistent mold, asbestos exposure, water damage, and ongoing maintenance failures. Mold spread through the home, appearing in air vents, the ventilation system, and the walls. Mold bugs thrived in the home.

487.    Despite the family submitting multiple work orders, Balfour consistently failed to address the hazards, and closed work order requests without resolution or performing inadequate repairs. The family was repeatedly assured that their home was safe, even as conditions deteriorated.

488.    The family suffered health consequences as a result of living in the Balfour home. Derek McQuaig experienced ongoing sickness, while Chelsea Johnson suffered from asthma. Their children experienced constant illness, with K.M. also suffering from brain fog and respiratory issues.

489.    When the McQuaig-Johnson family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The McQuaig-Johnson family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

490.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the McQuaig-Johnson family's home. Balfour knew or should have known that these representations were false and misleading. The McQuaig-Johnson family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the

mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

491.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

492.    The McQuaig-Johnson family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## The Melford Family

493.    Justin Melford, his wife Morgan Melford, and their children, Z.M. and B.M., moved into their Balfour home 1090 Unit A Dewey Road, Sigsbee Park, on December 8, 2022, after signing a Balfour lease.

494.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Melford family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Melford family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Melford family, who were left with

103

no choice but to continue living in dangerous conditions with no apparent path to resolution.

495.    Immediately after moving into their Balfour home, they began experiencing serious health and safety concerns due to mold, asbestos, water damage, lead exposure, structural defects, and ongoing maintenance failures.

496.    A moisture meter test conducted on September 5, 2023, revealed dangerously high moisture levels throughout the kitchen, but no mold tests were completed. However, a senior employee inspected the house and deemed the kitchen ceiling one of the worst in the neighborhood, and stated the family would be displaced immediately for repairs.

497.    They were not vacated until a few months later. Upon their return, repairs were not complete, and there were standing water issues in the A/C vent.

498.    These unsafe living conditions led to significant health issues for the entire family. Justin Melford experienced chronic headaches, nausea, congestion, and extreme fatigue. Morgan Melford suffered from similar symptoms along with thyroid issues. Their children, Z.M. and B.M., experienced recurring headaches, nausea, congestion, extreme fatigue, and sleep disruption.

499.    Despite placing repeated complaints and maintenance requests, Balfour failed to address the issues properly. Works orders were closed without resolution or inadequately repaired. The Melford family was told sagging ceilings were "normal," mold was not mold, and the family was repeatedly assured that the home was safe, even as conditions deteriorated.

500.    When the Melford family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Melford family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

501.    Balfour also represented that its representatives would adequately repair and

104

remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Melford family's home. Balfour knew or should have known that these representations were false and misleading. The Melford family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

502.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

503.    The Melford family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Mitchell Family**

504.    Dan Mitchell and his family, Brandy Mitchell, and their child C.M., moved into their Balfour home in Trumbo Point after signing the Balfour lease in 2022.

505.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Mitchell family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Mitchell family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root

causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Mitchell family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

506.    Shortly after moving in, they began experiencing severe health and safety hazards, including persistent mold infestation, structural water damage, and a widespread termite infestation. Balfour repeatedly told the family they were on a list for fumigation, but after waiting for months, the family discovered nothing was scheduled. In addition, Balfour was aware that this home had reoccurring water intrusion issues, especially related to the HVAC system.

507.    A Balfour vendor identified a potential electrical fire hazard in the home. Balfour failed to properly schedule a technician to fix the issue.

508.    Despite the family placing multiple maintenance requests, Balfour failed to address these hazards properly. Work orders were closed without resolution or handled with inadequate repairs. The family reported mold growth around light fixtures, bathroom vents, and in the home office. See for example, visible mold growth on the ceiling. Balfour responded by wiping down the affected areas with bleach and painting over them. They assured the family that "special paint" would resolve the issue, but the mold spread. Water pooled in the laundry room light fixture, compounding the damage.



106

509.    This all took a serious toll on the family's health. Brandy Mitchell suffered from headaches, hives, difficulty breathing, and chronic lethargy. Dan Mitchell experienced persistent cold-like symptoms, lethargy, and severe headaches, while C.M. struggled with rashes, respiratory issues, and recurring headaches.

510.    When the Mitchell family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Mitchell family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

511.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Mitchell family's home. Balfour knew or should have known that these representations were false and misleading. The Mitchell family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

512.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

513.    The Mitchell family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Moody Family**

514.    Active-duty service member Jacob Moody and Kayla Moody and their child B.M.

moved into their Balfour home in Sigsbee Park in September 2022, after signing a lease with Balfour.

515.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Moody family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Moody family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Moody family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

516.    Shortly after moving in, they experienced water leaks in the roof, ceiling, walls, and electrical outlets, and persistent mold infestation, including in the children's bedrooms. Water leaked from the dining room ceiling and consistently came through the ceiling when it rained. Electrical outlets leaked water.

517.    The family requested that Balfour relocate them to the unsafe hazards at the home. Balfour denied the request without providing clear guidance. When the Moody family was finally offered temporary relocation, it was to a hotel without a kitchen, which was impractical for a family with a young child. The family was forced to move out in October 2024, incurring over $5,000 in moving expenses.

518.    Each time repairs were requested, maintenance personnel either failed to resolve

108

the issues or marked the work orders as "completed" without verifying the problems had been fixed. Later, ceiling repairs were conducted without proper asbestos safety precautions. The family was not given appropriate accommodations during any of the hazardous repairs.

519.    As a result of the exposure to the toxic environment, the family suffered significant health issues. Their infant son suffered persistent health issues, including severe fatigue, excessive sleep patterns of twelve to fourteen hours per day, chronic coughing, and sneezing. The rashes that first appeared in 2023 persisted.

520.    Jacob Moody, once in excellent physical health, experienced chronic sinus issues, joint pain, and muscle aches. His physical therapist remarked that his level of pain was unusual for someone his age. Concerned about the long-term implications of his symptoms, he underwent further medical evaluation.

521.    Most distressing is the uncertainty surrounding B.M.'s future health. Kayla Moody's fears that exposure to mold and other hazards during his early development might lead to lung problems or other complications later in life. The guilt that she had no choice but to bring her newborn home to a dangerous and hazardous house is overwhelming.

522.    When the Moody family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Moody family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

523.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Moody family's home. Balfour knew or should have known that these representations were false and misleading. The Moody family relied on these representations and stayed in their home

waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

524.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

525.    The Moody family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The O'Brien Family

526.    Stephen O'Brien, Kayla O'Brien, and their two children, M.O. and R.O., moved into their Belfour home in Sigsbee Park in 2022, after signing a lease with Balfour.

527.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the O'Brien family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the O'Brien family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the O'Brien family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

110

528.     Shortly after moving in, they experienced vermin infestation, moisture running down the wall of a bedroom and visible mold in AC vents and on walls, as shown below. Mold tests conducted by a lab confirmed the presence of Stachybotrys, also known as toxic black mold.

 

529.     Despite frequent requests, work orders went unfulfilled. Balfour maintenance failed to show up despite multiple scheduled windows. Works order indicated repairs were completed for work never performed. Balfour maintenance claimed that the bathroom fans were present and lacked mold; however, there were no fans in their bathrooms.

530.     On February 5th, maintenance failed to arrive for another scheduled visit. The following day, moisture appeared running down the wall of a bedroom in the home. On February 6th, a third MRI was performed, along with an abatement of a 2-by-2 square foot portion of the ceiling. Another pull and clean of the A/C unit was conducted. Several loose floor tiles in the house were fixed. However, glue residue leaked throughout the house and spread onto rugs, furniture, and the children's toys. When Stephen O'Brien noticed the bathrooms lacked fans that Balfour claimed were present and clear of mold, he became concerned about fraudulent maintenance activity.

531.     On February 29, 2024, an inspection of the moldy duct was scheduled, but maintenance again failed to arrive. In March, living conditions deteriorated even more. The

111

Balfour team conducted another duct inspection but reported the ducts appeared normal. Aaron O'Brien later saw maintenance records reporting a "paint job" had been completed. On March 20th, Kayla O'Brien and her young children were displaced to a hotel due to ceiling drywall repairs and bracing abatement.

532.    Construction dust powdered the family's items after the drywall bracing. On March 24th, mold tests were conducted by P Lab, confirming the presence of Stachybotrys and raising serious health concerns. Microbial remediation was completed by K2 Construction & Development, LLC on March 29th.

533.    On April 15th, the family placed a maintenance request for an A/C duct inspection due to visible mold and a possible water leak. A dead rat was found in a trap that had been placed back in 2023. Around this time, M.O. became too ill to attend classes and missed the final month of school. Later, allergy testing confirmed an allergy to mold.

