**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE:  KEY WEST NAS LITIGATION

CASE NO. 4:25-cv-10037

**District Judge David S. Leibowitz**
**Magistrate Judge Edwin G. Torres**

_____/

THIS DOCUMENT RELATES TO: ALL CASES

## ORDER

**THIS CAUSE** is before the Court upon Defendants' Motion To Partially Dismiss Plaintiffs' Master Complaint [ECF No. 162] (the "Motion"), filed on April 27, 2026.  In the Motion, Defendants Balfour Beatty Communities, LLC ("BBC"), Southeast Housing, LLC ("Southeast Housing"), Balfour Beatty Military Housing Management, LLC ("Balfour Beatty Management"), BBC Military Housing-Navy Southeast, LLC ("BBC-NSE"), and Balfour Beatty Investments, Inc. ("BBI") (collectively, the "Defendants" or "Balfour") move to dismiss certain claims asserted in the Master Complaint dated March 6, 2026, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs have responded in opposition [ECF No. 169].  The Court need not await Defendants' reply to make its rulings, given the Court's schedule for this case.  [*See* ECF No. 152].  Upon due consideration of the Motion, the Master Complaint, the parties' papers, relevant portions of the record, and the governing law, the Motion is GRANTED IN PART and DENIED IN PART.

## I.      INTRODUCTION

This mass action is brought under 28 U.S.C. § 1332(d)(2) and (d)(11), by a group of military service members against private companies (collectively, "Balfour") that owned and/or operated the service members' military housing units located at the Naval Air Station Key West ("NAS Key West").  The Master Complaint alleges Defendants put Plaintiffs' "health, safety, and financial security … at

serious risk" by "fail[ing] or refus[ing] to address housing problems" at NAS Key West.  [SAC, ECF

No. 136 ¶¶ 2, 102].  Specifically, Plaintiffs allege:

> [Plaintiffs] have had to live with appalling conditions in their Balfour housing.  Ceiling collapses, water damage, faulty air conditioning, structural defects, pest infestations, and/or exposure to toxic mold and asbestos were part of [Plaintiffs']… day-to-day existence at their Balfour homes.… led to devastating health consequences for virtually all of [Plaintiffs'] families. These health effects can be traced to the mold and other environmental hazards to which [Plaintiffs]…  were exposed every day.
>
> Plaintiffs also suffered severe emotional harm as a result of their coming into contact with toxic substances and other hazards.
>
> Additionally, …the continuous stress [Plaintiffs] … experienced as a direct result of having to live with both the deplorable housing conditions they were subjected to by Balfour, and the effects these conditions had on their physical health and well-being, have also led them to suffer severe mental anguish and emotional distress that has often manifested physically.

[*Id.* ¶ 3].

Based on these allegations, among others, Plaintiffs assert the following twenty (20) causes of

action against all Defendants under Florida law:

> Count I (breach of contract);
> Count II (negligence);
> Count III (gross negligence);
> Count V[1] (negligent infliction of emotional distress);
> Count VI (intentional infliction of emotional distress);
> Count VII (breach of warranty of habitability);
> Count VIII (third-party beneficiary contract);
> Count IX (negligence *per se*);
> Count X (medical monitoring);
> Count XI (FDUTPA claim—unfair conduct);
> Count XII (FDUTPA claim—deceptive conduct);
> Count XIII (negligent misrepresentation concerning condition of home);
> Count XIV (negligent misrepresentation concerning remediation of unsafe conditions);
> Count XV (fraudulent inducement);
> Count XVI (fraudulent misrepresentations);
> Count XVII (fraudulent concealment of condition of housing);
> Count XVIII (fraudulent concealment leading to decisions to remain in homes);
> Count XIX (fraudulent misrepresentation by Figueroa family only);

---

[1]    Plaintiffs have withdrawn Count IV (nuisance) asserted in the First Amended Complaint.  [*See* ECF No. 136 at 307; ECF No. 289 ¶¶ 1468–84].

Count XX (fraudulent concealment by Figueroa family only); and
Count XXI (negligent misrepresentation by Figueroa family only).  [*Id.* at 302–31].

For relief, Plaintiffs seek damages for past and future physical pain and suffering; past and future mental anguish and emotional distress; past and future medical, healthcare, and attendant care expenses; past and future lost income and earning capacity; past and future physical impairment; past and future loss of enjoyment and quality of life; past and future loss of enjoyment of property; increased risk of future harm and medical monitoring for life; loss of life expectancy; nuisance damages, including inconvenience, illness, and fear; out of pocket expenses; loss of personal property; and costs, expenses, and fees (including attorney fees), as well as punitive damages and pre-/post-judgment interest.  [*Id.* at 331–32].

## II.     STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotations omitted)).  To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  When reviewing a motion to dismiss under Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiffs receive the benefit of all favorable inferences that can be drawn from the facts alleged. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Iqbal*, 556 U.S. at 678.  However, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.  Evidence on a 12(b)(6) motion is generally limited to the facts contained in the complaint and attached exhibits. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009).

### III.    DISCUSSION

Defendants attack the Master Complaint under Rule 12(b)(6) with respect to certain claims asserted against particular Defendants.  [*See generally*, ECF No. 162].  Consequently, each Defendant's relationship to NAS Key West and Plaintiffs, as pleaded in the Master Complaint, is described here as follows:

- **Defendant Southeast Housing** is a public-private venture between the United States Department of the Navy and Defendant BBC-NSE.  [SAC, ECF No. 136 ¶ 93].  Southeast Housing was created to lease the land, to assume title to the improvements, and to operate the military housing units at NAS Key West.  [*Id.* ¶ 95]. "According to sworn testimony provided by a senior Balfour official in 2013, Southeast Housing had no employees of its own.  On information and belief, at the times relevant to this action, Southeast Housing had no or very few employees and instead operated through personnel employed by other Balfour entities or through contractors and vendors."  [*Id.*].  Southeast Housing signed Plaintiffs' leases, and its Operating Agreement makes clear BBC-NSE controls Southeast Housing as its managing member.  [*Id.* ¶ 141].

- **Defendant BBC-NSE** is the managing member of Southeast Housing and "exerts sole and exclusive management and control of Southeast Housing."  [*Id.* ¶ 95]. BBC-NSE also contracted with the federal government to own, operate, or manage rental housing at NAS Key West.  [*Id.* ¶ 103].

- **Defendant Balfour Beatty Management**'s sole member is Defendant BBC. [*Id.* ¶ 98].  Balfour Beatty Management serves as a property manager for NAS Key West military housing.  [*Id.* ¶ 145].

- **Defendant BBC**'s sole member is Defendant BBI. [*Id.* ¶ 99]. "BBC is the owner, through an intermediary, of Defendant BBC-NSE." [*Id.* ¶ 139].

- **Defendant BBI** "derives substantial direct or indirect revenue and/or value from its investments in military housing, including but not limited to its indirect investments (through… BBC, of which it is the sole member), in military housing in Florida (including at NAS Key West)." [*Id.* ¶ 122].[2] BBI "directly participates in NAS Key West operations," through personnel who (1) identified themselves to Plaintiffs as BBI's representatives in interactions about NAS Key West housing; (2) handled Plaintiffs' housing complaints and maintenance; (3) scheduled and attended calls with Plaintiffs (the Talaricos) about their NAS Key West residence; (4) referred Plaintiffs to the "BBI Helpdesk" to log support requests; and (5) signed some of Plaintiffs' leases on behalf of BBI with instructions on how to contact BBI. [*Id.* ¶ 136].