534.    As a result of the exposure to the toxic environment, the family suffered significant health issues. M.O. developed a mysterious malaise, which a healthcare professional referred to as "kindergarten funk." Although not in school, R.O. also exhibited similar symptoms. Both children were frequently ill and their symptoms, initially intermittent, became constant. M.O., a typically happy child, woke up in physical distress and suffered uncharacteristic intestinal distress. A persistent cough interrupted sleep and was accompanied by noticeable weight loss. Kayla's once joyful child seemed to be changing overnight. In early March of 2023, alarming red welts appeared on R.O.'s body. On June 4, 2023, the child was treated at the emergency room after waking with their eyes swollen shut. They were prescribed a steroid shot and 10 days of antibiotics. Later that month, while on a family trip, M.O. was rushed to the emergency room with a burning throat, severe breathing issues, wheezing, and persistent coughing. A Navy pediatrician later prescribed

112

an inhaler to M.O., despite there being no diagnosis of asthma. On July 27, a school physical revealed additional weight loss.

535.    In October, the O'Briens faced a truly terrifying experience. M.O. woke daily with fevers, stomach pain, headaches, and overwhelming exhaustion.

536.    Despite numerous repair orders since 2023, issues remained unresolved, with no regard for the family's safety or health, prompting the family to take drastic action. They declined Balfour's offer to move them to another house and, in early July, moved their family into a trailer at a camping spot on base. Life in an RV was an unplanned pivot for the family, requiring tremendous sacrifice. The family sold most of their belongings, including Kayla O'Briens's vehicle, to switch to a dramatically downsized reality.

537.    Every night, Kayla and Stephen O'Brien slept in a narrow overhead pulldown bunk to give their children the only semi-private space available—the tiny RV bedroom. Despite the challenges, the O'Briens maintained a sliver of optimism. Escaping the hazardous house provided by Balfour and moving into the RV brought noticeable improvement to the health of both their children.

538.    When the O'Brien family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The O'Brien family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

539.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the O'Brien family's home. Balfour knew or should have known that these representations were false and misleading. The O'Brien family relied on these representations and stayed in their home

113

waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

540.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

541.    The O'Brien family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## The Phillips Family

542.    Sean and Leslie Phillips moved to 1133A Gilmore Drive in Balfour home at Sigsbee Park in Naval Air Station Key West in November 2022, after signing a lease with Balfour.

543.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Phillips family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Phillips family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Phillips family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

114

544.    After moving in, they were exposed to mold in the home. Balfour officials never acknowledged the severity of the problems.

545.    This led to significant health issues. Both Sean and Leslie Phillips developed severe allergy-like symptoms.

546.    The Phillips family relocated in July 2024. A short time after moving, their health improved.

547.    When the Phillips family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Phillips family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

548.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Phillips family's home. Balfour knew or should have known that these representations were false and misleading. The Phillips family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

549.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

550.    The Phillips family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

115

**The Potter Family**

551.    Levi Potter, his wife Annalyn Potter-Soza, and their nineteen-month-old daughter, M.P., moved into their Balfour in January 2024, after signing a lease with Balfour.

552.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Potter family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Potter family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Potter family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

553.    Shortly after moving in, the Potters began experiencing serious health and safety concerns due to structural defects, water damage, and mold. Holes began forming in the hallway ceiling, and shortly afterward the ceiling collapsed.

554.    Despite placing repeated complaints and maintenance requests, Balfour failed to properly address the hazards. Work orders were either closed without resolution or inadequately repaired, and the family was repeatedly told their home was safe, even as conditions worsened. Balfour never followed up on plans of action to resolve these issues.

555.    Due to the unsafe conditions in the Balfour house, the family was forced to relocate to a hotel from August 29, 2024, until early December 2024. Representatives from Navy Housing

116

and Balfour finally inspected the family's home in person and confirmed extensive water damage.

556.    These unsafe living conditions led to significant health issues. Annalyn Potter-Soza developed asthma, and M.P. suffered from respiratory infections and recurring ear infections, requiring tubes in her ears.

557.    When the Potter family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Potter family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

558.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Potter family's home. Balfour knew or should have known that these representations were false and misleading. The Potter family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

559.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

560.    The Potter family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**Marie Robbins**

561.    Marie Robbins moved into her 517 Truman Annex, Apt D, located in the Truman

117

Annex housing community at Naval Air Station Key West, in 2012, after signing a lease with Balfour.

562.     Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to Ms. Robbins, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, Ms. Robbins suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to Ms. Robbins, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

563.     In late September 2022, her home flooded during Hurricane Ian. The flooding was so severe that she had to be rescued from the property. She was displaced from November 2022 through April 2023 while repairs were conducted. Upon returning, she immediately began to observe mold growth reappearing in corners of the home and on vents—an indication that the repairs were either insufficient or that the underlying conditions were never properly remediated.

564.     Despite repeated signs of persistent moisture and mold, Balfour failed to conduct thorough remediation or take responsibility for the unsafe living environment. Ms. Robbins is currently displaced from her home once again while mold remediation is being performed, following years of exposure to environmental hazards that have compromised her health.

565.     Marie Robbins now suffers from serious respiratory symptoms and requires the use

118

of a nebulizer to manage her health. Her exposure to mold and other contaminants has had a significant and ongoing impact on her physical well-being and quality of life.

566.    When Ms. Robbins signed the lease, Balfour represented that his home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. Ms. Robbins relied on Balfour's representation when signing the lease. Had he known that the Balfour home was not habitable, he would not have signed the lease.

567.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to Ms. Robbins' home. Balfour knew or should have known that these representations were false and misleading. Ms. Robbins relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had he known that Balfour would not properly repair and remediate the home they would not have done so.

568.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

569.    Ms. Robbins suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Rodas Family

570.    Joshua and Samantha Rodas moved into their Balfour house at 1240B David Porter Road in September 2021, after signing a lease with Balfour.

571.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural

integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Rodas family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Rodas family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Rodas family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

572.     After moving in they began experiencing serious health and safety concerns due to persistent mold, water damage, and structural defects in their home. They experienced water leaks behind bathtub tiles, mold growth on air vents, bubbling bathroom laminate, major cracks and bulges along the garage wall extending into bathrooms, and a sagging, cracked kitchen ceiling. The front bedroom ceiling also cracked, bowed, and was confirmed to be wet and unsafe.

573.     Despite placing multiple maintenance complaints, Balfour failed to properly address the hazards. Work orders were either closed without resolution or inadequately repaired, and the family was repeatedly told their home was safe, even as conditions continued to deteriorate. Balfour refused to acknowledge the severity of the problems or provide proper remediation and timely assistance.

574.     These unsafe living conditions significantly impacted their health. Samantha Rodas suffered from migraines, depression, and anxiety, while Joshua Rodas experienced frequent headaches and anxiety.

575.     When the Rodas family signed the lease, Balfour represented that their home was

120

in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Rodas family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

576.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Rodas family's home. Balfour knew or should have known that these representations were false and misleading. The Rodas family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

577.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

578.    The Rodas family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Sanchez Family**

579.    Manuel Sanchez and his wife, Darcy, moved into their Balfour house at 1543 Bowfin Ct, on January 16, 2020, after signing a lease with Balfour.

580.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Sanchez family, concealing serious safety

121

hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Sanchez family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Sanchez family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

581.    After moving in, the Sanchez family found themselves battling severe mold growth, HVAC failures, and persistent leaks that directly impacted their health and quality of life.

582.    Balfour's responses constituted systemic neglect. Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests, even after Balfour representatives and maintenance workers acknowledged the severity of the mold problems in the house.

583.    For over two years, the Sanchez family endured hazardous living conditions and chronic health issues. In May 2020, Darcy Sanchez experienced significant hormonal imbalances, leading her to begin treatments. The following month, Manuel Sanchez was diagnosed with Squamous Cell Cancer and underwent surgery for cancer affecting his neck, tongue, and tonsils, which initiated a long and grueling battle with his health. By late June, he started radiation therapy, followed shortly by chemotherapy in July. At the same time, Darcy Sanchez sought medical attention for severe allergy symptoms, including post-nasal drip, which are later linked to environmental factors in their home. Over time, Manuel Sanchez 's health deteriorated, and in 2024, he lost his battle with metastatic cancer.

584.    During this critical period, mold-related issues in their home became increasingly

apparent. In early July 2020, a maintenance worker visited the property to address mold concerns, yet no follow-up records were provided. As many months passed, the problems persisted.

585.    Work on the HVAC unit was completed on February 5, 2021, but the family reported to Balfour worsening conditions including mold growth, a leaking bathtub faucet, clogged dryer tubing, and a persistent musty odor. Later that month, Darcy Sanchez explicitly requested a mold test, as the family was still awaiting repairs of a hole in A/C room ceiling, a wet/moldy area behind toilet upstairs, and mold growing on their personal items. Ms. Sanchez sent additional emails in March, documenting continuing mold exposure and its impact on their health, yet remediation efforts remained insufficient, and mold testing was not conducted.