For efficiency and convenience of the reader, the Court organizes its discussion in the same order as the Motion. Here's the roadmap: First, the Court addresses whether BBC-NSE and BBI must be dismissed because Plaintiffs inadequately pleaded vicarious liability with respect to these entities. [*See* ECF No. 162 at 16–19]. Next, the Court considers whether all breach-of-contract claims must be dismissed except those asserted against Southeast Housing (the only signatory to Plaintiffs' leases). [*See id.* at 19–20]. After that, the Court examines whether Plaintiffs plausibly plead a claim for intentional infliction of emotional distress under Florida law. [*See id.* at 20–23]. The Court's consideration of Plaintiffs' third-party beneficiary claims follows. [*See id.* at 23–29]. Then, the Court takes up the penultimate issue regarding whether Plaintiffs' negligent/fraudulent misrepresentation

---

[2] BBI has separately moved for dismissal under Rule 12(b)(2) for lack of personal jurisdiction. [*See* ECF No. 161]. The undersigned referred that motion to U.S. Magistrate Judge Edwin G. Torres for a report and recommendation. [*See* ECF No. 166]. Thus, this Order addresses only whether claims asserted against BBI survive dismissal under Rule 12(b)(6).

claims are barred by Florida's independent tort doctrine.  [*See id.* at 29–31].  Finally, the Court reaches Defendants' challenge to the counts for unfair trade practices under FDUTPA.  [*See id.* at 31–3].

### A. Plaintiffs' claims against BBC-NSE and BBI

Defendants move to dismiss all of Plaintiffs' claims asserted against BBC-NSE and BBI for failure to plausibly plead facts sufficient to make these entities vicariously liable for the actions complained of in the Master Complaint.  [ECF No. 162 at 16–19].  This motion is DENIED.

1.  Florida law governing vicarious liability of a parent company

In Florida, a parent company can be held liable for the acts of its subsidiaries in three ways: "(1) an alter ego theory to 'pierce the corporate veil;' (2) vicarious liability based on general agency principles; or (3) direct liability where the parent directly participated in the wrong complained of." *Alvarez Galvez v. Fanjul Corp.*, 533 F. Supp. 3d 1268, 1283–84 (S.D. Fla. 2021) (citation and internal quotation marks omitted).

2.  Plaintiffs' allegations

The Master Complaint alleges that **BBC-NSE**: (1) contracted with the federal government to own, operate, or manage rental housing at NAS Key West [SAC, ECF No. 136 ¶ 103]; (2) "exerts sole and exclusive management and control of Southeast Housing" [*id.* ¶ 95]; (2) "Southeast Housing signed Plaintiffs' leases, but it is entirely controlled by BBC-NSE" [*id.* ¶ 141]; (3) "Southeast Housing's Operating Agreement makes clear that BBC-NSE, as the managing member, controls it" [*id.*]; and (4) "Southeast Housing does not have any employees distinct from the other Defendants.  In fact, at the times relevant to this action, Southeast Housing had no or very few employees, and instead operated through personnel employed by other Balfour entities or through contractors and vendor." [*id.* ¶ 142].

As for **BBI**, the Master Complaint alleges that it "derives substantial direct or indirect revenue and/or value from its investments in military housing, including but not limited to its indirect investments (through… BBC, of which it is the sole member), in military housing in Florida (including

6

at NAS Key West)." [*Id.* ¶ 122]. BBI "directly participates in NAS Key West operations" through personnel who (1) identified themselves to Plaintiffs as BBI's representatives in interactions about NAS Key West housing; (2) handled Plaintiffs' housing complaints and maintenance; (3) scheduled and attended calls with lead Plaintiffs (the Talaricos) about their NAS Key West residence; (4) referred Plaintiffs to the "BBI Helpdesk" to log support requests; and (5) signed some of Plaintiffs' leases on behalf of BBI with instructions on how to contact BBI. [*Id.* ¶ 136].

   3.   Parties' arguments

Defendants urge dismissal of all claims asserted against BBC-NSE and BBI, arguing the Master Complaint fails to allege facts sufficient to give rise to vicarious liability as to these entities. [ECF No. 162 at 16–19]. Defendants contend that all direct actions about which Plaintiffs complain were taken by other Defendants, not BBC-NSE or BBI. Without direct actions by these entities giving rise to Plaintiffs' claims, Defendants maintain Plaintiffs must plead facts sufficient to disregard BBC-NES's and BBI's corporate forms, which Defendants argue Plaintiffs failed to do. [*Id.* at 19].

In opposition, Plaintiffs argue the allegations in the Master Complaint establish direct liability on the part of BBC-NSE and BBI, so vicarious liability for these Defendants need not be pleaded. [ECF No. 169 at 11–12]. In the alternative, Plaintiffs contend they have sufficiently pleaded facts to establish vicarious liability as to both BBC-NSE and BBI on traditional agency principles as well as under alto-ego/veil-piercing theories. [*Id.* at 13–19].

   4.   Analysis

Reviewing the allegations of the Master Complaint, the Court agrees with Plaintiff on both points. As pleaded, the allegations show that both BBC-NSE and BBI "directly participated in the wrong complained of." *Alvarez Galvez*, 533 F. Supp. 3d at 1283–84. Significant direct participation is alleged against BBI that connects to the complained-of harms. [*See* SAC, ECF No. 136 ¶ 122 (BBI derives direct or indirect substantial revenue from NAS Key West housing); ¶ 123 (BBI actively

develops and maintains military housing in the United States); ¶ 127 (BBI and BBC share six key business departments, including Legal, Accounting, IT, Environmental/Heath & Safety, HR, and Marketing) ; ¶ 128 (significant overlap between BBC and BBI officers); ¶ 133 (significant overlap between BBC and BBI operations); ¶ 134 (employees report illegal, unethical, or inappropriate conduct occurring at NAS Key West to BBI); ¶ 135 (Conflict-of-Interest policies provided to NAS Key West employees reference BBC and BBI); and ¶ 136(a)–(f) (BBI personnel identified themselves to Plaintiffs as involved in the issues concerning NAS Key West military housing; BBI Regional Operations Director Patty Avery scheduled and attended calls with Plaintiff Talarico to discuss problems with Plaintiff's home; Plaintiffs were referred to BBI's Help Desk to log support requests for housing issues; and disclosures in many of Plaintiffs' lease packets contained statements about BBI's legal obligations to provide certain notices as well as information on how to contact BBI)].

While the allegations showing direct participation by BBC-NSE are not as numerous as for BBI, they are still significant.  [*See* SAC, ECF No. 136 ¶ 103 (BBC-NSE contracted with the federal government to own, operate, or manage rental housing at NAS Key West); ¶ 141 (BBC-NSE and Southeast Housing are inseparable); ¶ 141 (Southeast Housing is completely controlled by BBC-NES)].  But even more fundamentally, the allegations also show that Southeast Housing was the front-man acting on behalf of BBC-NSE and BBI with respect to the claims asserted.  More specifically, Plaintiffs allege that BBC-NSE had complete control over Southeast Housing; importantly, the Master Complaint alleges that Southeast Housing (1) signed Plaintiffs' leases; (2) operated Plaintiffs' housing units; (3) and *had no employees of its own* during the relevant period beyond Balfour-supplied personnel. [SAC, ECF No. 136 ¶¶ 95 (emphasis added), 141].  The allegation that "Southeast Housing operated through personnel employed by other Balfour entities," is sufficiently supported by pleaded facts in the Master Complaint.  Thus, Plaintiffs plausibly plead that **BBC-NSE** controlled Southeast Housing

such that BBC-NSE and Southeast Housing were one in the same for purposes of this litigation at the pleading stage.