586.    In June 2021, a team of maintenance workers, including Balfour representatives, visited the home. They acknowledged the severity of the problem and recommended installing an entirely new air conditioning system, which was completed later that month. However, mold and humidity issues persisted. By the end of the year, Manuel Sanchez 's health deteriorated further, with increased pain in his right leg. A CT scan in December revealed new nodules, raising concerns about metastatic disease.

587.    After over two years of battling unsafe conditions, the family moved to another Balfour home at Matthew Perry Rd. in April 12, 2022. Shortly after moving into the new address, Manuel's health took a devastating turn. By September 2023, Manuel Sanchez was unable to continue working due to his declining health, and he was placed on disability. Mr. Sanchez's battle with metastatic cancer ultimately ended with his passing on September 25, 2024, leaving his family devastated.

588.    When the Sanchez family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and

misleading. The Sanchez family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

589.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Sanchez family's home. Balfour knew or should have known that these representations were false and misleading. The Sanchez family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

590.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

591.    The Sanchez family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Seaton Family

592.    Since 2020, Anthony Seaton, Lyric Seaton, and their child T.S., lived at 1108B Truxton Road, Sigsbee Park, while stationed at Naval Air Station Key West, after signing a lease with Balfour.

593.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Seaton family, concealing serious safety hazards

124

and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Seaton family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Seaton family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

594.   After moving into their Balfour home, the Seatons began experiencing serious health and safety concerns due to mold, water damage, electrical hazards, and structural defects. The Seaton family experienced rusted nails falling out of the walls, paint peeling, water seeping into the dining room, and black mold on the walls in their living room. Electrical breakers frequently tripped due to excessive moisture, and maintenance staff painted over mold instead of remediating it properly.

595.   Although repeated complaints and maintenance requests were placed, Balfour failed to properly address these hazards.

596.   After exhausting all avenues for help, the family moved out in December 2022, and their health improved almost immediately. When the family moved out, they discovered hidden black mold behind their television.

597.   These unsafe living conditions led to significant health issues. Lyric suffered from persistent swollen lymph nodes, chronic headaches, and severe year-round allergies with no relief. Tristan experienced unexplained fevers, frequent sickness, digestive issues that led to hospitalization, mucus in his stool, stomach pain, and recurring rashes that doctors could not diagnose. Anthony suffered from severe allergies, frequent illnesses, and headaches. The family's

125

baby was hospitalized multiple times with high fevers, digestive distress, and an inability to eat at just three months old.

598.    In addition to the health concerns, Lyric worked for Balfour in 2022 and witnessed them engage in fraudulent and deceptive practices. Employees were instructed to lie to Navy housing inspectors, block visible damage, and select only "perfect" files for audits. Mold issues were routinely covered up with spray paint rather than being properly remediated. There were known termite issues in the townhomes. Families were dismissed by management and later threatened with fabricated move-out charges to deter complaints. A Balfour Director was ultimately fired for accepting kickbacks and financial misconduct.

599.    Despite clear evidence of negligence and misconduct, Balfour offered no accountability, no financial relief, and no support.

600.    When the Seaton family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Seaton family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

601.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Seaton family's home. Balfour knew or should have known that these representations were false and misleading. The Seaton family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

602.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

126

603.     The Seaton family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Sechi Family

604.     Codie Sechi, Paige Sechi, and their child C.S moved into their Balfour home 1237 David Porter Rd, Apt A, in October 2021, after signing a lease with Balfour.

605.     Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Sechi family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Sechi family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Sechi family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

606.     After moving in they immediately encountered severe health and safety hazards, including mold, asbestos, lead contamination, water damage, and persistent maintenance issues.

607.     Despite submitting repeated complaints and maintenance requests, Balfour failed to address these hazards adequately. Work orders were closed without resolution, and repairs were

127

either delayed or insufficient. The family was repeatedly assured that their home was safe, even as conditions continued to deteriorate. Subsequent water testing revealed lead levels three times the legal limit.

608.    These unsafe living conditions caused significant health issues for the Sechi family. Their young daughter, C.S, suffered from persistent respiratory problems, while C.S. experienced frequent migraines, both documented by Navy medical personnel. Their pets also became severely ill—one dog remained extremely sick, while another died.

609.    When the Sechi family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Sechi family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

610.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Sechi family's home. Balfour knew or should have known that these representations were false and misleading. The Sechi family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

611.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

612.    The Sechi family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts

128

and omissions.

## The Serop Family

613.    Julia and Antranig Serop moved into their home at 1102 B Dewey Road in Sigsbee Park in July 2023, after signing a lease with Balfour.

614.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Serop family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Serop family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Serop family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

615.    After moving in they began experiencing serious health and safety concerns due to ongoing water damage, mold growth, and structural defects. Flooding from the side door  and water pouring from bathroom light fixtures created an ongoing moisture problem. Mold grew around the bathroom door and on bedroom walls.

616.    Although repeated complaints and maintenance requests were placed, Balfour failed to properly address the hazards. Balfour representatives ignored calls, refused to provide updates, and dismissed concerns, adding to the family's distress. Work orders were closed without resolution, repairs were either inadequate or ignored, and the family was repeatedly told their home

129

was safe—even as conditions deteriorated. Balfour refused to acknowledge the severity of the issues. When an inspection was finally conducted. Balfour blamed the tenants for improper air conditioning settings instead of addressing the real problem.

617.    These unsafe living conditions caused significant health issues. Julia Serop experienced headaches, coughing, congestion, fevers, sore throat, and burning eyes, while Antranig Serop suffered from headaches, sore throat, congestion, burning eyes, and loss of sleep. Their symptoms persisted while inside the home but disappeared when temporarily relocated.

618.    After exhausting all avenues for help, the family was forced to relocate to temporary housing, yet Balfour provided no suitable accommodations for their special needs dog, leaving them to shuttle back and forth between their home and the hotel. When contractors finally conducted a walkthrough, Balfour refused to test for mold, despite clear evidence of contamination.

619.    When the Serop family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Serop family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

620.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Serop family's home. Balfour knew or should have known that these representations were false and misleading. The Serop family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

621.    Defendants concealed the conditions of their housing and failed to properly

130

remediate the problems despite repeated requests.

622.    The Serop family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

## The Smith Family

623.    Jason Smith, his wife Leilah Smith, and their children B.S. and B.S. moved into their Balfour home at 2059 Halsey Drive in June 2022, after signing a lease with Balfour.

624.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Smith family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Smith family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Smith family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

625.    After moving in they began experiencing serious health and safety concerns due to ongoing HVAC failures, mold growth, water damage, insect infestations, and structural defects. The flooring cracked and was rotting. Termite infestations were documented in the grout, garage,

131

and living room. Sheetrock peeled from the walls, and mold continued growing despite attempted removal. Windows were rusted shut, creating safety hazards. HVAC malfunctions caused high humidity, persistent leaks, and mold growth inside the air handler unit.

626.    Despite placing repeated complaints and maintenance requests, Balfour failed to properly address the hazards. Work orders were frequently closed without resolution. Temporary fixes led to ongoing failures. When reported, the mold was never treated.

627.    These conditions caused ongoing health issues. Leilah experienced brain fog, joint pain, headaches, and respiratory symptoms. Jason Smith suffered from severe allergies, joint pain, and congestion. Their children, B.S. and B.S., endured chronic coughing, rashes, and bloody noses and suffered from asthma and unexplained joint pain. The entire family dealt with respiratory issues while living in these conditions. They missed hundreds of work hours due to illness and housing-related issues.

628.    When the Smith family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Smith family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

629.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Smith family's home. Balfour knew or should have known that these representations were false and misleading. The Smith family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

630.    Defendants concealed the conditions of their housing and failed to properly

132

remediate the problems despite repeated requests.

631.    The Smith family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### John Stevens

632.    John Stevens has resided at 1500 Salmon Court, Apt F, in the Sigsbee Park housing community at Naval Air Station Key West, since February 2023, when he signed a lease with Balfour.

633.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to Mr. Stevens, concealing serious safety hazards and defects. Placing his trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, Mr. Stevens suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to Mr. Stevens, who was left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

634.    In early 2024, Mr. Stevens personally observed visible mold growing on the air handler in his home.

133

635.     Throughout his tenancy, Mr. Stevens suffered from persistent respiratory problems without a clear diagnosis or understanding of their cause.

636.     Despite signs of environmental hazards, no meaningful or lasting remediation was performed. Balfour perpetuated its deception by failing to conduct proper inspections or maintenance. Only recently did the Navy conduct moisture testing inside Mr. Stevens's unit, confirming the presence of moisture in the walls—a clear indication of long-standing water intrusion that had never been properly addressed.