As for **BBI**, as noted above Plaintiffs allege a litany of activities whereby BBI "directly participates in NAS Key West operations." [*See* SAC, ECF No. 136 ¶¶ 122, 123, 127, 128, 133, 134, 135, ¶ 136(a)–(f)]. Thus, the Master Complaint sufficiently sets forth factual allegations to show BBI was not the bystander it claims to be in the Motion, but rather an active participant with respect to the claims asserted in this action.

At this stage, the allegations of the Master Complaint must be construed as true, permitting all reasonable inferences of the facts alleged in favor of the Plaintiffs.  Simply put, the "direct participation" allegations and the "agency" allegations of the Master Complaint reinforce each other and are more than sufficient to survive dismissal on the asserted ground.  Discovery may reveal otherwise, but for now Defendants' motion to dismiss BBC-NSE and BBI from this case is due to be DENIED.

## B. Plaintiffs' breach of contract claim (Count I)

Defendants next move to dismiss Plaintiffs' breach-of-contract claim (Count I) against all Defendants, except Southeast Housing, because none of the other Defendants signed Plaintiffs' leases. [ECF No. 162 at 19–20].  This motion is DENIED.

### 1.  Florida law governing breach of contract claims asserted against principals

"To state a claim for breach of contract in Florida, a plaintiff must plead, *inter alia*: (1) the existence of a contract; and (2) a material breach of that contract." *McCullough v. Nesco Res. LLC*, 760 F. App'x 642, 646 (11th Cir. 2019) (citing *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009)).  "Agency is a legal relationship created by an express or implied agreement or by operation of law whereby the agent is authorized to act for the principal. . . ." *Ocana v. Ford Motor Co.,* 992 So. 2d 319, 326 (Fla. Dist. Ct. App. 2008) (quoting *Karl Rove & Co. v. Thornburgh,* 39 F.3d 1273, 1296 (5th Cir.

1994)).  The principal is responsible for and can be liable for the acts of its agent, "if the agent had the apparent authority to do the act and that apparent authority was reasonably relied upon by the third party dealing with the agent."  *Benson v. Seestrom,* 409 So. 2d 172, 173 (Fla. Dist. Ct. App. 1982) (quoting *Stiles v. Gordon Land Co.*, 44 So. 2d 417 (Fla. 1950) and citing *Parsley Bros. Constr. Co. v. Humphrey*, 136 So. 2d 257 (Fla. Dist. Ct. App. 1962).  Apparent authority must be the result of acts or omissions by the principal to subject the principal to liability for the agent's actions.  *See Taco Bell of California v. Zappone*, 324 So. 2d 121 (Fla. Dist. Ct. App. 1976); *Tampa Sand & Material Co. v. Davis*, 125 So. 2d 126 (Fla. Dist. Ct. App. 1960).

To demonstrate *actual agency*, a plaintiff must allege: (1) acknowledgement by the purported principal that the purported agent was acting as its agent; (2) acceptance of the undertaking by the agent; and (3) control by the purported principal over the agent's day-to-day activities during the agency period.  *See id.* (citing *Goldschmidt v. Holman,* 571 So. 2d 422, 424 n.5 (Fla. 1990)).  To establish *apparent agency*, a plaintiff must allege (1) a representation by the purported principal; (2) reliance on that representation by a third party; and (3) a change in position by the third party in reliance upon such representation.  *See Ilgen v. Henderson Props., Inc.,* 683 So. 2d 513, 514 (Fla. Dist. Ct. App. 1996) (reversing dismissal of contract claim based on apparent agency) (citing *Mobil Oil Corp. v. Bransford,* 648 So. 2d 119, 121 (Fla. 1995)).

2.  Plaintiffs' allegations

With that legal backdrop in place, the Master Complaint alleges the following:

Under the leases signed by …. Plaintiffs, Balfour owed contractual obligations to Plaintiffs to provide and maintain habitable housing and remedy leaks, mold, and other issues with the housing.

Balfour failed to comply with the material terms of each Lease by failing to ensure the houses were fit for human habitation and by failing to timely and adequately repair and remedy the conditions at the premises.

Although Defendant Southeast Housing was identified as the lessor in Plaintiffs' leases, the other Defendants were bound in agency and alter-ego relationships in

10

leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.  In addition, Southeast Housing relied on the other Defendants to attempt to fulfill the leases' contractual obligations with respect to the provision of safe and habitable housing and to redress and remediate unsafe and unhealthy conditions.

[SAC, ECF No. 136 ¶ 1515–17].

3.   Parties' arguments

Defendants argue that Count I fails as to all Defendants except Southeast Housing because (1) Southeast Housing was the only Defendant that executed Plaintiffs' leases and (2) Plaintiffs have not pleaded facts sufficient to establish the existence of an agency relationship that would make BBC-NSE, BBI, BBC, or Balfour Beatty Management liable for Count I.  [ECF No. 162 at 19–20].

Plaintiffs' position is that a breach of contract claim may be asserted against the other Defendants because the (1) performance of the leases Southeast Housing executed lay squarely with the other Defendants, and (2) because Southeast Housing merely signed its name to a lease on behalf of the other Defendants who were bound by the lease terms and who breached those terms to cause Plaintiffs' harm. [ECF No. 169 at 20].

4.   Analysis

A complaint (or claim asserted therein) should not be dismissed for failure to state a claim unless no set of facts could be proven from the allegations that would support a claim for relief.  *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).  Under the agency principles cited above, the Court finds that Plaintiffs plausibly plead facts that show an agency relationship between Southeast Housing and the other Defendants sufficient to state a breach of contract claim against all Defendants at this juncture.  Specifically, Plaintiffs allege that BBC-NSE, BBI, and Balfour Beatty Management, owed Plaintiffs contractual obligations under the leases; they breached those obligations; and their breaches caused Plaintiffs' damages.  [SAC, ECF No. 136 ¶¶ 105, 144, 149, 288, 961, 1515–17].  Indeed, Plaintiffs allege throughout the Master Complaint that all Defendants worked together in an agency-

11

alter-ego relationship with respect to Plaintiffs' military housing problems. [*See id.* ¶¶ 1528, 1536, 1546, 1556, 1568, 1582, 1599, 1608, 1619, 1631, 1640, 1648, 1655, 1665, 1674, 1685, 1693, 1704, 1713]. Under Florida agency principles, BBC-NSE, BBI, and Balfour Beatty Management cannot hide behind the absence of their signature on the leases to relieve them of contractual liability for obligations they undertook pursuant to the leases.

At summary judgment, Plaintiffs will need to *bring forward affirmative evidence to show* an agency relationship supports a breach of contract claim against BBC-NSE, BBI, Balfour Beatty Management, and Southeast Housing.  But that is not the test at this stage.  Taking the allegations as true and in the light most favorable to Plaintiffs, they have plausibly pleaded enough here to withstand dismissal of Count I as against these Balfour entities.  Accordingly, Defendants' motion to dismiss Count I against BBC-NSE, BBI, and Balfour Beatty Management is due to be DENIED.  *Cf. Penn Atl. Mgmt. Grp., Inc. v. Hosp. Dev. Grp., Inc.,* No. 07-60045-CIV, 2007 WL 9701103, at \*2 (S.D. Fla. June 6, 2007) (finding complaint sufficiently alleged non-signatory parent company's agreement with plaintiff to withstand dismissal of breach of contract claim against parent).