637.     On March 25, 2025, Mr. Stevens was displaced from his home while Balfour Beatty started floor remediation. To date, he has not been informed whether proper safety protocols— particularly concerning potential asbestos exposure—are being followed during the process. Access to his residence has been revoked, leaving him uncertain about both the scope and safety of the remediation.

638.     When Mr. Stevens signed the lease, Balfour represented that his home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. Mr. Smith relied on Balfour's representation when signing the lease. Had he known that the Balfour home was not habitable, he would not have signed the lease.

639.     Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to Mr. Stevens' home. Balfour knew or should have known that these representations were false and misleading. Mr. Stevens relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had he known that Balfour would not properly repair and remediate the home they would not have done so.

640.     Defendants concealed the conditions of their housing and failed to properly

134

remediate the problems despite repeated requests.

641.    Mr. Smith suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Stroud Family

642.    The Stroud family, Petty Officer First Class Taylor Stroud, his wife Jessica Stroud, and their children L.L.S. and L.K.S. moved into their Balfour home on August 1, 2022, after signing a lease with Balfour.

643.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Stroud family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Stroud family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Stroud family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

644.    After moving in, the Stroud family experienced insect infestation, vermin, dangerously high levels of mold exposure, including black mold, and water damage, including in the ceiling light fixture and rotting doors and baseboards. An independent mold test confirmed the

135

presence of mold.

645.     Balfour was dismissive of their concerns. Balfour rejected the Stroud's independent mold test and accused them of violating their lease for hiring one. Balfour then refused to conduct their own or to remediate the mold. The Strouds learned that Balfour also withheld a report showing dangerously high levels of moisture.

646.     Due to the dangerous exposure in their home, the Strouds developed persistent congestion and allergy-like symptoms. The Strouds' daughters suffered from congestion, sore throats, and respiratory distress. Jessica Stroud developed chronic migraines, and Taylor Stroud experienced persistent sickness and skin irritation.

647.     Due to the dangerous conditions in the house, the Strouds were forced to leave their and  move into temporary housing multiple times.

648.     In early March 2024, after arriving at their new Balfour house at 1244B David Porter Road, Jessica Stroud noticed that the back bathroom had a terrible smell and was moldy. Balfour's reply was, "That's just Florida living."

649.     Floor adhesive seeped through tiles, pooled up, and spread onto household items, ruining them. The Stroud's escalated their complaints to Navy housing, and only when they threatened further escalation did Balfour finally begin some repairs.

650.     In August 2024, after months of inaction, the family reached a final breaking point. They moved off-base despite the financial strain of this decision. While packing, they uncovered additional signs of structural decay. Nails holding photos had rusted from moisture, and while wiping down the walls to clean them, Taylor's hand went straight through rotted drywall. After leaving Balfour housing, their health dramatically improved.

651.     When the Stroud family signed the lease, Balfour represented that their home was

136

in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Stroud family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

652.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Stroud family's home. Balfour knew or should have known that these representations were false and misleading. The Stroud family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

653.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

654.    The Stroud family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Taylor Family**

655.    Derek Taylor, his wife Shanna Taylor, and their child M.F., currently reside in Balfour housing. Shanna Taylor has lived in military base housing on and off throughout the years occupying multiple residences since 1992. M.F. has occupied two residences since 2016, and Derek Taylor moved into military housing in 2018 occupying two residences. After Shanna and M.F., and her two other children moved into their Balfour housing address at 1500 C Salmon Court in 2016, severe and persistent housing issues begin impacting their health and well-being.

137

656.     Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Taylor family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Taylor family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Taylor family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

657.     At Balfour housing, the Taylor family has experienced frequently HVAC leaks, which caused flooding in the living room and adjacent closets; black mold throughout the house; structural damage; leaks in the bathroom; and high moisture levels throughout the house.

658.     A noticeable odor permeated the home upon move-in, and the A/C unit leaked frequently, flooding the living room and adjacent closets due to the lack of drip pan. Despite repeated maintenance requests, including the request to install a drip pan, the issues persisted.

659.     In 2017, during a maintenance visit, Shanna observed a vendor concealing mold contamination. They removed baseboards, wiped a black substance with a towel, and reinstalled new baseboards, claiming the substance was "dirt." After Shanna insisted on halting the work to conduct a deeper investigation, contractors discovered black mold extending at least three feet up the wall. They later cut additional walls in the living room, A/C closet, pantry, and kitchen storage area, exposing even more mold, shown below. After witnessing the blatant disregard for properly

138

repair, along with cover-up attempts, Shanna was forced to miss work for all future maintenance work conducted inside the residence.



660.    In 2020, with her health in decline, Shanna asked for a medical accommodation to move into a single-story home. Within two days of moving into their 1225 Apt B Eugene Valencia Rd address, an undetected washer pipe leak flooded the bedroom. In response, Balfour provided a dehumidifier, neglecting to inspect or replace wet baseboards or walls.

661.    Eventually, the bathroom ceilings bubbled and cracked. When the maintenance manager arrived to assess the damage, he claimed condensation from A/C vents was at fault. Shanna's husband, an experienced home builder, noted the home was not built to code, and that mold resistant sheetrock was required.

662.    During this same visit, each wall and ceiling was tested for moisture, and it was discovered that the front door, foyer, living room, dining room, and the second of three bedrooms required portions of the ceiling to be cut out and replaced.

663.    Despite this, the family observed signs of worsened structural damage throughout the home. Maintenance requests for cracks in the kitchen ceiling were ignored. Rather than proper repair, wooden braces were installed in an attempt to delay ceiling collapse. Following the

installation of the wooden braces, the kitchen ceiling developed a long visible crack that stretched across the entire room. Large bubbles formed along the ceilings throughout the home, which created tremendous safety concerns for the family, who lived in constant fear of injury from structural failure.

664.    A persistent leak in the toilet caused bathroom floor tiles to become unstable, creating another hazard. At one point, loose tiles shifting beneath Shanna's feet and caused her to fall and hit her back and head. After days of worsening pain, she sought medical care. Balfour subsequently offered her $600 in compensation, citing her use of her own insurance and ability to work remotely as justification for the low amount.

665.    Despite repeated maintenance requests, the issues persisted, and Balfour failed to properly remediate the mold and repair the underlying issues in the house.

666.    The family's health symptoms became increasingly severe. Shanna Taylor experienced chronic fatigue, nosebleeds, asthma attacks, excessive hair loss, migraines, and burning eyes, all symptoms that worsen when she is inside her home. M.F. has nosebleeds, and headaches, along with severe cognitive and behavioral issues, including ADHD, learning deficits, and violent outbursts requiring medication and specialized educational support. Derek Taylor suffers from debilitating headaches, unexplained weight gain, and persistent exhaustion, all of which he never had prior to moving in with Shanna Taylor in military base housing.

667.    When the Taylor family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Taylor family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

668.    Balfour also represented that its representatives would adequately repair and

140

remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Taylor family's home. Balfour knew or should have known that these representations were false and misleading. The Taylor family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

669. Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

670. The Taylor family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Telfer Family

671. Jennifer Telfer, Dreyden Telfer, D.T., and S.T., moved into their Balfour home, 1138A Gilmore Drive, in September 2022, after signing a lease with Balfour.

672. Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Telfer family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Telfer family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes.

141

Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Telfer family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

673.    After moving in the family immediately encountered severe mold and water damage, as well as high indoor humidity levels. The Telfer family's HVAC system repeatedly failed, and a portable unit provided by Balfour leaked, damaging floors and furniture while raising the humidity levels to 90%. Visible mold in the HVAC system is shown below.



674.    Despite multiple maintenance requests, Balfour repeatedly failed to provide adequate repairs. Balfour dismissed independent mold findings. Due to the ongoing issues, the family was forced to relocate to another Balfour house at 2060 Halsey Drive in March 2023. However, conditions remained substandard, and by October 2024, Balfour acknowledged the need for long-term displacement. Despite this, Balfour failed to provide a clear timeline for any repairs and placed a lockbox on the home before the family could retrieve their belongings.

675.    The hazardous conditions severely impacted the family's health. Jennifer Telfer suffered from multiple upper respiratory infections, headaches, fatigue, rashes, and persistent

142

coughing. The children experienced headaches, chronic respiratory issues, walking pneumonia, fevers, and gastrointestinal distress.

676.    Repeated delays, failed repairs, and displacement weighed heavily on the family, leaving Jennifer Telfer and her children struggling with the financial and emotional toll.