**C.  Plaintiffs' IIED claim (Count VI)**

Defendants then move to dismiss Plaintiffs' claim for intentional infliction of emotional distress ("IIED") (Count IV) for failure to allege the "outrageous" conduct required to support such a claim.  [ECF No. 162 at 20–23].  This motion is GRANTED.

1.  Florida law governing IIED claims

To state a claim an IIED claim in Florida, the plaintiff must allege:

(1) The wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result;
(2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community;
(3) the conduct caused emotional distress; and
(4) the emotional distress was severe.

*Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 954–55 (Fla. Dist. Ct. App. 2017) (citing *LeGrande v. Emmanuel*, 889 So. 2d 991, 994 (Fla. Dist. Ct. App. 2004).

What constitutes "outrageous" conduct for IIED purposes is an issue of law for the Court to decide. *Id.* (citation omitted). A plaintiff's "subjective response" to the conduct "does not control the question of whether the tort of intentional infliction of emotional distress occurred." *Id.* (quoting *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. Dist. Ct. App. 2007) (internal quotation marks omitted). "While there is no exhaustive or concrete list of what constitutes outrageous conduct, Florida common law has evolved an extremely high standard." *Garcia*, 838 F. Supp. 2d at 1339 (citation omitted). The Florida Supreme Court, when it recognized the common law tort of IIED, adopted the definition of "extreme and outrageous" conduct in § 46 of the Restatement (Second) of Torts (1965), as follows:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278-79 (Fla. 1985). In other words, even purposeful, criminal conduct that one knows is going to hurt another person is not "outrageous" enough to support an IIED claim in Florida.

2. Plaintiffs' allegations

For Count VI (the IIED claim), the Master Complaint alleges the following:

Defendants intentionally and knowingly subjected Plaintiffs to housing conditions that were unsafe and unhealthy.

Defendants also recklessly misled Plaintiffs into moving into or working in homes that they knew were dangerous and unfit for human habitation and then deceived many of

13

them into remaining in those homes by either convincing them the dangers did not exist or by falsely claiming that they would eliminate them.

This intentional conduct, which subjected Plaintiffs, service members, and their families, to risk of serious injury or death over a prolonged period of time, was extreme and outrageous.

Defendants continued this behavior even as residents reported that they were becoming ill.

Defendants told families to move into homes even after people in neighboring homes had reported that living in those homes caused them to suffer grave illness. Defendants told families to remain in or return to homes despite knowing that doing so would put their health and lives at risk.

Intentionally subjecting these families to such dangerous conditions and taking actions that ensured that they would continue to suffer such exposure is beyond all possible bounds of decency and utterly intolerable in a civilized community.

This conduct led to severe emotional distress as Plaintiffs suffered serious injuries and watched their loved ones get sick or die and eventually understood that they were constantly in grave danger in their own homes.

[SAC, ECF No. 136 ¶¶ 1549–55].

3.   Parties' arguments

Defendants argue Plaintiffs fail to allege the level of "outrageous" conduct required in Florida to support an IIED claim because courts dismiss such claims "even where defendants allegedly expose plaintiffs to physical danger, fail to act in the face of known risks, or engage in intentional or reckless misconduct, such conduct does not satisfy the IIED standard unless it crosses 'an extremely high standard.'" [ECF No. 162 at 22 (quoting *Paul v. Celebrity Cruises Inc.*, No. 21-208414, 2021 WL 7082839, at *14 (S.D. Fla. July 15, 2021) (internal quotations omitted))].

Plaintiffs acknowledge the "outrageousness" needed to support a Florida IIED claim presents a high bar, but they argue their allegations "easily clear[] this hurdle." [ECF No. 169 at 21]. Those allegations include the following: (1) Defendants intentionally leased contaminated housing units to Plaintiffs; (2) Defendants repeatedly and intentionally concealed the presence of those contaminants, and/or intentionally deceived Plaintiffs by falsely claiming the contaminants did not exist or that

14

Defendants would eliminate them; (3) Defendants continued this deceptive behavior, which subjected Plaintiffs to risk of serious illness and death over a prolonged period of time, even as residents reported they were becoming ill; and (4) Defendants instructed their employees to "shut [their] mouth[s]" if they discovered contaminants in Plaintiffs' homes.  [*Id.* (citing Compl. ¶¶ 139, 1550–52)].  When combined, Plaintiffs characterize Defendants' conduct described above as "utterly intolerable in a civilized community."  [*Id.* (citing *Broberg v. Carnival Corp.*, 303 F. Supp. 3d 1313, 1317 (S.D. Fla. 2017))].

    4.  <u>Analysis</u>

As egregious as the conduct alleged in the Master Complaint appears, surviving dismissal on an IIED claim is a tall order.  A plaintiff alleging IIED must overcome an extremely high burden "as Florida courts have repeatedly found a wide spectrum of behavior insufficiently 'outrageous.'"  *Matter of Horizon Dive Adventures, Inc. v. Sotis,* 2018 WL 6978636, at *4 (S.D. Fla. Nov. 28, 2018) (quoting *Brown v. Royal Caribbean Cruises, Ltd.,* 2017 WL 3773709 (S.D. Fla. Mar. 17, 2017)).  Consequently, there are only "a very limited set of cases in which courts [have] recognized conduct as sufficiently egregious to support a claim of [intentional infliction of emotional distress]."  *Crenshaw ex. rel. United States v. DeGayner*, 622 F. Supp. 2d 1258, 1282 (M.D. Fla. 2008).

Instructive here, two district courts dismissed Florida IIED claims where the plaintiff alleged an environmental hazard which exposed the plaintiff to health risks.  *See Delfrate v. Liberty Mut. Fire Ins. Co.*, 727 F. Supp. 2d 1307, 1308–09 (M.D. Fla. 2010) (dismissing IIED claim where the plaintiff alleged the defendant knowingly forced him to remain in a mold-infested home despite awareness of serious health risks and resulting injury); *Brown*, 2017 WL 3773709, at *2–3 (dismissing IIED claim where the plaintiff alleged the defendant exposed passengers to Legionnaires' disease, causing the plaintiff severe physical illness).  Courts have also dismissed IIED claims on allegations far worse than what is alleged here.  *See, e.g., Rubio v. Lopez*, 445 F. App'x 170, 174–75 (11th Cir. 2011) (finding no outrageous conduct to support IIED claim where deputy sheriff hobble-tied arrestee on black asphalt pavement in sun,

resulting in second-degree burns to face and chest); *Garcia,* 838 F. Supp. 2d at 1339 (S.D. Fla. 2012) (finding no outrageous conduct to support IIED claim where seven members of cruise ship crew beat, handcuffed, and imprisoned plaintiff); *Parkey v. Carter*, 702 F. Supp. 3d 1253, 1258–60 (S.D. Fla. 2023) (dismissing IIED claim where fisherman encouraged plaintiff's child to grab shark, causing shark bite that partially or completely amputated child's finger).  Also missing from the Master Complaint are allegations of the kind of specific, targeted conduct against known vulnerable recipients that have been ruled sufficiently "outrageous" for an IIED claim to survive dismissal.  *See, e.g., Thomas v. Hospital Bd. of Dirs. of Lee Cnty.*, 41 So. 3d 246 (Fla. 2d DCA 2010) (administering lethal dose of medication to patient and then concealing and falsifying cause of death and then notifying family that patient died from "stress of surgery"); *Estate of Duckett v. Cable News Network LLLP*, 2008 WL 295 9753 (M.D. Fla. July 31, 2008) (interviewing mother of missing son and suggesting she was responsible for son's disappearance and death; news organization knew before interview that mother was in severe state of mental anguish from son's disappearance; after interview and before show aired, mother committed suicide).