677.    When the Telfer family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. Telfer family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

678.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Telfer family's home. Balfour knew or should have known that these representations were false and misleading. The Telfer family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

679.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

680.    The Telfer family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Trotter Family

681.    Astrid Trotter and her children Ki.T. and Ka.T., moved into their Balfour home at

1089A Dewey Rd., in 2013, after signing a lease with Balfour.

682.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Trotter family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Trotter family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Trotter family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

683.    After moving in they experienced serious health and safety concerns due to mold, water damage, asbestos, insect infestation, and structural defects. Moisture issues were evident, the flooring was compromised, and the air conditioning was faulty.

684.    Despite reporting these issues immediately, no adequate repairs were made.

685.    Between 2013 and 2016, the family's home remained unsafe. Their daughter woke up with ants crawling in her hair and on her face. Ceiling leaks persisted, and despite repeated complaints to the main office, the issues remained unresolved. On April 19, 2015, after returning from a family vacation, they discovered that the ceiling over their daughter's bed caved in, leaving a large, wet, mold-infested hole.

686.    These unsafe living conditions led to devastating health consequences. Astrid Trotter was diagnosed with Multiple Sclerosis in 2016. Her son, Ka.T., developed a compromised

144

immune system and had to take injections for the rest of his life. Her daughter, Ki.T., also suffered from immune system failure, and when she became sick, there was an additional threat of hospitalization due to organ failure risk.

687.    After exhausting all the avenues for help, the family was forced to relocate on January 16, 2017.

688.    When the Trotter family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Trotter family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

689.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Trotter family's home. Balfour knew or should have known that these representations were false and misleading. The Trotter family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

690.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

691.    The Trotter family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Vigren-Ulrich Family**

692.    Matthew Vigren, Kendra Ulrich, and their daughter C.V. moved into their Balfour home at 1165A Gilmore Drive, in September 2024.

693.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Vigren-Ulrich family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Vigren-Ulrich family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Vigren-Ulrich family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

694.    After moving in the family began experiencing serious health and safety concerns due to water damage and leaks that led to persistent moisture issues. The family was also exposed to soft spots in the ceiling.

695.    Despite repeated concerns and official inspections, Balfour failed to take meaningful action. Despite their timely reports of moisture including soft spots on the ceiling, Balfour failed to properly address this hazard. A month later, on October 23, 2024, Balfour conducted an MRI inspection of the home and determined that an abatement was necessary. However, no action followed.

146

696.    On November 5, 2024, Navy facilities engineers performed a walkthrough of the home, and on November 6, 2024, a moisture inspection determined that the home was a "low concern house." This designation failed to address the family's worsening health conditions.

697.    By December 4, 2024, more than two months after the abatement was scheduled, the family still had not received any further correspondence. Frustrated by a lack of progress, they attended a town hall meeting and inquired about the status of their home's abatement. Despite their persistence, no resolution was provided, prolonging their uncertainty and distress.

698.    These unsafe living conditions led to significant health issues. Matthew Vigren and Kendra Ulrich suffered from chronic headaches, fatigue, and stomach pains, while their nine-month-old daughter, C.V., developed a chronic cough, fatigue, itchy eyes, and constant restlessness.

699.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

700.    When the Vigren-Ulrich family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Vigren-Ulrich family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

701.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Vigren-Ulrich family's home. Balfour knew or should have known that these representations were false and misleading. The Vigren-Ulrich family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known

147

that Balfour would not properly repair and remediate the home they would not have done so.

702.   The Vigren-Ulrich family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Voiles Family

703.   Since July 2022, the Voiles family consisting of Joshua Voiles, Jannine Voiles and their children, P.V., L.V., and C.V., moved to their Balfour house in Sigsbee Park in July 2022 after signing the lease.

704.   Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Voiles family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Voiles family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Voiles family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

705.   Shortly after moving in, they experienced maintenance failures, including persistent water leaks, mold infestations, and structural failures. Water leaks caused mold damage

148

in the kitchen cabinets, there was mold contamination in the air vents shown below; and mold appeared in baseboards near the shower.



706.    Despite repeated complaints, Balfour neglected to address the hazards adequately, leaving the family to endure unsafe conditions. For example, a leak under the kitchen sink was reported in August 2022. Repairs were delayed for nearly three weeks, allowing the cabinet wood to deteriorate. Balfour never treated the mold caused by the leaks, even though they stated they would apply an anti-mold and moisture coating in the area. The family continued to notice damp spots in the area.

707.    In January 2024, work on a ceiling bracing project prompted Jannine to request professional cleaning due to concerns for her infant son's health. Balfour Vice President Paula Cook refused the request, stating that the child did not have a "medical disability," despite a supporting letter from a pediatrician.

708.    Due to the family's persistence, Balfour finally inspected the home and confirmed mold contamination in the air vents. However, they downplayed the findings as "discoloration" and failed to offer temporary housing during a weeks-long remediation process. Further

149

maintenance failures occurred in June and December 2024, as Balfour ignored promised mold-prevention treatments and opted to paint over blackened, musty baseboards.

709.    The prolonged exposure to mold and persistent damp conditions took a toll on the family's health. Jannine Voiles and Joshua Voiles frequently experienced sore throats, congestion, and chronic coughing. P.V. suffered from respiratory infections and skin issues.

710.    When the Voiles family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Voiles family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

711.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Voiles family's home. Balfour knew or should have known that these representations were false and misleading. The Voiles family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

712.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

713.    The Voiles family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

**The Winter Family**

714.    Samuel Winter, Kiley Winter, and their children, T.W. and D.W., moved into their Balfour home at 1170A Gilmore Dr, Key West, FL, in June 2023, after signing a lease with Balfour.

715.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Winter family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Winter family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Winter family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

716.    After moving in they experienced ongoing mold contamination, water damage, and structural defects. In addition, they noticed severe safety concerns, including bubbling paint, seeping liquid from the floors, and mold growth in multiple areas.

717.    Despite repeatedly reporting these hazards, Balfour failed to address the issues. Maintenance personnel dismissed concerns as "normal" and applied superficial fixes, such as re-caulking over mold rather than conducting proper remediation. Requests for mold testing were denied, and the family was falsely assured that repairs were complete, only to find mold regrowing within weeks. Independent inspections revealed persistent moisture issues, yet Balfour displaced

151

the family and later returned them to unsafe conditions without resolving the root cause of contamination.

718.    The hazardous living environment took a severe toll on the family's health. Kiley Winter suffered from chronic headaches, brain fog, sore throat, and congestion. Samuel developed a persistent cough and congestion. The children experienced ongoing respiratory issues, with D.W. suffering the most severe symptoms, including recurring strep throat, pneumonia, fevers, and vomiting. Despite medical treatment, their symptoms persisted.

719.    When the Winter family signed the lease, Balfour represented that their home was in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Winter family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

720.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Winter family's home. Balfour knew or should have known that these representations were false and misleading. The Winter family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

721.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

722.    The Winter family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts

and omissions.

## The Wylie Family

723.    William Wylie and Michele Wylie moved into their Balfour home at 1097B Dewey Rd residence on April 17, 2021, after signing a lease with Balfour.

724.    Though Defendants were fully cognizant of the widespread problems plaguing NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when leasing the home to the Wylie family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their dwelling was safe, properly maintained, and in livable condition, the Wylie family suffered significant harm. Balfour perpetuated this deception by falsely claiming to perform adequate maintenance while conducting superficial repairs that merely disguised deeper issues rather than addressing their root causes. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Wylie family, who were left with no choice but to continue living in dangerous conditions with no apparent path to resolution.

725.    After moving in they faced an overpowering mold odor and ant infestation. Over the next three years the Wylie's encountered significant problems with their housing, including mold growth, water damage, and plumbing problems which all lead to disruptive displacements and exacerbated health issues. Mold would appear behind the lights in the main bathroom and MRI testing showed that moisture levels were too high to register.

726.    Initially, when maintenance checked for moisture, Balfour said the ceiling connecting the living room and kitchen need to be removed. This repair required the Wylie's to move to a "Patriot House." Upon returning, the family found the odor of mold was persistent.

Balfour maintenance proposed cleaning out the vents as a solution. When Michele asked the maintenance worker if mold is fully removed from the ventilation system, his response was dismissive, as he claimed he "can only go as far as [his] arm reaches."

727.    After the vent cleaning, the mold was visible again, growing from behind the vents, the stove, and the kitchen cabinets. The family was displaced for the second time while the kitchen cabinets were removed, the drywall replaced, and the cabinets reinstalled. Bathrooms leaked from under the tile floors. Work orders submitted for this by the family but go unanswered. Maintenance insisted the repairs were being postponed prioritizing ceiling repairs for other tenants. Eventually, the Wylies' ceilings were braced, but bathroom leaks remained.