Applying Florida's high standard for pleading "outrageousness" to the allegations of the Master Complaint, dismissal of Count VI is warranted.  While Plaintiffs' allegations (if proved) could establish serious and intentional tortious conduct, even taking Plaintiffs' allegations as true does not rise to the level of "outrageousness" required to support an IIED claim under Florida law.  Accordingly, Defendants' motion to dismiss Count VI of the Master Complaint [ECF No. 136] is GRANTED.  Count VI is DISMISSED.[3]

---

[3]     Plaintiffs' claim for negligent infliction of emotional distress (Count V) was not challenged by Defendants.  [*See* ECF No. 162].

**D.  Plaintiffs' third-party beneficiary contract claim (Count VIII)**

Defendants move to dismiss Plaintiffs' third-party beneficiary contract claim (Count VIII) for failure to plausibly allege their beneficiary status under any of the contracts that might apply to support the claim. [ECF No. 162 at 23–28].  The motion is DENIED.

1.  Plaintiff's allegations

The Master Complaint alleges in Count VII (Third-Party Beneficiary Contract):

Defendants are bound by the contracts they entered into with the United States and Department of the Navy respecting MHPI housing at NAS Key West.

Each of those contracts was entered into to further the goal of the MHPI to improve housing for service members.

The Southeast Housing Operating Agreement contains language establishing that Plaintiffs were intended beneficiaries of certain Defendants' contractual obligations with respect to the provision of housing at NAS Key West.

The Ground Lease entered into by the Navy and BBC-NSE's predecessor-in-interest contains language indicating that Plaintiffs were intended beneficiaries.

The Property Management Agreement between Southeast Housing and [Beatty Balfour Management]… contains language indicating that Plaintiffs were intended beneficiaries.

It was the intent of Balfour, the United States, and the Department of the Navy to benefit the service members living at NAS Key West.

These obligations were included in the underlying contracts to ensure military service members, including Plaintiffs and their families, would be provided with safe and habitable housing.

Balfour breached the requirements of the underlying contracts by failing to provide adequate and professional management, maintenance, operations, and renovation of the homes at NAS Key West… [and] failing to adhere to federal, state, and local lead-based paint regulations and local housing codes.

Balfour's conduct also breached the duty of good faith and fair dealing implied in the underlying contracts.

As a direct, proximate, and foreseeable result of the Balfour breaches of the underlying contracts, the service members… sustained damages.

[SAC, ECF No. 136 ¶¶ 1571–81].

17

2. Parties' arguments

Defendants challenge Count VIII in two main ways. First, Defendants maintain that Florida law does not govern any of the three agreements upon which Plaintiffs rely to support this claim—(1) Southeast Housing's Operating Agreement ("Operating Agreement"); (2) Ground Lease between the Navy and BBC-NSE's predecessor-in-interest ("Ground Lease"); and (3) the Property Management Agreement between Southeast Housing and Beatty Balfour Management ("Property Management Agreement"). [ECF No. 162 at 23–24].[4] Thus, to the extent the claim arises under Florida law, it fails. [*Id.*]. Second, Defendants argue Plaintiffs are not the intended beneficiaries of any of the three agreements, further arguing that it is difficult for any plaintiff to show intended-beneficiary status under a government contract. [*Id.* at 12, 24–28].

Plaintiffs respond that Count VIII sufficiently alleges Plaintiffs were intended third-party beneficiaries of Defendants' agreements with the government pursuant to the Military Housing Privatization Initiative ("MHPI"), the central purpose of which was to improve military housing for the benefit of military families. [ECF No. 169 at 23–24 (citing *Bessinger v. United States*, 448 F. Supp. 2d 684, 686–87 (D.S.C. 2006)[5] (MPHI was intended to "improve the quality of housing conditions for active-duty military personnel" by "substantially upgrad[ing] military housing on an accelerated basis.")].

As for Defendants' choice-of-law argument, Plaintiffs say their third-party beneficiary claims satisfy the governing law as to each agreement. [ECF No. 169 at 25–29]. Specifically, under Delaware

---

[4]   The Operating Agreement contains a choice-of-law provision selecting Delaware law; whereas, the Ground Lease and Property Management Agreement select Georgia law. [ECF No. 162 at 23].

[5]   *Bessinger* involved Federal Tort Claims Act claims asserted against the United States for negligence committed by an independent contractor, which claims were dismissed for lack of subject matter jurisdiction. 448 F. Supp. 2d at 690–92.

18

law, the terms of the Operating Agreement reveal that conferral of a beneficial effect upon military families was a material part of the Operating Agreement's purpose. [*Id.* at 25–27 (citing *Arkansas Tchr. Ret. Sys. v. Alon USA Energy, Inc.*, No. 2017-0453-KSJM, 2019 WL 2714331, at *13 (Del. Ch. Ct. June 28, 2019);[6] *Instituform of N. Am., Inc. v. Chandler*, 534 A.2d 257, 270 (Del. Ch. Ct. 1987)]. Under Georgia law, the Ground Lease and Property Management Agreement need not specifically identify Plaintiffs as intended third-party beneficiaries—as long as the parties' intention to benefit Plaintiffs appears on the face of the agreements, which Plaintiffs say they do. [ECF No. 27 at 27–29 (citing *Northen v. Tobin*, 585 S.E.2d 681, 686 (Ga. Ct. App. 2003)[7])]. Plaintiffs, therefore, construe all three agreements to meet the appropriate test for third-party beneficiary status under applicable law.

3. <u>Analysis</u>

Defendants' motion to dismiss Plaintiffs' third-party beneficiary claims fails for multiple reasons. For starters, courts generally hold that a choice-of-law analysis is not appropriate at the motion to dismiss stage. *See, e.g.*, *Viera v. Basf Catalysts LLC*, 2016 WL 1394333, at *1 n.2 (M.D. Fla. Apr. 8, 2016) ("[G]iven the fact intensive inquiry required to determine the applicable law, a choice-of-law determination at this stage would be premature."); *Buckalew v. Columbia Aircraft Sales, Inc.*, No. 13-62758, 2014 WL 11720085, at *2 (S.D. Fla. Sept. 4, 2014) (denying a motion to dismiss because "a

---

[6]     Under Delaware law, to qualify as a third-party beneficiary of the Agreement:
(i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.
*Arkansas Tchr. Ret. Sys.*, 2019 WL 2714331, at *10.

[7]     Under Georgia law, "[t]he beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract." OCGA § 9–2–20(b). A third-party beneficiary contract is one in which the promisor engages to the promisee to render some performance to a third person. In order for a third party to have standing to enforce such a contract it must clearly appear from the contract that it was intended for his benefit. The mere fact that he would benefit from performance of the agreement is not alone sufficient. *Northen*, 585 S.E.2d at 686.

choice-of-law determination at this juncture of the litigation is premature"); *In re Palm Beach Finance Partners, L.P.*, 517 B.R. 310, 323–24 (Bankr. S.D. Fla. 2013) ("Here, the Court finds that the facts necessary to make a choice of law determination are not clear on the face of the Amended Complaint, so the Court will not engage in a choice of law analysis at this stage in the proceedings in order to determine which state's statute of limitations applies."). That said, the parties agree as to what law applies to each agreement, so that issue is decided. Accordingly, Defendants are not entitled to dismissal of Count VIII on choice-of-law grounds.