728.    Water ran down the hallway whenever the Wylies attempted to use their shower. No work was done despite Balfour's assurances that repairs would be completed while the family was away for Christmas. The Wylies were displaced for a third time, while plumbing work in both bathrooms was redone. By this time, the pipes had been leaking under the floors for about five months.

729.    The prolonged exposure had devastating consequences for Michele Wylie 's health. Once active and independent, working out three days a week, she struggled with basic mobility, and was eventually unable to get into her vehicle. Her preexisting Meniere's disease, which was previously limited to one episode before moving in, escalated drastically, triggering multiple episodes throughout her time at this address.

730.    The family's suffering extended beyond their own health. In July 2023, their dog, who had no prior medical issues, suddenly laid down in one of the bedrooms and died. The veterinarian suspected an aneurysm, which raised further concerns about their environment.

731.    When the Wylie family signed the lease, Balfour represented that their home was

154

in habitable condition. Balfour knew or should have known that this representation was false and misleading. The Wylie family relied on Balfour's representation when signing the lease. Had they known that the Balfour home was not habitable, they would not have signed the lease.

732.    Balfour also represented that its representatives would adequately repair and remediate the unsafe, unhealthy, and hazardous conditions in the leaks, mold, structural damage to the Wylie family's home. Balfour knew or should have known that these representations were false and misleading. The Wylie family relied on these representations and stayed in their home waiting for Balfour to make the repairs and remediate the mold issues. Had they known that Balfour would not properly repair and remediate the home they would not have done so.

733.    Defendants concealed the conditions of their housing and failed to properly remediate the problems despite repeated requests.

734.    The Wylie family suffered serious health problems and economic damages (including loss of personal property, repair costs and current and future medical expenses), emotional distress, and mental anguish as a direct result of the unsafe and unhealthy conditions at their Balfour home, Defendants' failure to redress those conditions, and Defendants' other acts and omissions.

### The Figueroa Family

735.    Alejandro and Zuki Figueroa worked as post-construction cleaning vendors for Balfour from 2021 to 2024. During this time, they cleaned numerous properties, unknowingly exposing themselves to hazardous materials, including mold, asbestos, and lead. Despite the known environmental dangers, Balfour failed to provide safety reports or disclose potential risks to the workers.

736.    Though Defendants were fully cognizant of the widespread problems plaguing

NAS Key West housing—including chronic rodent and insect invasions, compromised structural integrity, pervasive mold growth, and defective plumbing systems—they deliberately withheld this critical information when hiring the Figueroa family, concealing serious safety hazards and defects. Placing their trust in Balfour's deceptive assurances that their work environment was safe, the Figueroa family suffered significant harm. Throughout this ordeal, Balfour consistently refused to accept responsibility, provide financial compensation, or offer meaningful assistance to the Figueroa family, who were left with no choice but to continue to work in dangerous conditions with no apparent path to resolution.

737.    The Figueroas later learned that many of the homes they worked in had documented mold infestations, water damage, and lead contamination. At no point were they warned of these risks, nor were they provided with protective measures to mitigate exposure.

738.    The realization of prolonged exposure to hazardous materials has caused significant distress for the Figueroa's. The couple remains concerned about potential long-term health effects due to Balfour's failure to inform and protect them.

## CAUSES OF ACTION

### COUNT I: Breach of Contract
### (by all Plaintiffs (except the Figueroa Family) against all Defendants)

739.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 – 738 as if fully set forth here at length.

740.    Plaintiffs, except for the Figueroa Family, have valid leases with the Balfour Defendants. Under the leases signed by the Plaintiffs (except for the Figueroa Family), Balfour owed contractual obligations to Plaintiffs to provide habitable housing and remedy leaks, mold, and other issues with the housing.

741.    Defendants' contractual obligations arise out of the leases between Plaintiffs and

156

Southeast Housing and Balfour Beatty Communities LLC, as well as contracts between the United States and Defendants for property management, repairs, and developments.

742.    Balfour failed to comply with the material terms of each Lease by failing to ensure the houses were fit for human habitation and by failing to timely and adequately repair and remedy the conditions at the premises.

743.    Balfour's conduct also breached the duty of good faith and fair dealing implied in Plaintiffs' leases with Balfour.

744.    As direct and foreseeable results of Defendants' breaches,  Plaintiffs suffered physical, psychological, emotional, and financial harm.

745.    As a direct and foreseeable result of these breaches Plaintiffs suffered substantial actual damages, including personal and property damages, future economic damages, and attorney's fees and costs.

746.    As a direct and foreseeable result of these breaches, the Plaintiffs suffered special damages and will require testing/medical monitoring.

## COUNT II: Negligence
### (by all Plaintiffs against all Defendants)

747.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 – 738 as if fully set forth here at length.

748.    The Defendants lease, operate, manage, maintain, and repair the homes at Naval Air Station Key West.

749.    Balfour owed a duty to exercise reasonable case in the operation, management, maintenance, and repair of the homes at NAS Key West. Defendants negligently failed to meet the standard of care in performing those duties.

750.    Defendants' acts and omissions, as detailed in this Complaint, in performance of

157

their duties as Plaintiffs' landlords, and as the Figueroas' employer, fell far below the standard of care owed to Plaintiffs under Florida law.

751.    Defendants' acts and omissions breached the duty of reasonable care owed to Plaintiffs by failing to maintain Plaintiffs' housing to ensure the homes were not a threat to the health and safety of Plaintiffs and were otherwise fit for human habitation.

752.    Balfour breached the duty to exercise ordinary care as discussed previously in the Complaint, and at least in the following respects:

a.    Defendants failed to remediate defects they knew, or should have known, with the exercise of reasonable diligence, would cause moisture intrusion, elevated indoor humidity, and microbial growth;

b.    Defendants failed to reasonably repair and remediate residents' complaints of mold, water leaks, faulty wiring, lead, asbestos, and pests;

c.    Defendants failed to implement appropriate safety protocols to protect residents from toxic mold and asbestos;

d.    Defendants failed to respond timely to mold complaints;

e.    Defendants failed to properly install or replace HVAC systems;

f.    Defendants knew or should have known of the hazardous conditions in Plaintiffs' homes and failed to take corrective action;

g.    Defendants failed to warn Plaintiffs that they were being exposed to toxic mold and asbestos;

h.    Defendants ordered inexperienced, unlicensed workers to repair and remediate Plaintiffs' homes;

i.    Defendants knew that maintenance failures had compromised the safety of

158

Plaintiffs' homes;

j.    Defendants engaged in additional safety violations and breaches of the duty of care to be determined upon discovery.

753.    As direct and foreseeable results of Defendants' negligence, Plaintiffs suffered physical, psychological, emotional, and financial harm.

754.    As a direct and proximate result of the negligence of Defendants and their employees, the Plaintiffs suffered substantial physical injuries and damages, as well as mental and emotional distress related to those physical injuries.

755.    As a direct and proximate result of the negligence of Defendants, the Plaintiffs suffered special damages and will require testing/medical monitoring.

756.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered damage to their personal property.

757.    Plaintiffs are entitled to actual damages in an amount to be determined at trial sufficient to compensate the Plaintiffs for the negligence of Defendants.

## COUNT III:  Gross Negligence
### (by all Plaintiffs against all Defendants)

758.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 – 738 as if fully set forth here at length.

759.    The Defendants lease, operate, manage, maintain, and repair the homes at Naval Air Station Key West.

760.    Balfour owed a duty to exercise reasonable case in the operation, management, maintenance, and repair of the homes at NAS Key West. Defendants grossly negligently failed to meet the standard of care in performing those duties.

159

761.    Defendants' acts and omissions have been grossly below the applicable standard of care. Moreover, Defendants were recklessly indifferent to the consequences of their acts and omissions, and failed to demonstrate even the slight diligence that a landlord would have exercised under the same or similar circumstances.

762.    Defendants' acts and omissions, as detailed in this Complaint, in performance of their duties as Plaintiffs' landlords were below the standard of care owed to the Plaintiffs and recklessly indifferent to the consequences in the operation and maintenance of the Plaintiffs' homes, and at least in the following respects:

a.    Defendants failed to remediate defects they knew, or should have known, with the exercise of reasonable diligence, would cause moisture intrusion, elevated indoor humidity, and microbial growth

b.    Defendants failed to reasonably repair and remediate residents' complaints of mold, water leaks, faulty wiring, asbestos, lead, and pests;

c.    Defendants failed to implement appropriate safety protocols to protect residents from toxic mold and asbestos;

d.    Defendants failed to respond timely to mold complaints;

e.    Defendants failed to properly install or replace HVAC systems;

f.    Defendants knew or should have known of the hazardous conditions in Plaintiffs' homes and failed to take corrective action;

g.    Defendants failed to warn Plaintiffs that they were being exposed to toxic mold, asbestos, and lead ;

h.    Defendants ordered inexperienced, unlicensed workers to repair and remediate Plaintiffs' homes;

160

     i.    Defendants knew that maintenance failures had compromised the safety of Plaintiffs' homes;

763.    As direct and foreseeable results of Defendants' gross negligence, Plaintiffs suffered physical, psychological, emotional, and financial harm.