As to the merits, the parties' intent is a key factor in a third-party-beneficiary contract claim under both Delaware and Georgia law. *See Arkansas Tchr. Ret. Sys.*, 2019 WL 2714331, at *10; *Northen*, 585 S.E.2d at 686. To determine the parties' intent would require this Court to look at matters outside of the Master Complaint. As such, this issue is not appropriate for resolution on a motion to dismiss. *See Westinghouse Electric Supply Co. v. Wesley Constr. Co.*, 414 F.2d 1280, 1281–82 (5th Cir. 1969)[8] (reversing the district court's order dismissing a third-party beneficiary claim); *see also Snow v. DirectTV, Inc.*, 450 F.3d 1314, 1321–22 (11th Cir. 2006) (examining four corners of the complaint on a motion to dismiss). As alleged, Count VIII puts Defendants on notice of Plaintiffs' claim to be third-party beneficiaries of the Operating Agreement, the Ground Lease, and the Property Management Agreement. *See* Fed. R. Civ. P. 8(a). Plaintiffs have also plausibly pleaded they are the intended beneficiaries of all three agreements. [*See* SAC, ECF No. 136 ¶¶ 1571–81].

At this stage of the litigation, the Court must accept as true Plaintiffs' allegations regarding their third-party status. Accordingly, Defendants' motion to dismiss Count VIII (Third Party Beneficiary Contract) is DENIED. *See, e.g., Barnett v. Carnival Corp.,* No. 06-22521-CIV-

---

[8]   In *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted the precedent of the Fifth Circuit as of September 30, 1981, as binding precedent.

O'SULLIVAN, 2007 WL 1746900, at *4–5 (S.D. Fla. June 15, 2007) (denying motion to dismiss third-party-beneficiary claim).

### E. The independent tort doctrine and Counts XIV and XVI

Moving on, Defendants seek dismissal of Plaintiffs' negligent and fraudulent misrepresentation claims (Counts XIV and XVI) as barred by Florida's independent tort doctrine. [ECF No. 162 at 29–31].  This motion is also DENIED.

1.  Florida's independent tort doctrine

"Florida's independent-tort doctrine requires a fraud claim to be 'independent of a breach of contract claim'—*i.e.*, for the 'fraud allegations' to be 'separate and distinct from defendants' performance under the contract.'"  *MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1333 (11th Cir. 2022) (quoting *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1031 (11th Cir. 2017)). "This is because a 'breach of contract, alone, cannot constitute a cause of action in tort….  It is only when the breach of contract is attended by some additional conduct which amounts to an independent tort that such a breach can constitute [a separate action in tort]."  *Id.* (first quoting *Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.*, 482 So. 2d 518, 519 (Fla. Dist. Ct. App. 1986), then citing *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996) (noting that the independent tort doctrine "requires proof of facts separate and distinct from the breach of contract")).

2.  Plaintiffs' allegations

Count XIV of the Master Complaint asserts a claim for "Negligent Misrepresentation Concerning Remediation of Unsafe Conditions"; Count XVI asserts a claim for "Fraudulent Misrepresentation" with respect to Defendants' alleged false representations regarding the habitability and safety of Plaintiffs' homes as well as Defendants' unmet assurances that any problems would be remediated.  [SAC, ECF No. 136 ¶¶ 1642–49; 1657–66].

3. Parties' arguments

Defendants contend that Counts XIV and XVI cannot co-exist with Plaintiffs' breach of contract claims because the alleged misrepresentations in Counts XIV and XVI concern only Defendants' failure to perform their contractual duties, which is not independent as required by Florida's independent tort doctrine.  [ECF No. 162 at 29–31 (citing as to **Count XIV**: *Perez v. Scottsdale Ins. Co.*, No. 19-CV-22346, 2020 WL 607145, at *3 (S.D. Fla. Feb. 7, 2020) (dismissing negligent misrepresentation claim where the challenged misrepresentations were terms from insurance policy that formed the basis of plaintiff's breach of contract claim); *Straub Cap. Corp. v. L. Frank Chopin, P.A.*, 724 So. 2d 577, 579 (Fla. Dist. Ct. App. 1998) (explaining the plaintiff-tenants' claim for negligent misrepresentation was barred because there was no independent tort separate from the contractual breach of the lease); *Island Travel & Tours, Ltd. Co. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1239 (Fla. Dist. Ct. App. 2020) (reversing and remanding negligent misrepresentation claim when "[t]he only properly alleged misrepresentation simply has to do with [Defendant's] failure to perform under the contract"); then citing as to **Count XVI**: *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74, 78 (Fla. Dist. Ct. App. 1997) ("Misrepresentations relating to the breaching party's performance of a contract do not give rise to an independent cause of action in tort, because such misrepresentations are interwoven and indistinct from the heart of the contractual agreement."); *Springboard Media, LLC v. Augusta Hitech Soft Sols., LLC*, No. 22-20191-CIV, 2022 WL 18465128, at *3 (S.D. Fla. June 14, 2022) (dismissing fraudulent misrepresentation claim because misrepresentations about performance under the agreement "do not allege conduct or facts independent of and are based on Defendant's breach of the agreement."))].

Plaintiffs counter that the mere existence of a contract does not bar their tort claims because Plaintiffs' tort claims are predicated on facts independent of any contract.  [ECF No. 169 at 29–31]. Specifically, Plaintiffs identify the following non-contract-related allegations: (1) Defendants' false

22

representations regarding "the severity of the mold damage and other unsafe conditions so that Plaintiffs would remain in their homes, and in some cases renew their leases," which misrepresentations "may result in different types of damages than the breach of contract claims." [*Id.* at 31 (citing *Johnston-Gebre v. IH4 Prop. L.P., et al.*, No. 23-CV-61136-RUIZ/STRAUSS, 2023 WL 6466333, at *5 n.5 (S.D. Fla. Sept. 13, 2023))].

    4.  <u>Analysis</u>

The Court has reviewed the authority cited by the parties as well as the factual allegations of Counts XIV and XVI and finds Plaintiffs plausibly plead facts independent from their contact claims to support claims for negligent and fraudulent misrepresentation.

Although "the exact contours" of the independent tort doctrine can sometimes appear murky, "where a breach of contract is combined with some other conduct amounting to an independent tort," the tort claim is not barred by the independent tort doctrine. *Lamm v. State Street Bank & Tr.*, 749 F.3d 938, 947 (11th Cir. 2014); *see King v. Bernie*, 752 F. App'x 881, 883 (11th Cir. 2018) (acknowledging the "unsettled" nature of the independent tort doctrine post-*Tiara Condo Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 401 (Fla. 2013)). Importantly, the doctrine requires contractual privity between the parties. *See CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, No. 3:16-CV-186-J-34JRK, 2018 WL 905752, at *10 (M.D. Fla. Feb. 15, 2018) ("Notably, *where a party is in contractual privity with another*, to bring a valid tort claim, the party must establish that the tort is independent of any breach of contract." (emphasis added) (citations omitted)). District courts in the Southern District of Florida have thus "held that it 'is well settled that a plaintiff may not recast causes of action that are otherwise breach-of-contract claims as tort claims." *Id.* (citing *Sun Life Assurance Co. of Can. v. Imperial Holdings Inc.*, No. 13-80305-CIV-Brannon, 2016 WL 10565034, at *5 (S.D. Fla. Sept. 22, 2016)).