764.    As a direct and proximate result of Defendants' gross negligence, the Plaintiffs suffered substantial physical injuries and damages, as well as mental and emotional distress related to those physical injuries.

765.    As a direct and proximate result of the gross negligence of Defendants, the Plaintiffs suffered special damages and will require testing/medical monitoring.

766.    As a direct and proximate result of the Defendants' gross negligence, Plaintiffs suffered damage to their personal property.

767.    Plaintiffs are entitled to actual damages in an amount to be determined at trial sufficient to compensate the Plaintiffs for the gross negligence of Defendants.

## COUNT IV: Nuisance
### (by all Plaintiffs (except the Figueroa Family) against all Defendants)

768.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 – 738 as if fully set forth here at length.

769.    Plaintiffs are, or during some or all of the pertinent times were, in lawful possession of their properties, and used them, or had the right to use them, as residences.

770.    Balfour owned and materially controlled the Plaintiffs' properties.

771.    Balfour is liable for creating a continuing condition at the Plaintiffs' residences that interfered with their right to use and enjoy those properties. The employees' conduct thereby caused a nuisance to the Plaintiffs.

772.    The Plaintiffs' right to use and enjoy their properties has been impaired by Balfour.

161

773.     The nuisance caused by Balfour has substantially impaired the Plaintiffs' use and enjoyment of their property, has caused inconvenience, decreased quality of life, physical and mental discomfort, reasonable fear of disease, and adverse health effects.

774.     Defendants' conduct has been unreasonable. Reasonable persons, generally, looking at Defendants' conduct, the problems caused by it, and the nature of the harm to the Plaintiffs' properties and health, would consider Defendants' conduct to be unreasonable.

775.     The invasions, harms, and injuries complained of herein by the Plaintiffs are substantial invasions, harms, and injuries to the Plaintiffs' health, both physical and mental.

776.     Balfour knew or should have known that by not maintaining Plaintiffs' homes it would substantially impair the Plaintiffs' health and use and enjoyment of their properties.

777.     While knowing that practicable technologies and methods are available to abate mold and the other unsafe, unhealthy, and hazardous conditions at Plaintiffs' homes, Defendants have failed to abate the causes of nuisance.

778.     Defendants' conduct described above constitutes a series of recurring abatable nuisances, which Defendants have failed to remedy within a reasonable period of time, and for which Defendants are liable.

779.     As direct and foreseeable results of the nuisances created and caused by Defendants,  Plaintiffs suffered physical, psychological, emotional, and financial harm.

780.     As a result of Defendants' liability for recurring abatable nuisances, the Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

### COUNT V: Negligent Infliction of Emotional Distress
### (by all Plaintiffs against all Defendants)

781.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 – 738 as if fully set forth here at length.

162

782.    By its acts and omissions, Balfour caused physical injuries to Plaintiffs, which thereby caused the Plaintiffs worry, anxiety, anguish, suffering, and grief.

783.    Balfour knew or should have known that Plaintiffs' homes were unsafe to reside in or to work in, and that it was probable that additional problems, including exposure to dangerous or toxic substances, would occur and cause substantial damage if it did not act.

784.    Balfour is liable for the exact consequences that it knew or should have known would happen and for which it accepted the risk.

785.    Plaintiffs, as well as their children, spouses, and other occupants of their homes, have suffered, are suffering, and will continue to suffer because of the Defendants' acts and omissions.

786.    As direct and foreseeable results of Defendants' conduct and omissions, Plaintiffs suffered severe physical,  psychological, and emotional harm.

787.    Defendants' conduct was a substantial factor in causing the Plaintiffs' severe emotional distress.

788.    Plaintiffs have been damaged in an amount to be proven at the time of trial.

### COUNT VI: Breach of Warranty of Habitability
### (by all Plaintiffs (except the Figueroa Family) against all Defendants)

789.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 – 738 as if fully set forth here at length.

790.    Defendants owed Plaintiffs a duty to provide Plaintiffs with habitable living conditions, under Fla. Stat. § 83.51, including but not limited to a duty to exercise reasonable case in the operation, management, maintenance, and repair of Plaintiffs' homes at NAS Key West. Defendants negligently failed to meet the standard of care in performing those duties.

791.    In the Leases between the Defendants and Plaintiffs, Defendants warranted that the

163

NAS Key West housing was safe, habitable, and free from defects. Defendants did not reasonably maintain the homes to meet the ordinary and normal standards of fitness and rendered them uninhabitable.

792.   Defendants breached the express and implied warranty of habitability.

793.   As a direct and proximate result of Defendants' breach of the express and implied warranty of habitability, the Plaintiffs have been injured.

794.   As direct and foreseeable results of Defendants' breaches, Plaintiffs suffered physical, psychological, emotional, and financial harm.

795.   As a direct and proximate result of Defendants' breach of the express and implied warranty of habitability, the Plaintiffs suffered substantial physical injuries and damages, as well as mental and emotional distress related to those physical injuries.

796.   As a direct and proximate result of Defendants' breach of the express and implied warranty of habitability by Defendants, the Plaintiffs suffered special damages and will require testing/medical monitoring.

797.   As a direct and proximate result of Defendants' breach of the express and implied warranty of habitability, Plaintiffs suffered damage to their personal property.

798.   Plaintiffs are entitled to actual damages in an amount to be determined at trial .

### COUNT VII: Fraud
### (by all Plaintiffs against all Defendants)

799.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 – 738 as if fully set forth here at length. Plaintiffs further count to the specific allegations and misrepresentations set forth in paragraphs 151-162 (Talarico), 163-172 (Alger), 173-184 (Baillie), 185–194 (Bastian), 233–242 (Caputo), 305–312 (Fellows), 313–327 (Fothergill), 328–340 (Frates), 341–348 (Gonzalez), 349–357 (Graham), 358–372 (Guess), 373–382 (Hernandez), 383–

164

398 (Hester), 399–409 (Hurd), 410–420 (Johnston), 470–483 (McCarthy), 514–525 (Moody), 579–591 (Sanchez), 613–622 (Serop), 632–641 (Stevens), 642–654 (Stroud), 671–680 (Telfer), 692–702 (Vigren-Ulrich).

800.    Defendants deliberately and willfully made knowingly false and material statements regarding the habitability and safety of the Plaintiffs' housing as described in detail in this Complaint and affirmatively concealed the truth by omission regarding the condition of the homes.

801.    Defendants also made false statements about the status, sufficiency, and success of the repairs and remediation work as described in the Complaint.

802.    Defendants, through their agents and representatives, including management personnel, maintenance persons, and third-party contractors, made statements to Plaintiffs that the homes did not contain toxic mold and were suitable for habitation.

803.    These representations were material to Plaintiffs' decisions to remain in the housing, causing Plaintiffs' BAH to continue to be paid to Defendants.

804.    Defendants knew or reasonably should have known about the false statements concerning the condition of the homes and that material information regarding the condition of the home had been omitted.

805.    To cover up the breaches of the duty of care Defendants owed to the Plaintiffs, Defendants intentionally made knowing and false statements that adequate repairs to their houses had been completed.

806.    But for the Defendants' false statement and material omissions, Plaintiffs would not have signed the leases for their Balfour homes.

807.    As a direct and proximate result of Defendants' fraud, the Plaintiffs suffered

substantial physical injuries and damages, as well as mental and emotional distress related to those physical injuries.

808.    As a direct and proximate result of Defendants' fraud, the Plaintiffs suffered special damages and will require testing/medical monitoring.

809.    As a direct and proximate result of Defendants' fraud, Plaintiffs suffered damage to their personal property.

### COUNT VIII: Third-Party Beneficiary Contract
### (by all Plaintiffs (except the Figueroa Family) against all Defendants)

810.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 - 738 as if fully set forth here at length.

811.    Defendants are bound by the contracts they entered into with the United States and Department of the Navy respecting MHPI housing at NAS Key West, including the ground lease.

812.    On information and belief, Plaintiffs were the intended beneficiaries of the underlying contract, including, but not limited to, provisions in the ground leases that Balfour provide professional management and maintenance of the military housing.

813.    It was the intent of Balfour, the United States, and the Department of Navy to benefit the service members living at NAS-Key West.

814.    These obligations were included in the underlying contracts to ensure military service members, including Plaintiffs and their families, would be provided with safe and habitable housing.

815.    Balfour breached the requirements of the underlying contracts by failing to provide professional management, maintenance operations and renovation of the homes at NAS – Key West.