In this case, the record is not developed enough to know which Defendants (beyond Southeast Housing) were actually "in privity" with Plaintiffs to support the potential application of Florida's independent tort doctrine against them in Counts XIV and XVI.  But even if privity were established as to all Defendants, Counts XIV and XVI plausibly allege independent tortious conduct separate and apart from Plaintiffs' breach of contract claims.  To show this, Count XIV of the Master Complaint alleges the following, in relevant part:

> Once Plaintiffs discovered the unsafe and hazardous conditions in their homes, Defendants falsely claimed that they would take steps to mitigate or fix those problems.
>
> Defendants either knew that they would never take those steps, made the representations without knowledge of their truth or falsity, or should have known the representations were false.
>
> *Defendants intended to convince Plaintiffs to remain in their homes based on these false representations.*
>
> Plaintiffs justifiably relied on Defendants' assurances that they would take steps to make their homes safe.
>
> As a direct and proximate result of Defendants' negligence, the Plaintiffs suffered substantial damage to their personal property, physical injuries and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

 [SAC, ECF No. 136 ¶¶ 1643–47 (emphasis added)].   Similarly, Count XVI (fraudulent misrepresentation) alleges tortious conduct apart from Defendants' alleged failure to perform their lease obligations:

> Defendants deliberately and willfully made false and material statements regarding the habitability and safety of the Plaintiffs' housing as described in detail in this Complaint in order *to cause Plaintiffs to remain in their NAS Key West homes notwithstanding the unsanitary and dangerous conditions.*
>
> Defendants falsely assured Plaintiffs that they would remediate any problems that existed in their homes and make them safe for human habitation.
>
> Defendants knew that the statements concerning the condition of the homes and the promised remediation were false.

These representations were material to Plaintiffs' decisions to remain in their homes, and even to the decisions of some Plaintiffs to renew their leases.

But for Defendants' false statements, Plaintiffs would not have remained in their Balfour home.

[SAC, ECF No. 136 ¶¶ 1658–64 (emphasis added)].   Thus, Counts XIV and XVI allege Defendants misrepresented the condition of Plaintiffs' housing when Defendants knew the housing was unsafe in order to induce Plaintiffs into remaining in unsafe housing conditions to Plaintiffs' harm.   Those allegations are separate enough from the promise to provide safe housing under the leases, which allegations underpin Plaintiffs' breach of contact claim.   Accordingly, Defendants' motion to dismiss Counts XIV and XVI as barred by the independent tort doctrine is DENIED.

**F.   Plaintiffs' FDUTPA claim (Count XI - Unfair Conduct)**

Defendants next move to dismiss Plaintiffs' FDUTPA claim for unfair conduct (Count XI) for failure to plead facts showing an unfair business practice.  [ECF No. 162 at 31–32].  This motion is DENIED.

1.   FDUTPA and "unfair conduct"

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1). "A consumer's claim for damages made pursuant to FDUTPA 'has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'" *Gavron v. Weather Shield Mfg., Inc.*, 819 F. Supp. 2d 1297, 1301 (S.D.  Fla. 2011) (citation omitted).  Pertinent to the instant Motion, Florida's standard jury instruction defines "unfair conduct" under the FDUTPA as follows:

An act or practice is "unfair" if it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.   An "unfair" practice or act must satisfy three tests:  a. it must produce substantial injury to (claimant); b. the injury must not be outweighed by a benefit to [consumers] [competition] that the practice produces; and c. it must be an injury that (claimant) could not have reasonably avoided.

25

*See* Fla. Standard Jury Instructions in Civil Cases, Florida Deceptive and Unfair Trade Practices Act

("FDUTPA"), 416.50(a).

2.   Plaintiffs' allegations

Count XI of the Master Complaint alleges, in relevant part:

At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at NAS Key West, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA….

At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA….

Defendants' practices relating to Plaintiffs' Balfour housing at NAS Key West… constituted unfair and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

Defendants failed to follow their own policies and procedures relating to the treatment of harmful conditions including policies and procedures for the treatment and remediation of asbestos, mold, and lead contamination.

In many instances, Defendants' purported attempts at remediation actually increased Plaintiffs' exposure to mold, lead paint, and asbestos.

Defendants' acts and practices at NAS Key West exposed Plaintiffs to unsafe and unhealthy conditions, including structural defects, collapsed ceilings, water leaks, HVAC issues, and pest and vermin infestations. These abhorrent conditions were known to Defendants. These conditions exposed Plaintiffs to hazardous substances, including toxic mold, asbestos, and lead. Given those unconscionable conditions, Plaintiffs' interests in their Balfour homes were only worth a small fraction of the rental payments for those homes.

Defendants' acts and practices offended established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.  As such, those acts and practices were unfair and unconscionable within the meaning of FDUTPA….

[SAC, ECF No. 334 ¶¶ 1612–17].

3.   Parties' arguments

Defendants argue that Count XI is duplicative of Plaintiffs' breach-of-contract claim and

should, therefore, be dismissed because a party's intentional breach of a contractual duty cannot

support a FDUTPA claim for unfair conduct. [ECF No. 162 at 32]. Additionally, because Count XI fails to identify what policies and procedures Defendants violated, Defendants say the claim improperly relies on the terms of the parties' contract, rendering the claim infirm. [*Id.* (first citing *Willard v. Home Depot, U.S.A., Inc.*, No. 5:09-cv-110/RS-MD, 2009 WL 1884395, at *2 (N.D. Fla. June 29, 2009) then citing *Epoch Int'l Partners, LLP v. Bigfoot Inc.*, 587 F. Supp. 3d 1214, 1219 (S.D. Fla. 2022) (allegations of inducement to contract and inducement into settlement through false and misleading statements "mirror the breach of contract claim and are insufficient to state a claim under FDUTPA"))]. Moreover, even if Defendants failed to follow unspecified policies as alleged by Plaintiffs, Defendants argue Plaintiffs failed to allege the kind of "substantially injurious… unscrupulous, oppressive, unethical, immoral" conduct which "offends established public policy" to state a FDUTPA claim for unfair conduct. [*Id.* (citing *State v. Beach Blvd. Auto. Fin., Inc.*, 139 So. 3d 380, 386–87 (Fla. Dist. Ct. App. 2014))].

Plaintiffs defend Count XI as sufficiently pleaded based on their allegations that Defendants (1) knowingly exposed Plaintiffs to unsafe and unhealthy conditions and hazardous substances; (2) failed to follow their own policies regarding remediation of such conditions; and (3) acted in a manner that increased (rather than lessened) Plaintiffs' exposure. [ECF No. 169 at 31–33]. Plaintiffs also point out that a breach-of-contract claim can co-exist with a FDUTPA claim as long as the FDUPTA claim alleges something more than just the breach of a contractual duty. [*Id.* at 32 (citing *PNR, Inc. v. Beacon Prop. Mgmt., Inc,*, 842 So. 2d 773, 777 (Fla. 2003) (remanding dismissed FDUTPA claim brought by tenant as against landlord sufficiently pleaded); *Kenneth F. Hackett & Assocs. v. GE Cap. Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1313 (S.D. Fla. 2010) (holding lessee's FDUTPA claim not duplicative of breach of contract claim as the lessee alleged more than a "mere breach"); *Sanchez v. Team Health, LLC*, No. 18-cv-21174, 2021 WL 4990803, at *10 (S.D. Fla. Mar. 31, 2021) ("Florida law permits a FDUTPA claim to travel with a related breach of contract claim if the FDUTPA claim challenges the

27

acts underlying or 'giving rise' to the breach, and does not 'rely solely on a violation of the Agreement as a basis for assertion of a FDUTPA claim.'") (quoting *Hackett & Assocs.,* 744 F. Supp. 2d at 1312)].