816.    Balfour also breached the requirements of the underlying contracts by failing to

166

adhere to federal, state, and local lead-paint based regulations and local housing codes

817.   Balfour's conduct also breached the duty of good faith and fair dealing implied in the underlying contracts.

818.   As a direct, proximate, and foreseeable result of the Balfour breaches of the Underlying Contracts, the Servicemembers, as intended, direct, third- party beneficiaries of such contracts, sustained damages.  They are entitled to recover from  Balfour Defendants, jointly and severally, all actual damages, economic damages incurred in the past, and economic damages to be incurred in the future.

### COUNT IX: Negligence Per Se
### (by all Plaintiffs (except the Figueroa Family) against all Defendants)

819.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-738 as if fully set forth here at length.

820.   Defendants owed Plaintiffs a particular duty to take steps to protect them from the specific injuries outlined in this Complaint.

821.   This duty was created by statutes specifically intended to protect Plaintiffs from those harms.

822.   Plaintiffs' houses were "unfit for habitation" pursuant to Key West's Unsafe and Unsanitary Buildings Ordinance. §14-71 *et seq.*

823.   Defendants were required to abate the dangers posed by such homes due to their potential to be "injurious to the health of the people." §14-74.

824.   Plaintiffs' houses were unsafe buildings as defined by Monroe County Building Code § 6-27.

825.   Defendants were required to abate the danger posed by those homes pursuant to § 6-27(c).

167

826.    The purpose of Key West's Unsafe and Unsanitary Buildings Ordinance is to protect city residents from dwellings that are "unsafe or insanitary or dangerous or detrimental to the health, safety or morals, or otherwise inimical to the welfare." §14-75.

827.    The purpose of Monroe County Building Code § 6-27 is to protect residents from buildings that are "unsafe, unsanitary … or otherwise harmful or dangerous to human life, or which in relation to existing use, constitute a hazard to safety or health."

828.    Florida has a statutory framework regulating mold-related services in order to protect Plaintiffs from the injuries described above. Fla. Stat. § 468.84-8424,

829.    The Florida legislature determined that this chapter is "necessary in the interest of the public safety and welfare, to prevent damage to real and personal property, to avert economic injury to the residents of this state, and to regulate persons and companies that hold themselves out to the public as qualified to perform mold-related services." § 468.84

830.    Defendants failed to comply with the following statutory requirements:

a.    "A person may not … perform or offer to perform any mold assessment unless the mold assessor has documented training in water, mold, and respiratory protection under s. 468.8414(2)." § 468.8419(1)(a).

b.    "A person may not …  Perform or offer to perform any mold remediation to a structure on which the mold assessor or the mold assessor's company provided a mold assessment within the last 12 months." § 468.8419(1)(d).

c.    "A person may not … accept an engagement to make an omission of the assessment or conduct an assessment in which the assessment itself, or the fee payable for the assessment, is contingent upon the conclusions of the assessment." § 468.8419(1)(h).

168

d. "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest in a company employing a mold remediator may not …Perform or offer to perform any mold remediation unless the remediator has documented training in water, mold, and respiratory protection under s. 468.8414(2)." § 468.8419(2)(a).

e. "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest in a company employing a mold remediator may not …Perform or offer to perform any mold assessment to a structure on which the mold remediator or the mold remediator's company provided a mold remediation within the last 12 months." § 468.8419(2)(d).

831.    The plaintiffs are members of the class that each of the above statutes were designed to protect.

832.    The statutes were intended to protect residents from the sorts of exposure-based injuries suffered by the plaintiffs and described in this complaint.

833.    The violation of those statutes constitutes negligence per se and was the proximate cause of the plaintiffs' injuries.

### COUNT X: Medical Monitoring
### (by all Plaintiffs against all Defendants)

834.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 - 738 as if fully set forth here at length.

835.    Plaintiffs were exposed to greater than normal background levels of hazardous substances as described in the Complaint. For all Plaintiffs, the exposure to these toxic substances included, in combination and separately, mold, lead, and asbestos.

169

836.   All of the Plaintiffs have a significantly increased risk of contracting serious latent diseases because of that exposure.

837.   Monitoring procedures make early detection of those diseases possible. Different monitoring procedures will be necessary depending on the exposure of each Plaintiff, but all Plaintiffs would benefit from monitoring.

838.   The monitoring procedure would be unnecessary in the absence of the Plaintiffs' exposure.

839.   Given the exposure, the prescribed monitoring regimes are reasonably necessary according to contemporary scientific principles.

840.   Plaintiffs request the cost of medical monitoring necessary to detect the onset of physical harm and/or, in the alternative, that the court use its equitable powers to create and supervise a medical monitoring fund.

### COUNT XI Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA)
### (by all Plaintiffs (except the Figueroa Family) against all Defendants)

841.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 – 738 as if fully set forth here at length.

842.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts, or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Section 501.204, Fla. Stat.

843.   # At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at NAS-Key West, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA, *see, e.g.,* Section 501.203, Fla. Stat.

844.   At all relevant times, Plaintiffs were consumers within the meaning of the

170

FDUTPA, *see, e.g.,* Section 501.203, Fla. Stat.

845.    Defendants' practices relating to Plaintiffs' Balfour housing at NAS Key West, as described in detail in this Complaint, constituted unfair, false, misleading, deceptive, and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

846.    Defendants made false, misleading, and/or deceptive representations    that Plaintiffs' Balfour homes were in habitable condition and thus far more valuable than they were in reality. In the leases between Defendants and Plaintiffs, Defendants falsely warranted that the NAS Key West housing was safe, habitable, and free from defects. Such acts and practices were unfair, false, misleading, deceptive, and unconscionable within the meaning of FDUTPA.

847.    Defendants failed to disclose information about the condition of Plaintiffs' Balfour housing that was known to Defendants when they leased the homes to Plaintiffs with the intention to induce Plaintiffs into leasing the homes at a cost beyond what they were actually worth.

848.    Defendants also made false, misleading, and/or deceptive representations that repairs and remediation efforts in Plaintiffs' Balfour homes were performed completely and to the standard of care required of professional landlords. In fact, those repair and remediation efforts often fell far below the standard of care, and failed to adequately address the unsafe, unhealthy, and hazardous conditions in Plaintiffs' homes. Defendants failed to disclose the grossly inadequate nature of their repair and remediation efforts. Plaintiffs therefore paid far more in rent than their homes were actually worth. Such acts and practices were unfair, false, misleading, deceptive, and unconscionable within the meaning of FDUTPA.

849.    Defendants' acts and practices at NAS-Key West also exposed Plaintiffs to unsafe and unhealthy conditions, including structural defects, collapsed ceilings, water leaks, HVAC

issues, and pest and vermin infestations. These abhorrent conditions were known to Defendants. These conditions exposed Plaintiffs to hazardous substances, including toxic mold, asbestos, and lead. Given those unconscionable conditions, Plaintiffs' interests in their Balfour homes were only worth a small fraction of the rental payments for those homes. Defendants' acts and practices offended established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. As such, those acts and practices were unfair, false, misleading, deceptive, and unconscionable within the meaning of FDUTPA and thus violated the FDUTPA.

850.    As a result of Defendants,' unfair, false, misleading, deceptive, and unconscionable acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorney fees, and court costs. *See, e.g.,* Section 501.211, Fla. Stat.

## DAMAGES

As a result of the Defendants' breaches, negligence, gross negligence, fraud, and other acts and omissions described in this Complaint, Plaintiffs have sustained damages and injuries including but not limited to the following:

a.    Past and future physical pain and suffering;

b.    Past and future mental anguish and emotional distress;

c.    Past and future medical, healthcare, and attendant care expenses;

d.    Past and future lost income and earning capacity;

e.    Past and future physical impairment;

f.    Past and future loss of enjoyment and quality of life;

g.    Past and future loss of enjoyment of property;

h.    Increased risk of future harm and medical monitoring for life;

172

     i.        Loss of life expectancy;

     j.        Nuisance damages, including inconvenience, illness, and fear;

     k.       Out of pocket expenses;

     l.        Loss of personal property; and

     m.      Costs.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court:

     a.       Award the Plaintiffs compensatory damages and punitive damages, in an amount to be determined at trial;

     b.       Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees, including attorneys' fees, to which they may be entitled by law; and

     c.       Grant the Plaintiffs such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all so triable.

Dated:  March 27, 2025.

                    Respectfully submitted,

                    */s/ Robert J. McKee*
                    Robert J. McKee
                    Florida Bar No.: 972614
                    **THE MCKEE LAW GROUP, LLC**
                    2800 South Flamingo Road
                    Davie, Florida 33330
                    Tel: (954) 888-9877
                    Fax: (954) 217-0150
                    rmckee@themckeelawgroup.com

                    *Attorney for Plaintiffs*

173