4. Analysis

Plaintiffs have the best of it here; their FDUTPA claim for unfair conduct withstands dismissal because the allegations of the Master Complaint satisfy all three elements of the claim, and the claim does not rely solely upon Plaintiffs' leases as a basis for the claim. Instead, Plaintiffs allege Defendants' failure to follow their own policies to remediate hazardous housing conditions while, at the same time, misrepresenting to Plaintiffs the conditions were not unsafe and/or the conditions would be remediated without any intention to do so, caused Plaintiffs serious injuries. Those allegations plausibly plead a FDUTPA claim for unfair practices apart from Defendants' alleged failure to provide safe housing under the lease agreements. Moreover, whether the conduct alleged is unfair under FDUTPA is "a question of fact for the jury to determine." *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC,* 278 F. Supp. 3d 1307, 1316 (S.D. Fla. 2017) (citations omitted). Thus, a jury (not this Court) must make that determination.

Accordingly, Defendants' motion to dismiss Count XI is DENIED. *See Beacon,* 842 So. 2d at 777; *Hackett & Assocs.,* 744 F. Supp. 2d at 1313 (denying motion to dismiss FDUPTA claim where different facts supported the claim than facts supporting the breach of contact claim); *Sanchez,* 2021 WL 4990803, at *10 (same).

### G. **Pleading requirements for Plaintiffs' FDUTPA claims**

Finally, Defendants ask the Court to clarify whether the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure applies to Plaintiffs' FDUTPA claims—to ensure the proper standard is applied to those claims' yet-to-be-filed in individual Short Form Complaints. [ECF No. 162 at 32–33].

The Eleventh Circuit recently held that FDUTPA claims which "sound in fraud" must satisfy Rule 9(b)'s pleading requirements.  *See Pop v. LuliFama.com LLC,* 145 F.4th 1285, 1294 (11th Cir. 2025). A claim under FDUTPA "sounds in fraud" when it involves a "false representation of material fact by one who knew it was false, made to one who did not know if was false, with intent to deceive such person and to influence his action, which did deceive such person and influence his action to his damage."  *Id.* at 1295 (citations omitted) (cleaned up).

With this guidance, Plaintiff's first FDUTPA claim (Count XI-Unfair Conduct) does not sound in fraud.  No fraudulent representation of a material fact is alleged in Count XI.  [*See* SAC, ECF No. 334 ¶¶ 1612–17].  Instead, Plaintiffs allege Defendants' failure to follow their own policies for remediating hazardous housing conditions was "unethical, oppressive, unscrupulous," in violation of the FDUTPA.  [*Id.*].  Further, Count XI does not allege that Defendants knew about any fraudulent representation relied upon by Plaintiffs to their detriment.  Accordingly, Count XI is not subject to Rule 9(b)'s heightened pleading requirements.

Count XII of the Master Complaint (FDUTPA - Deceptive Conduct), on the other hand, "sounds in fraud" for this purpose.  That count alleges, in relevant part:

> Defendants concealed facts and made deceptive assurances that caused Plaintiffs to sign leases that they never would have signed had they known the truth.
>
> Defendants made false, misleading, and/or deceptive representations that Plaintiffs' Balfour homes were in habitable condition and thus far more valuable than they were in reality.
>
> In the leases between Defendants and Plaintiffs, Defendants falsely warranted that the NAS Key West housing was safe, habitable, and free from defects. Such acts and practices were unfair, false, misleading, deceptive, and unconscionable within the meaning of FDUTPA.
>
> Defendants failed to disclose information about the condition of Plaintiffs' Balfour housing that was known to Defendants when they leased the homes to Plaintiffs with the intention to induce Plaintiffs into leasing the homes at a cost beyond what they were actually worth.

29

> Once Plaintiffs discovered the unsafe and hazardous conditions in their homes, Defendants falsely claimed that they would take steps to mitigate or fix those problems. Defendants made these false statements in order to prevent Plaintiffs from taking measures to protect their safety, and to ensure that they would keep receiving payment even after Plaintiffs discovered that their homes were unsafe and did not conform to the Defendant's promises. Plaintiffs suffered injuries based on their reliance on these misrepresentations.

> Defendants also made false, misleading, and/or deceptive representations that repairs and remediation efforts in Plaintiffs' Balfour homes were performed completely and to the standard of care required of professional landlords. In fact, those repair and remediation efforts often fell far below the standard of care, and failed to adequately address the unsafe, unhealthy, and hazardous conditions in Plaintiffs' homes. Defendants failed to disclose the grossly inadequate nature of their repair and remediation efforts. Plaintiffs therefore paid far more in rent than their homes were actually worth. Such acts and practices were unfair, false, misleading, deceptive, and unconscionable within the meaning of FDUTPA.

> As a result of Defendants' false, misleading, and deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorney fees, and court costs.

[SAC, ECF No. 136 ¶¶ 1626–30].  As the foregoing shows, and as was the case in *Pop, supra*, Count XII (FDUTPA-Deceptive Act) "sounds in fraud" for purposes of Rule 9(b).  In Count XII, Plaintiffs allege Defendants made false representations of material fact knowing the representations were false with the intent to deceive Plaintiffs into remaining in their housing units, causing Plaintiffs damage. *See Pop,* 145 F.4th at 1292.  Accordingly, the individual plaintiffs must satisfy Rule 9(b)'s heightened pleading requirements when asserting a FDUTPA claim for deceptive practices.

Under Rule 9(b), a plaintiff "alleging fraud" must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  That means the individual plaintiffs must allege "the who, what, when[,] where, and how" of the fraudulent conduct giving rise to their FDUTPA claims for deceptive practices.  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).  To satisfy Rule 9(b), the Short Form Complaints must contain allegations about "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants

gained by the alleged fraud." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997) (internal quotation marks)).

To wrap up:  FDUTPA claims that sound in fraud (like Count XII of the Master Complaint) must be pleaded with particularity as required by Rule 9(b); whereas, FDUTPA claims that do not sound in fraud (like Count XI of the Master Complaint) need not satisfy Rule 9(b).  (The Court further underscores that the requirements of Rule 9 must be satisfied for any applicable claim in an individual Short Form Complaint.)

## IV.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

Defendants' Motion to Dismiss [**ECF No. 162**] is **GRANTED IN PART** and **DENIED IN PART**.

a.  The Motion is DENIED as to Plaintiffs' claims asserted against BBC-NSE and BBI.

b.  The Motion is DENIED as to Plaintiffs' breach of contract claims (Count I) asserted against BBC-NSE, BBI, BBC, and Balfour Beatty Management.

c.  The Motion is GRANTED as to Plaintiffs' claims for intentional infliction of emotional distress.  **Count VI of the Master Complaint [ECF No. 136] is DISMISSED WITHOUT PREJUDICE**.

d.  The Motion is DENIED as to Plaintiffs' third-party beneficiary claims (Count VIII).

e.  The Motion is DENIED as to Plaintiffs' claims for negligent and fraudulent misrepresentation (Counts XIV and XVI).

f.  The Motion is DENIED as to Plaintiffs' FDUTPA claims for unfair practices (Count XI).

**DONE AND ORDERED** in the Southern District of Florida on May 14, 2026.

_____

**DAVID S. LEIBOWITZ**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record