**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

In Re: NAS KEY WEST LITIGATION

CASE NO. 4:25-CV-10037

District Judge David S. Leibowitz
Magistrate Judge Edwin G. Torres

_____/

THIS DOCUMENT RELATES TO: ALL CASES

## FIRST AMENDED MASTER COMPLAINT

Pursuant to Case Management Order No. 1, Doc. 152 (March 30, 2026) ("CMO"), Plaintiffs, by and through the undersigned counsel, hereby respectfully file this amended Master Complaint seeking judgment against Defendants for injuries sustained as a result of Defendants' intentional, negligent, and grossly negligent acts and omission, relating to their management and operation of military housing at Naval Air Station ("NAS") Key West. Plaintiffs intend this Master Complaint to achieve efficiency and economy by presenting certain common factual and legal allegations that generally pertain to Plaintiffs who will file individual actions in the Master Docket established under the CMO.

Plaintiffs plead all Counts of this Master Complaint in the broadest sense and pursuant to all applicable laws and choice of law principles. As contemplated and authorized by the CMO, individual Plaintiff families will bring their own actions through Short-Form Complaints. This Master Complaint is intended to be read in concert with any individual Short-Form Complaints that are filed, and does not include individualized allegations about each Plaintiff's experiences and injuries. For any given Plaintiff who adopts the Master Complaint's allegations, the totality of that Plaintiff's allegations will include both the common allegations of this Master Complaint and

1

the individual allegations in that Plaintiff's Short-Form Complaint. This Master Complaint does not constitute or effect a waiver or dismissal of any actions or claims asserted in any individual Short-Form Complaint. Nor does it waive, relinquish, or forfeit any Plaintiff's rights, including the right to amend their individual complaints to include additional allegations or claims as warranted in light of information and evidence obtained in discovery or otherwise.

## NATURE OF THE ACTION

1.      For decades, Balfour Beatty PLC, a United Kingdom-based conglomerate and the entities it controls—Defendants Balfour Beatty Communities, LLC; Southeast Housing, LLC; Balfour Beatty Military Housing Management, LLC; BBC Military Housing-Navy Southeast LLC; and Balfour Beatty Investments, Inc. (collectively, "Defendants" or "Balfour")—have profited from a multi-billion-dollar corporate military housing monopoly that abuses, sickens, and traumatizes American military families. Pleas by servicemember families to repair and remediate water-damaged, mold-ridden, and pest-infested homes have been met with inadequate maintenance practices and corporate indifference or ineptitude. In hearings before the United States Congress, Balfour executives and other representatives of the military housing cartel have been repeatedly forced to explain why military families continue to live in dangerous housing. By 2021, Defendant Balfour Beatty Communities, LLC pled guilty to federal fraud charges over falsification of military housing repair records. Even after the fraud plea, a United States Senate report cited Balfour for "ongoing abuses" of military families in 2022. This Complaint, and any individual Short-Form Complaints that are filed, will further detail the litany of consequences of Balfour's leasing and management of military housing.

2.      Military families residing in Balfour housing at Naval Air Station ("NAS") Key West are among those whose health, safety, and financial security were put at serious risk by Balfour, which for years has failed or refused to address housing problems there.

3.      As detailed below, military families at NAS Key West have had to live with appalling conditions in their Balfour housing. Ceiling collapses, water damage, faulty air conditioning, structural defects, pest infestations, and/or exposure to toxic mold and asbestos were part of these families' day-to-day existence at their Balfour homes. Predictably, the unsafe, unhealthy, and hazardous living conditions led to devastating health consequences for virtually all of these families. These health effects can be traced to the mold and other environmental hazards to which the families were exposed every day. Plaintiffs also suffered severe emotional harm as a result of their coming into contact with toxic substances and other hazards. Additionally, and understandably, the continuous stress the families experienced as a direct result of having to live with both the deplorable housing conditions they were subjected to by Balfour, and the effects these conditions had on their physical health and well-being, have also led them to suffer severe mental anguish and emotional distress that has often manifested physically.

4.      These types of nightmarish experiences with Balfour housing are, regrettably, not outliers. These ordeals were shared by dozens of service members and their families who moved into Balfour housing at NAS Key West. The service men and women stationed at NAS Key West cannot be mission-ready if they and their families are sick, distressed, and forced to cope with appalling conditions at what should be their refuge—their homes.

5.      That anguish and distress have been greatly compounded and multiplied by Balfour's indifference to the families' plights, as exemplified by Balfour's failure to resolve or even meaningfully address the unsafe and unhealthy (and indeed inhumane) conditions of the families'

homes, much less take responsibility for those conditions. Despite repeated requests and complaints from the families, Balfour not only failed to adequately redress the problems at the homes but sought to downplay, minimize, and conceal the serious nature of those problems. What's more, on numerous occasions, Balfour actually made the problems much worse, by taking actions, like tearing up walls and ceilings, that had the effect of further exposing Plaintiffs to toxic substances such as asbestos and mold.

6.     With only a few exceptions, Plaintiffs are military service members and their families who leased housing in military housing communities located in Key West, managed and operated by Defendants.

7.     This case concerns the unsafe and unhealthy conditions that military families living at NAS Key West have been exposed to, not because of lack of funding or resources, but because of the systematic neglect and intentional misconduct by Defendants. When families reported dangerous mold, water damage, and other serious, unsafe conditions and defects in their homes, Balfour repeatedly failed to remediate the issues, told residents that their concerns were unfounded, falsely marked work orders as complete, and exposed residents to pests and to toxic substances, including mold, asbestos, and lead-based paint. The physical, emotional, and financial harm suffered by the families living in those houses was the foreseeable consequence of Defendants' actions and omissions.

8.     Plaintiffs' homes were owned and managed by Balfour, which had contracted with the United States to provide housing for the United States military and their families. Balfour has earned millions of dollars from leasing and managing military housing.

9.     Balfour has failed to take basic steps to ensure that the housing is free from hazardous materials, including mold. The condition of the housing has jeopardized the health and safety

of our nation's military service members and their families. Balfour has also repeatedly and systematically failed to address these dangerous housing conditions.

10.     Balfour concealed the horrific conditions from unsuspecting service men and women and their families through untrue and misleading statements and failure to disclose conditions Balfour knew about. When these conditions were discovered and reported, Balfour failed to properly repair and remediate significant problems in the homes, including water damage, mold, structural defects, HVAC, plumbing issues, electrical problems, and the presence of lead paint and asbestos. Balfour tried to persuade numerous families that these hazards existed only in their imaginations. Balfour also misled many Plaintiff families into believing that repairs were made, knowing that families living in the homes would likely suffer serious health problems as a result of the conditions.

11.     All families have the right to expect landlords to provide safe and habitable homes. But it is especially unacceptable, and unconscionable, to subject those who serve and protect our nation to these conditions. The military families who serve our nation deserve safe, healthy housing that supports their mission readiness. Instead, they have experienced persistent health problems, deteriorating living conditions, and a housing provider that prioritized profits over their well-being.

12.     In addition to having to endure these unendurable conditions, Plaintiffs have suffered personal injuries and health problems as a result of Defendants' acts and omissions. These problems include asthma and other respiratory issues, sinusitis, migraines, memory loss, brain fog, blurred vision, compromised immune systems, and other serious health issues. Those physical injuries have also led to extreme stress and emotional and psychological injuries such as depression and anxiety. Virtually all Plaintiffs have been left with lasting fears about their own and their loved

5

ones' physical conditions, causing chronic emotional stress about their living conditions and Defendants' knowing failure to redress them.

13.     Plaintiffs accordingly file this suit to hold Balfour accountable for its negligence, gross negligence, its deceit and misrepresentations, and its utter failure to provide the safe and habitable housing that military families deserve, and that Balfour was contractually obligated to provide. The law underlying Plaintiffs' claims is designed to provide the remedies that they seek—not only compensation for the harm, but also deterrence for the wrongdoers. Only with accountability will these conditions change.

## THE PARTIES[1]

14.     Plaintiffs JACKIE TALARICO and ANTHONIE TALARICO are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. JACKIE TALARICO is also the parent and/or legal guardian of Plaintiffs A.T. and R.T., minor children. The Talaricos are citizens of Florida.

15.     Plaintiffs ANTHONY ALGER and SARA ALGER are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. SARA ALGER is also the parent and/or legal guardian of Plaintiffs A.A. and E.A., minor children. The Algers are citizens of Alaska.

16.     Plaintiffs ANTHONY BAILLIE and CEANNA BLOOM-LEDOUX are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. AN-

---

[1] This section identifies those Plaintiffs who were named in the Second Amended Complaint, Doc. 136 (March 6, 2026). The vast majority of Plaintiffs are families and individuals who have resided in NAS Key West housing operated, managed, and maintained by Defendants. Other Plaintiffs ("Non-Resident Plaintiffs") have worked in such NAS Key West housing and have been exposed to unsafe and unhealthy conditions as a result of Defendants' acts and omissions.

THONY BAILLIE is also the parent and/or legal guardian of Plaintiff I.B., a minor child. The family members are citizens of Florida.

17. Plaintiffs ASHLEY BASTIAN and KARL BASTIAN are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. ASHLEY BASTIAN is also the parent and/or legal guardian of Plaintiffs M.B. and W.B., minor children. The Bastians are citizens of Texas.

18. Plaintiffs LEE BRENNAN and MELISSA BRENNAN are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. MELISSA BRENNAN is also the parent and/or legal guardian of Plaintiffs C.C., C.B., and S.B, minor children. The Brennans are citizens of Florida.

19. Plaintiffs LEVI BROWN and JAIME BROWN are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. JAIME BROWN is also the parent and/or legal guardian of Plaintiff E.B., a minor child. Levi Brown and E.B. are citizens of Texas. Jaime Brown is a citizen of Oklahoma.

20. Plaintiffs KENYATTA BRYANT and MAYRA BRYANT are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. KENYATTA and MAYRA BRYANT are also the parents and/or legal guardians of Plaintiffs K.A.B., K.D.B, K.D'S.B., and K.D'W.B., minor children. Mayra Bryant is a citizen of Tennessee. Kenyatta Bryant, K.A.B., K.D.B, K.D'S.B., and K.D'W.B., are citizens of North Carolina.

21. Plaintiffs WAYNE BUSH and LISA MARIE BUSH are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. The Bushes are citizens of Florida.

22.     Plaintiffs KRISTI ANN CAPUTO and BRANDON ROMANSKY are individuals who reside in Key West, Monroe County, Florida. KRISTI ANN CAPUTO is also the parent and/or legal guardian of Plaintiffs C.R. and J.R., minor children. The family members are citizens of Florida.

23.     Plaintiffs STEPHEN CATES, SHARON EARLY CATES, and HANNAH CATES are individuals, who at all relevant times to the Complaint, resided in Key West, Monroe County, Florida. The Cateses are citizens of Florida.

24.     Plaintiff ALLISON MARIE CHOCIANOWSKI is an individual who resides in Key West, Monroe County, Florida. ALLISON CHOCIANOWSKI is also the parent and/or legal guardian of Plaintiffs A.C., K.C., and P.C., minor children. The Chocianowskis are citizens of Florida.

25.     Plaintiff SAVANNAH DEIS is an individual who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. SAVANNAH DEIS is also the parent and/or legal guardian of Plaintiffs A.E.D. and A.M.D., minor children. The Deises are citizens of Nevada.

26.     Plaintiffs KAYLEE JO DOWELL and GRANT DOWELL are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. KAYLEE JO DOWELL is also the parent and/or legal guardian of Plaintiff D.D., a minor child. The Dowells are citizens of Florida.

27.     Plaintiffs NELLIE FEENEY and JOEL A.H. REEVES are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. NELLIE FEENEY is also the parent and/or legal guardian of Plaintiffs I.C. and L.C., minor children. The family members are citizens of Florida.

8

28.     Plaintiffs MICHAEL FELLOWS and AMANDA FELLOWS are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. AMANDA FELLOWS is also the parent and/or legal guardian of Plaintiffs G.F. and M.F., minor children. The Fellowses are citizens of Florida.

29.     Plaintiffs ALEJANDRO FIGUEROA and ZUKI FIGUEROA are individuals who reside in Key West, Monroe County, Florida. The Figueroas are citizens of Florida.

30.     Plaintiffs MCKAYLA FOTHERGILL and DUSTIN FOTHERGILL are individuals who reside in Key West, Monroe County, Florida. MCKAYLA FOTHERGILL is also the parent and/or legal guardian of Plaintiff B.F., a minor child. The Fothergills are citizens of Florida.

31.     Plaintiffs BRITTANY FRATES and AARON FRATES are individuals who reside in Key West, Monroe County, Florida. BRITTANY FRATES is also the parent and/or legal guardian of Plaintiffs A.F. and V.F., minor children. The Frateses are citizens of Florida.

32.     Plaintiffs HIRAM GONZALEZ and ANA GONZALEZ are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. ANA GONZALEZ is also the parent and/or legal guardian of Plaintiff A.R., a minor child. The Gonzalezes are citizens of Florida.

33.     Plaintiffs ADAM GRAHAM and LYNDSAY GRAHAM are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida with their now adult daughter ROMAN GRAHAM. The Grahams are citizens of Florida.

34.     Plaintiffs VIRGINIA GUESS and CALEB GUESS are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. VIRGINIA GUESS is also the parent and/or legal guardian of Plaintiffs C.W., S.W., G.G., and L.G., minor children. The Guesses are citizens of Texas.

35.     Plaintiffs CARLOS HERNANDEZ and JESSICA HERNANDEZ are individuals who reside in Key West, Monroe County, Florida. CARLOS HERNANDEZ is also the parent and/or legal guardian of Plaintiff H.H., a minor child. The Hernandezes are citizens of Florida.

36.     Plaintiff RICK FRANK HESTER, JR. is an individual who resides in Key West, Monroe County, Florida. RICK FRANK HESTER, JR., is also the parent and/or legal guardian of Plaintiff L.H., a minor child. The Hesters are citizens of Florida.

37.     Plaintiffs BRANDON HURD and CAITLYN HURD are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. CAITLYN HURD is also the parent and/or legal guardian of Plaintiffs H.H., P.H., R.H., and W-C.H., minor children. Caitlyn Hurd is a citizen of Washington. Brandon Hurd, H.H., P.H., R.H., and W-C.H are citizens of Florida.

38.     Plaintiffs MATTHEW JOHNSTON and CANDACE JOHNSTON are individuals who reside in Key West, Monroe County, Florida. CANDACE JOHNSTON is also the parent and/or legal guardian of Plaintiff A.J., a minor child.  The Johnstons are citizens of Florida.

39.     Plaintiffs ALBERT LEE KING, JR., NATALIE KING, AUBRIANA KING, and SA'NAYVIA KING are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. ALBERT LEE KING, JR., is also the parent and/or legal guardian of Plaintiffs Ja.K., and Jak.K., minor children. The Kings are citizens of Texas.

40.     Plaintiffs KIMO LEE and JESSA LEE are individuals who reside in Key West, Monroe County, Florida. JESSA LEE is also the parent and/or legal guardian of Plaintiffs J.L. and K.L., minor children. The Lees are citizens of California.

41.     Plaintiffs REFUGIO MARTINEZ and LARISSA ANNE MARTINEZ are individuals who reside in Key West, Monroe County, Florida. LARISSA ANNE MARTINEZ is also the

parent and/or legal guardian of Plaintiff CHRISTIAN MARTINEZ, her adult disabled son. The Martinezes are citizens of Florida.

42.     Plaintiff DANIEL MASTRIANI is an individual who resides in Key West, Monroe County, Florida. DANIEL MASTRIANI is also the parent and/or guardian of Plaintiffs E.M. and S.M., minor children. The Mastrianis are citizens of Florida.

43.     Plaintiffs CHRISTOPHER MCCARTHY and MEG MCCARTHY are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. MEG MCCARTHY is the parent and/or legal guardian of Plaintiffs A.M., J.M., and R.M., minor children. The McCarthys are citizens of Alaska.

44.     Plaintiffs DEREK MCQUAIG and CHELSEA JOHNSON are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. CHELSEA JOHNSON is also the parent and/or legal guardian of Plaintiffs K.M., M.M., and N.M., minor children. The family members are citizens of Florida.

45.     Plaintiffs JUSTIN MELFORD and MORGAN MELFORD are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. MORGAN MELFORD is also the parent and/or legal guardian of Plaintiffs B.M. and Z.M., minor children. The Melfords are citizens of Florida.

46.     Plaintiffs DANIEL MITCHELL, BRANDY RAE MITCHELL, and FIONN CROCKETT are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. DANIEL MITCHELL is also the parent and/or legal guardian of Plaintiff C.M., a minor child. The family members are citizens of Alaska.

47.     Plaintiffs JACOB MOODY and KAYLA MOODY are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. JACOB MOODY is

11

also the parent and/or legal guardian of Plaintiff B.M., a minor child. The Moodys are citizens of Alabama.

48.     Plaintiffs KAYLA O'BRIEN and STEPHEN O'BRIEN are individuals who reside in Key West, Monroe County, Florida. KAYLA O'BRIEN is also the parent and/or legal guardian of Plaintiffs M.O. and R.O., minor children. The O'Briens are citizens of Florida.

49.     Plaintiffs SEAN PHILLIPS and LESLIE PHILLIPS are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida.  The Phillipses are citizens of Florida.

50.     Plaintiffs LEVI POTTER and ANNALYN POTTER-SOZA are individuals who reside in Key West, Monroe County, Florida. ANNALYN POTTER-SOZA is also the parent and/or legal guardian of Plaintiff M.P., a minor child. The family members are citizens of Oklahoma.

51.     Plaintiff MARIE ROBBINS is an individual who resides in Key West, Monroe County, Florida. Marie Robbins is a citizen of Florida.

52.     Plaintiffs JOSHUA RODAS and SAMANTHA RODAS are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. The Rodases are citizens of Florida.

53.     Plaintiffs CHRISTOPHER SANCHEZ, DARCY SANCHEZ, SYMONE SANCHEZ, and JELENA SANCHEZ are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. The Sanchezes are citizens of Florida.

54.     Plaintiffs ANTHONY SEATON and LYRIC SEATON are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. LYRIC SEATON

12

is also the parent and/or legal guardian of Plaintiff T.S., a minor child. The Seatons are citizens of Mississippi.

55.     Plaintiffs CODIE SECHI and PAIGE SECHI are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. PAIGE SECHI is also the parent and/or legal guardian of Plaintiff C.S., a minor child. Codie Sechi is a citizen of Georgia. Paige Sechi and C.S. are citizens of Utah.

56.     Plaintiffs ANTRANIG SEROP and JULIE SEROP are individuals who reside in Key West, Monroe County, Florida. The Serops are citizens of Florida.

57.     Plaintiffs JASON SMITH and LEILAH SMITH are individuals who reside in Key West, Monroe County, Florida. LEILAH SMITH is also the parent and/or legal guardian of Plaintiffs Ba.S. and Bo.S., minor children.  The Smiths are citizens of Florida.

58.     Plaintiff JOHN STEVENS is an individual who resides in Key West, Monroe County, Florida. John Stevens is a citizen of Florida.

59.     Plaintiffs TAYLOR CHASE STROUD and JESSICA STROUD are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. JESSICA STROUD is also the parent and/or legal guardian of Plaintiffs L.L.S. and L.K.S., minor children. The Strouds are citizens of Texas.

60.     Plaintiffs DEREK TAYLOR and SHANNA TAYLOR are individuals who reside in Key West, Monroe County, Florida. SHANNA TAYLOR is also the parent and/or legal guardian of Plaintiff M.F., a minor child. The Taylors are citizens of Florida.

61.     Plaintiffs JENNIFER TELFER, ROY TELFER, and DREYDEN TELFER are individuals who reside in Key West, Monroe County, Florida. JENNIFER TELFER is also the parent and/or legal guardian of Plaintiffs D.T. and S.T., minor children. The Telfers are citizens of Florida.

62.     Plaintiffs KAYLA TIMPONE and DAVID DANFORD, JR. are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. KAYLA TIMPONE is also the parent and/or legal guardian of Plaintiffs L.A.D. and L.J.D., minor children. The family members are citizens of Florida.

63.     Plaintiff ASTRID TROTTER is an individual who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. ASTRID TROTTER is also the parent and/or legal guardian of Plaintiffs Ki.T. and Ka.T., minor children. The Trotters are citizens of Texas.

64.     Plaintiffs RICHARD VANDERHOOF, MEGHAN KELLY-VANDERHOOF, COREY VANDERHOOF, and KIAN VANDERHOOF are individuals who reside in Key West, Monroe County, Florida. The Vanderhoofs are citizens of Florida.

65.     Plaintiffs MATTHEW VIGREN and KENDRA ULRICH are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. MATTHEW VIGREN is also the parent and/or legal guardian of Plaintiff C.V., a minor child. The family members are citizens of Florida.

66.     Plaintiffs JOSHUA VOILES and JANNINE VOILES are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. JANNINE VOILES is also the parent and/or legal guardian of Plaintiffs C.V., L.V., and P.V., minor children. The Voileses are citizens of Florida.

67.     Plaintiffs SAMUEL WINTER and KILEY ANN WINTER are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. KILEY ANN WINTER is also the parent and/or legal guardian of Plaintiffs D.W. and T.W., minor children. The Winters are citizens of Florida.

68.     Plaintiffs WILLIAM WYLIE and MICHELLE WYLIE are individuals who reside in Key West, Monroe County, Florida. The Wylies are citizens of Florida.

69.     Plaintiffs SAIDI ALABI and KELLI ALABI are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. KELLI ALABI is also the parent and/or legal guardian of Plaintiffs J.A., L.A., and S.A., minor children. The Alabis are citizens of Florida.

70.     Plaintiff WEATHERBY CARNEY is an individual who at all relevant times to the Complaint resided in Key West, Monroe County, Florida.  Weatherby Carney is a citizen of Florida.

71.     Plaintiffs CHRISTOPHER CARR and KANAKO CARR are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. CHRISTOPHER CARR is also the parent and/or legal guardian of Plaintiffs F.C., J.C., P.C., R.C., and S.C., minor children. The Carrs are citizens of Florida.

72.     Plaintiff DENNY CASTILLO is an individual who resides in Key West, Monroe County, Florida. Denny Castillo is a citizen of Florida.

73.     Plaintiffs AUSTIN DISCOLI and HALI DISCOLI are individuals who reside in Key West, Monroe County, Florida. AUSTIN DISCOLI is also the parent and/or legal guardian of Plaintiffs R.D. and T.D., minor children. The Discolis are citizens of Florida.

74.     Plaintiffs JULIO GODREAU and JESSICA GODREAU are individuals who reside in Key West, Monroe County, Florida. JESSICA GODREAU is also the parent and/or legal guardian of Plaintiffs E.G., K.G., and L.G., minor children. The Godreaus are citizens of Florida.

75.     Plaintiffs BRIAN HAWKINS and XENIA HAWKINS are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. BRIAN HAW-

15

KINS is also the parent and/or legal guardian of Plaintiffs E.H., M.H., and S.H., minor children. The Hawkinses are citizens of California.

76.     Plaintiffs JOSHUA HILL, AMANDA HILL, TRISTAN HILL, and KEELY HILL are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. KEELY HILL is also the parent and/or legal guardian of Plaintiff E.H., a minor child. The Hills are citizens of Florida.

77.     Plaintiffs GEORGE JOHNSON and EMILEE JOHNSON are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. The Johnsons are citizens of Florida.

78.     Plaintiffs JACOB LEE and RACHEL LEE are individuals who reside in Key West, Monroe County, Florida. RACHEL LEE is also the parent and/or legal guardian of Plaintiffs B.L., P.L., and W.L., minor children. The Lees are citizens of Florida.

79.     Plaintiff KATHLEEN MCCARTY is an individual who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. KATHLEEN MCCARTY is also the parent and/or legal guardian of Plaintiff O.M., a minor child. The McCartys are citizens of Maryland.

80.     Plaintiff FRANCISCO OLALDE, JR. is an individual who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. Francisco Olalde, Jr. is a citizen of Texas.

81.     Plaintiffs JACOB RITTER and RYLEIGH RITTER are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. RYLEIGH RITTER is also the parent and/or legal guardian of Plaintiffs B.R. and S.R., minor children. The Ritters are citizens of Georgia.

16

82.     Plaintiffs NICHOLAS ROBINS and AMY ROBINS are individuals who reside in Key West, Monroe County, Florida. NICHOLAS ROBINS is also the parent and/or legal guardian of Plaintiff N.R., a minor child. The Robinses are citizens of Illinois.

83.     Plaintiffs KAROLYNA AYALA ROMAN and JOSHUA Y.E. MUNIZ are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. KAROLYNA AYALA ROMAN is also the parent and/or legal guardian of Plaintiff A.A., a minor child. The family members are citizens of Florida.

84.     Plaintiffs ANDREW RUSSO and KRISTIN RUSSO are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. KRISTIN RUSSO is also the parent and/or legal guardian of Plaintiffs J.R. and R.R., minor children. The Russos are citizens of Florida.

85.     Plaintiffs BRYAN SALADIS, JAIME SALADIS, and TAYLOR SUTER are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. JAIME SALADIS is also the parent and/or legal guardian of Plaintiff R.S., a minor child. The family members are citizens of Florida.

86.     Plaintiffs CODY SCOTT and KAMIRYN SCOTT are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. KAMIRYN SCOTT is also the parent and/or legal guardian of Plaintiffs A.S. and Z.S., minor children. The Scotts are citizens of Florida.

87.     Plaintiff JUSTIN SEAGROVES is an individual who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. JUSTIN SEAGROVES is also the parent and/or legal guardian of Plaintiff Z.S., a minor child. The Seagroveses are citizens of Texas.

17

88.     Plaintiffs SHAWN STANLEY and JESSICA STANLEY are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. JESSICA STAN-LEY is also the parent and/or legal guardian of Plaintiffs A.S. and L.S., minor children. Shawn Stanley is a citizen of New Jersey.  Jessica Stanley, A.S., and L.S. are citizens of North Carolina.

89.     Plaintiffs CHRISTOPHER TREMPER and IVORY MCCLURE are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. The family members are citizens of Florida.

90.     Plaintiffs ZACHARY MALLOY BROOK and ERICA SHANNON BROOK are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. The Brooks are citizens of Florida.

91.     Plaintiffs MICHAEL PARKS and CARMEN PARKS are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida, along with their now adult children, Plaintiffs BRAYDON PARKS and REECE PARKS. They are also the parents and/or legal guardians of Plaintiff M.P., a minor child. The Parks are citizens of Florida.

92.     Plaintiffs CHRISTOPHER RESSEGUIE and PATSY RESSEGUIE are individuals who at all relevant times to the Complaint resided in Key West, Monroe County, Florida. The Resseguies are citizens of Florida.

93.     Defendant SOUTHEAST HOUSING LLC ("Southeast Housing") is a public-private venture between the United States Department of the Navy and Defendant BBC Military Housing – Navy Southeast LLC. Southeast Housing is a Delaware limited liability company with its principal place of business in the Commonwealth of Pennsylvania.  For purposes of this Court's jurisdiction under 28 U.S.C § 1332(d)(2), Southeast Housing is therefore a citizen of Delaware and Pennsylvania.  *See* 28 U.S.C. § 1332(d)(10) (for purposes of 28 U.S.C. § 1332(d), "an

18

unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized").

94.     Southeast Housing LLC has two members: Defendant BBC Military Housing – Navy Southeast LLC (whose citizenship is discussed at ¶ 96, *infra*), and the U.S. Department of the Navy. Defendant BBC Military Housing – Navy Southeast LLC's sole member is Balfour Beatty Military Housing Investments, LLC, a Delaware limited liability company with its principal place of business in the Commonwealth of Pennsylvania. For the purposes of 28 U.S.C. § 1332(d)(2), Balfour Beatty Military Housing Investments, LLC is therefore a citizen of Delaware and Pennsylvania. BBC Military Housing – Navy Southeast LLC's sole member is Defendant Balfour Beatty Communities, LLC (whose citizenship is discussed at ¶ 99, *infra*). The U.S. Navy is not treated as a citizen of any State for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a) (general diversity).

95.     Southeast Housing was created to lease the land, to assume title to the improvements, and to operate the housing units at NAS Key West. Southeast Housing may be served with process through its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301. According to sworn testimony provided by a senior Balfour official in 2013, Southeast Housing had no employees of its own. On information and belief, at the times relevant to this action, Southeast Housing had no or very few employees and instead operated through personnel employed by other Balfour entities or through contractors and vendors.

96.     Defendant BBC MILITARY HOUSING – NAVY SOUTHEAST LLC ("BBC-NSE") is a Delaware limited liability company with its principal place of business located at One Country View Road, Suite 100, Malvern, Pennsylvania.  For purposes of this Court's jurisdiction

19

under 28 U.S.C § 1332(d)(2), Defendant BBC-NSE is a citizen of Delaware and Pennsylvania. *See* 28 U.S.C. § 1332(d)(10).

97.     BBC-NSE's sole member is Balfour Beatty Military Housing Investments, LLC a Delaware limited liability company with its principal place of business in the Commonwealth of Pennsylvania. For the purposes of 28 U.S.C § 1332(d)(2), Balfour Beatty Military Housing Investments, LLC is therefore a citizen of Delaware and Pennsylvania.  Balfour Beatty Military Housing Investments, LLC's sole member is Defendant Balfour Beatty Communities, LLC (whose citizenship is discussed at ¶ 99, *infra*). Defendant BBC-NSE is the managing member of Southeast Housing and exerts sole and exclusive management and control of Southeast Housing. BBC-NSE may be served with process through its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

98.     Defendant BALFOUR BEATTY MILITARY HOUSING MANAGEMENT LLC, ("BBMHM") is a Delaware limited liability company authorized to do business in Florida and with a principal place of business located at One Country View Road, Suite 100, Malvern, Pennsylvania. For purposes of this Court's jurisdiction under 28 U.S.C § 1332(d)(2), BBMHM is a citizen of Delaware and Pennsylvania. *See* 28 U.S.C. § 1332(d)(10).  BBMHM's sole member is Defendant Balfour Beatty Communities, LLC (whose citizenship is discussed at ¶ 99, *infra*). BBMHM may be served with process through its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

99.     Defendant BALFOUR BEATTY COMMUNITIES, LLC ("BBC") is a Delaware limited liability company authorized to do business in Florida and with a principal place of business located at One Country View Road, Suite 100, Malvern, Pennsylvania. For purposes of this Court's jurisdiction under 28 U.S.C § 1332(d)(2), BBC is a citizen of Delaware and Pennsylvania.

*See* 28 U.S.C. § 1332(d)(10). On information and belief, BBC is a subsidiary, either directly or through other wholly owned entities, of Balfour Beatty plc, a United Kingdom based company. BBC's sole member is Defendant Balfour Beatty Investments, Inc. (whose citizenship is discussed at ¶ 100, *infra*). BBC may be served with process through its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

100.   Defendant BALFOUR BEATTY INVESTMENTS, INC. ("BBI") is a Delaware corporation with a principal place of business located at One Country View Road, Suite 100, Malvern, Pennsylvania. For the purposes of this Court's jurisdiction under 28 U.S.C. § 1332(d)(2), Defendant BBI is a citizen of Delaware and Pennsylvania. *See* 28 U.S.C. § 1332(c)(1).

101.   Throughout this complaint, Plaintiffs will refer to the Defendants collectively as "Balfour," "Defendants," or "Balfour Defendants."

## JURISDICTION AND VENUE

102.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(d)(2) and (d)(11), as this is a "mass action" within the meaning of 28 U.S.C. § 1332(d)(11),[2] at least one member of the class of Plaintiffs is a citizen of a State different from any Defendant, the class of Plaintiffs exceeds 99 members, and the aggregate amount in controversy exceeds $5,000,000. None of the statutory exceptions to Section 1332(d)(2)'s grant of subject matter jurisdiction apply. *See, e.g.*, 28 U.S.C. §§ 1332(d)(4), (d)(5), (d)(9), (d)(11)(B)(ii).

103.   In removing this action from state court to this Court, Defendants also invoked this Court's removal jurisdiction under the federal officer removal statute, which allows removal of

---

[2] *See* 28 U.S.C. § 1332(d)(11)(A) ("the term 'mass action' means any civil action … in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a)").

claims directed at a person acting under an officer of the United States or any agency thereof, if the claim is for or relating to any act done under the color of such office. 28 U.S.C. § 1442(a)(1). Defendants have alleged that BBC-NSE "acted under" a federal officer or agency because it contracted with the federal government to own or operate housing at NAS Key West. Defendants' Notice of Removal ¶ 50, ECF No. 1 (May 6, 2025). Defendants have also alleged that at least one of the claims raised in this action relates to an act done under the color of federal office because at least one claim is connected to or associated with alleged actions by Defendants undertaken pursuant to the contractual agreement to own, operate, or manage rental housing at NAS Key West. *See id.* ¶ 53. And Defendants have alleged that they have one or more colorable federal defenses to Plaintiffs' claims. *See id.* ¶¶ 54–56.

104. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as a substantial part of the acts or omissions giving rise to the matters alleged in this Complaint occurred within the Southern District of Florida.

105. This Court has personal jurisdiction over the Balfour Defendants. All of the Defendants other than BBI have conceded that this Court has personal jurisdiction over them. This Court has jurisdiction over BBI because its acts and omissions—carried out through its agents and alter-egos—caused the harms complained of herein which occurred at NAS Key West. Fla. Stat. § 48.193(1)(a)(2). In addition, as explicated further below, BBI itself participated directly in acts and omissions relating to the operation and management of military housing at NAS Key West, including acts and omissions relating to the subject matter of Plaintiffs' claims. Moreover, on information and belief, BBI also derived substantial revenue, whether directly or indirectly, from services provided to persons in the State of Florida. As such, BBI is subject to the personal jurisdiction of this Court pursuant to Fla. Stat. § 48.193(1)(a) and consistent with due process.

## FACTUAL ALLEGATIONS

### The Military Housing Privatization Initiative

106.     In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI") to address the state of military housing across the United States. The MHPI was intended to improve the housing experience for service members and their families by allowing professional housing companies to bring their resources and experience to existing and new military housing. Congress's purpose in establishing the MHPI was to "improve the quality of housing conditions for active-duty military personnel" by "substantially upgrad[ing] military housing on an accelerated basis." 141 Cong. Rec. S18853.

107.     As stated by the Military Housing Association, which represents leading members of the military housing public-private partnership industry (and of which BBC is a member), "MHPI provides for quality housing for DoD service members and their families[.]" *About MHPI*, MIL. HOUSING ASS'N, https://perma.cc/DJ3E-EVR4.

108.     Under the MHPI, a private contractor is granted a long-term real property lease of military base grounds. The military department generally conveys the existing homes on the leased land to the private contractor for the duration of the lease. The private contractor is responsible for constructing new homes and renovating existing homes and then leasing, operating, managing, and maintaining this housing. The MHPI contractor serves as landlord or owner of the home under the lease.

109.     Typically, an MHPI contractor is a limited liability company composed of one or more private companies. In some cases, a military department may also be a member of the limited liability company.

110. The federal government provides the MHPI contractor with a share of initial funding and incentivized financing payments. Significantly, the federal government also typically directly pays to the MHPI contractor the Basic Allowance for Housing ("BAH") to which the service member who rents the home is entitled.

111. Military families pay the BAH automatically through deductions from the service members' pay. The BAH rates are based on several factors, including the geographic location where the military member is stationed, the military member's pay grade, and whether the military member has dependents.

112. The MHPI contractor typically collects the full amount of its residents' BAH regardless of the size or condition of the home.

113. In addition, MHPI contractors receive performance incentive fees, payable upon approval of the military department, here the United States Navy. In order to obtain incentive fees, MHPI contractors are required to submit proof that they have satisfied performance objectives, which include, *inter alia*, maintenance of housing communities and resident satisfaction. The Navy relies on these submissions in deciding whether to approve the payment of relevant performance incentive fees.

### Defendants' Joint and Integrated Approach to NAS Key West Housing

114. As discussed in more detail below, Balfour is the private contractor entrusted with developing, operating, managing, and maintaining MHPI housing at NAS Key West.

115. Defendants are all members of the Balfour conglomerate, at the top of which sits Balfour Beatty plc ("BBPLC"), a company based in the United Kingdom. Defendants function as an integrated enterprise in their operation of NAS Key West housing.

116.    BBPLC, the head of the sprawling Balfour conglomerate, does not directly control its MHPI business in the United States. Instead, BBPLC utilizes numerous subsidiaries to carry out those tasks. The company's public statements reflect a unity of purpose among all these entities. BBPLC refers to itself and its subsidiaries as an integrated "Group" and describes the Group's actions, goals, assets, risks, compliance, and opportunities as if it is a unified entity.

117.    BBPLC includes among its "principal subsidiaries" Defendants BBI and BBC.

118.    Additionally, BBPLC lists among its subsidiaries Defendants BBMHM and BBC-NSE. 2024 Annual Report at 270.

119.    BBPLC makes clear that all of its subsidiaries' activities are "controlled by the group," and that it has the ability to affect the subsidiaries' returns through its power over them. These entities function as integrated parts of a single enterprise rather than independent companies.

120.    BBPLC makes clear that each of these subsidiaries operates on behalf of BBPLC and the larger Group.

121.    Each of the Defendant entities work together in managing and operating the housing at NAS Key West. It would deny the reality of how the Balfour Group functions to try to disentangle the different entities and treat them as if they were truly independent.

122.    For example, BBI, a subsidiary of BBPLC, is an integral part of Balfour's confusing conglomerate that invests in military housing in America. Its public statements acknowledge that nearly half of the value of its investments comes from military housing in the United States. On information and belief, BBI derives substantial direct or indirect revenue and/or value from its investments in military housing, including but not limited to its indirect investments (through, *inter alia*, BBC, of which it is the sole member), in military housing in Florida (including at NAS Key West).

123.    BBI's role, however, is not limited to passive investments in military housing. BBPLC reports that BBI actively develops and maintains military housing in the United States. And BBI describes itself as "an active owner/investor, developer and manager of residential real estate in the multi-family and military markets." *US Military and residential housing*, BALFOUR BEATTY INVS., https://perma.cc/8YX5-N93E. BBI also publicly refers to itself as undertaking activities such as developing, managing, and maintaining military housing throughout and across the United States. *About US*, BALFOUR BEATTY INVS., https://perma.cc/TR5K-TQTS.

124.    BBI's webpage showcases that it is involved in housing development in Florida, including the Waterchase Apartments in Largo, Florida, and the Preserve at Zephyr Ridge, Florida. *Showcase - Our Expertise*, BALFOUR BEATTY INVS., https://perma.cc/ST53-M6JP.

125.    BBI has acknowledged that it serves as Balfour's "investment ownership vehicle" for the operation of some MHPI housing in the United States. While it has asserted that BBC, rather than it, serves as the "investment ownership vehicle" for the MHPI housing at NAS Key West, the borders between BBC and BBI are porous at best.

126.    As noted, BBI is the sole member of BBC. BBI therefore derives significant value, through its interest in BBC, from the MHPI projects in which BBC serves as the "investment ownership vehicle." BBI's web page also explains that at least some of its residential ventures in North America are managed through BBC.

127.    BBI and BBC also share at least six key business departments, including: Legal, Accounting, Information Technology, Environmental/Health & Safety, Human Resources, and Marketing.

128.    There is also significant overlap between officers at BBC and its parent company BBI. At most times relevant to this action, the President, Senior Vice President, Executive Vice

26

President, Chief Compliance Officer, Corporate Controller, and Treasurer of BBC all have held senior positions at BBI as well. At all times relevant to this action, BBC has been managed and operated almost exclusively by officers who are also senior executives at BBI.

129.   A section of BBPLC's 2024 Annual Report discussing BBI North America's business suggests that the Group carries out its military housing projects in America through its subsidiary BBC. This further highlights the integrated operational relationship between BBC, BBI, and the entire Group.

130.   BBI has connections to and involvement with NAS Key West housing separate and apart from its interest in BBC. For example, the "Leadership" page of BBC's website notes that Leslie Cohn, the Executive Vice President, and General Counsel "for the Balfour Beatty Investments division of" BBPLC, "oversees the Legal function for the company's Investments portfolio," which "includes public private partnerships … and multifamily, military and student housing business segments."

131.   Ms. Cohn signed several of the legal documents governing Defendants' activities at NAS Key West, including the Operating Agreement, Ground Lease, and Property Management Agreement, which are discussed below, *infra* ¶¶ 153–60.

132.   In 2013, Ms. Cohn, identifying herself as "Executive Vice President and General Counsel at Balfour Beatty Investments," voluntarily testified in Florida State court in proceedings concerning the tax status of Balfour's military housing properties in Florida, including NAS Key West.

133.   Additionally, significant operational overlap exists between BBC and BBI, including in Florida. For example, BBI has established mold management policies that are apparently applicable to all entities within the BBPLC conglomerate. Thus, Balfour operates a "Balfour

Beatty 360° intranet" portal. That portal contains, *inter alia*, Balfour's Mold Management Policy, which requires that when "hazardous materials are present, all cleanup and remediation activities are required to be completed in accordance with all BBI Safety, Health and Risk Management Policies and Procedures[.]"

134.   Similarly, Balfour employees, including those at NAS Key West, are instructed to report illegal, unethical, or inappropriate conduct to the Ethics and Compliance Team, which includes the BBI Compliance Manager and the BBI VP of Ethics & Compliance.

135.   Along the same lines, the Conflict-of-Interest policy provided to Balfour employees at NAS Key West states that the "policy applies to all employees of [BBI], its subsidiaries, including, but not limited to [BBC], . . . each of their subsidiaries as well as any future subsidiaries identified by [BBI] … and including those working in joint ventures."  The policy goes on to note that approvals related to certain conflicts of interest may require approval by "the Strategic Business Unit Managing Director of [BBI] in addition to the Managing Director of the Business Unit."

136.   BBI also directly participates in NAS Key West operations in other ways. Examples of such direct participation include, but are by no means limited to, the following:

    a.   On multiple occasions, personnel who identified themselves as representatives of or as acting on behalf of Balfour Beatty Investments interacted with Plaintiffs with respect to issues concerning NAS Key West housing. Thus, Lee Tysinger, whose signature block identifies him as a "Life Health Safety Service Manager [at] Balfour Beatty Investments," has personally handled resident complaints and maintenance issues at NAS Key West.

    b.   Similarly, Patty Avery, a Regional Operations Director at "Balfour Beatty Investments," scheduled and attended calls with Plaintiff Jackie Talarico related

to issues at Ms. Talarico's NAS Key West home. In scheduling a meeting with the Talaricos, Ms. Avery referred to BBC and BBI officials as representatives of the "landlord."

c. Several other individuals who interacted with Plaintiffs regarding NAS Key West housing also identified themselves as acting on behalf of "Balfour Beatty Investments." Such individuals include Alina Mekhtiieva and Tamara Perry, who identified themselves as Customer Experience Specialists with Balfour Beatty Investments, and Jesse Busick, who identified himself as a Facility Director with Balfour Beatty Investments.

d. BBC employees at NAS Key West are referred to the "BBI Helpdesk" to log support requests.

e. The BBI Helpdesk is accessible to BBC employees at NAS Key West.

f. The lease packets provided to some Plaintiffs indicate that the leases were signed by Demetraise Wynn, who was identified as "Assistant Community Manager, Balfour Beatty Investments." Disclosures in many of these lease packets contained multiple references to Balfour Beatty Investments, including statements noting that Balfour Beatty Investments may be required by law to provide tenants with certain notices, and instructions on how to contact Balfour Beatty Investments.

137. As such, BBI is responsible for the acts of BBC and liable for its breaches of duty, as it had the right to control BBC.

138. Other Defendants are also subject to the control of BBC and BBI.

29

139.    For example, BBC is the owner, through an intermediary, of Defendant BBC-NSE. BBC-NSE is in turn the managing member of Defendant Southeast Housing.

140.    Southeast Housing was created to lease from the Navy the land to be used for housing at NAS Key West and to lease housing to military families.

141.    Southeast Housing signed Plaintiffs' leases, but it is entirely controlled by BBC-NSE, and thus it is inseparable from BBC and ultimately BBI. Southeast Housing's Operating Agreement makes clear that BBC-NSE, as the managing member, controls it.

142.    Southeast Housing does not have any employees distinct from the other Defendants. In fact, at the times relevant to this action, Southeast Housing had no or very few employees, and instead operated through personnel employed by other Balfour entities or through contractors and vendors.

143.    Southeast Housing does not have a website, and the NAS Key West Homes website refers only to Balfour Beatty Communities. Southeast Housing does not appear on the NAS Key West Homes website.

144.    BBC-NSE, as the managing member of Southeast Housing, with the right to control and direct its operations, is vicariously liable for the acts of its agent Southeast Housing. Moreover, BBC as the parent of BBC-NSE, with control over its actions, is also vicariously liable for the acts of its agent.

145.    BBC is also the owner and sole member of Defendant BBMHM, which serves as a property manager for Balfour's NAS Key West military housing.

146.    However, when NAS Key West residents, including many Plaintiffs, complained about the hazards that made their homes unfit for human habitation or other issues regarding their

leases, they often interacted directly with BBC or BBI representatives rather than with BBMHM personnel.

147.    Based on the foregoing, and on information and belief, each of these entities took actions that evidence their acknowledgement of the fact that they were operating on behalf of BBPLC, BBI, and the Group.

148.    On information and belief, these subsidiaries were formed or used for fraudulent, improper, or unjust purposes.

149.    For the foregoing reasons, although Defendants may have been formally structured as distinct entities, for purposes of the acts and omissions underlying Plaintiffs' claims, they are integrated, closely related components of one confusing conglomerate that operates for a single purpose. The Balfour Defendants are joint tortfeasors, agents of the other, joint venturers, and/or engaged in a joint enterprise of leasing and managing military housing at NAS Key West, as well as the conduct, acts and omissions alleged herein. In addition, at all relevant times, there existed a unity of interest and ownership among Defendants, their predecessors, agents, and parents, such that each entity is the alter ego of each other entity.

**NAS Key West's Status as a Concurrent Federal Enclave**

150.    All of the NAS Key West properties at issue in this case (including the NAS Key West homes at which those Plaintiffs other than the Figueroa Plaintiffs resided and the NAS Key West homes at which the Figueroa Plaintiffs worked) are located in one of three neighborhoods: Truman Annex, Trumbo Point, and Sigsbee Park.

151.    On information and belief, the Truman Annex neighborhood was originally ceded to the United States in 1911, the Trumbo Point neighborhood was originally ceded to the United

States in 1941, and the Sigsbee Park neighborhood was originally ceded to the United States in 1951.

152.   On information and belief, when the Truman Annex, Trumbo Point, and Sigsbee Park neighborhoods were originally ceded to the United States, the United States accepted proprietary jurisdiction over those neighborhoods.

153.   On information and belief, prior to 1991, the United States also obtained exclusive legislative jurisdiction over smaller parcels of land at NAS Key West not at issue in this action.

154.   Thus, as of mid-1991, the United States possessed exclusive legislative jurisdiction over certain parcels of land at NAS Key West and proprietary jurisdiction over other parcels of land, including the Truman Annex, Trumbo Point, and Sigsbee Park neighborhoods.

155.   In 1991, the United States and the State of Florida engaged in a transaction designed in part to ensure that Florida would share concurrent legislative jurisdiction with the United States over all of NAS Key West.  In a letter dated June 24, 1991, the Navy noted that it had "proprietary jurisdiction" over more than 5,500 acres at NAS Key West and "exclusive" jurisdiction over about 390 acres. Letter from Jacqueline E. Schafer, Ass't Sec'y of the Navy, Installations & Env't, to Lawton Chiles, Fla. Gov. (June 24, 1991) (attached hereto as Ex. 1 at 2).  The Navy noted that "this patchwork of legislative jurisdiction has presented legal and security problems." *Id.* It therefore suggested "changing all tracts [at NAS Key West] to concurrent jurisdiction" in order to "provide for more efficient property management and law enforcement" and to "clarify the rights of the residents of the area." *Id.*  The Navy therefore "requested that the state of Florida take appropriate action to adjust jurisdiction over this property to concurrent." *Id.*

156.   In a second letter dated October 30, 1991, the Navy outlined a path for creating concurrent legislative jurisdiction, in order "to eliminate legal and security problems" in those

areas over which the United States exercised only proprietary jurisdiction and to establish uniform legislative jurisdiction over the entire base, through two essentially simultaneous actions: First, Florida would cede to the Navy exclusive jurisdiction over those lands over which the United States exercised proprietary jurisdiction. *Id.* at 2. Second, the Navy would accept the State's cession and then "retrocede concurrent legislative jurisdiction" back to the State. *Id.*

157. In accordance with the plan outlined by the Navy, on November 12, 1991, Florida Governor Chiles signed a "Deed of Cession" ceding exclusive jurisdiction over the lands to the United States, and the Navy retroceded concurrent legislative jurisdiction to the State. *Id.* at 3. On that same date, Governor Chiles officially "accepted" the retrocession to Florida of "[c]oncurrent jurisdiction." *Id.* at 2.

158. Florida and the United States have thus shared concurrent legislative jurisdiction over NAS Key West since at least November 12, 1991, when the United States retroceded, and the Governor of Florida accepted, concurrent legislative jurisdiction over the facility.

159. Because, at all times relevant to this action, Florida has possessed at least concurrent legislative jurisdiction over NAS Key West, including over all of the properties at issue in this action, Plaintiffs' claims are governed by contemporary Florida law.

160. Moreover, and as addressed below, those of Plaintiffs' claims that seek recovery for personal injuries would be governed, under 28 U.S.C. § 5001(b), by contemporary Florida law even if it were determined or assumed that NAS Key West were an exclusive federal enclave.

161. Finally, all of Plaintiffs' claims would be governed by contemporary Florida law even if it were determined or assumed that NAS Key West were an exclusive federal enclave because Plaintiffs' leases contain choice of law provisions selecting contemporary Florida law.

33

**MHPI Housing at NAS Key West**

162.    GMH Communities Trust ("GMH") (now known as Balfour Beatty Military Housing LLC) was selected by the Department of Defense ("DoD") to serve as a partner in the MHPI. GMH became the private sector partner for the design, development, construction, renovation, and management of military housing at NAS Key West.

163.    The purpose of this project, as with the MHPI in general, was to improve housing conditions for service members and their families.

164.    In furtherance of the project, the Navy and GMH formed the joint public-private entity Southeast Housing.

165.    GMH and Southeast Housing became the lessors and managers of NAS Key West. The property management agreement stated that the property was to be owned by Southeast Housing LLC, which was a joint venture between the Navy and GMH and managed by Balfour Beatty Military Management, LLC, formerly GMH Military Housing Management, LLC.

166.    In the spring of 2008, BBPLC, through Defendant BBC, acquired all of GMH's military housing assets, including NAS Key West, in a $350 million transaction.

167.    On information and belief, BBC, either directly or through its subsidiaries or affiliates, Defendants BBMHM, Southeast Housing LLC, and BBC-NSE, assumed all obligations, as the MHPI contractor, for on-base housing at NAS Key West.

168.    In addition to the rent paid by the housing occupants, the Navy pays Balfour for management and maintenance of the property. These payments consist of (1) a monthly base fee, and (2) an incentive fee payment upon achieving certain performance criteria.

169. To obtain the incentive fee payment, Balfour submits documentation and a statement that it satisfied the performance criteria, including objectives related to maintenance work orders and customer satisfaction.

170. Language in Southeast Housing's Operating Agreement, the Ground Lease entered into by the Navy and BBC-NSE's predecessor, and the Property Management Agreement between Southeast Housing and BBMHM makes clear that each agreement was intended to further the MHPI's goal of benefiting Plaintiffs.

171. Southeast Housing's Operating Agreement refers to service members as "Preferred Referrals" who have a "preferential right" to lease the relevant housing units. ECF 41-1, §§ 3.2, 4.02(j).

172. The Operating Agreement requires the "Managing Member [BBC-NSE]" to "cause the Project to be developed, constructed, renovated, maintained, leased, operated and managed in a first-class manner, employing the standard of care rendered by companies performing similar services for market rate residential rental property similar to the Project." *Id.* § 4.02(a).

173. The Operating Agreement also requires Southeast Housing to remediate certain hazards that would impact "the health or safety of residents." ECF 41-1, § 4.02(l)(iv).

174. The Ground Lease entered into by the Navy and BBC-NSE's predecessor-in-interest and the Property Management Agreement between Southeast Housing and BBMHM similarly indicate an intent to benefit Plaintiffs.

175. The Property Management Agreement explains that the homes are "intended for occupancy by Qualified Military Tenants" such as Plaintiffs. ECF 41-3, Ex. B-2, §§ 1.02, 2.01(a).

176.    The Property Management Agreement also requires the Property Manager to "cause the Project to be maintained in a first-class condition." *Id*. § 2.04. And it includes certain incentive provisions designed to reward practices that are responsive to the needs of residents.

177.    The Ground Lease acknowledges that it was entered into under authority contained in the MHPI, and it requires Balfour to "protect, preserve, maintain and repair the Lease Premises, and keep them in good order and condition." ECF 41-2, § 13.1.

### Military Housing Conditions Remained Poor Under the MHPI

178.    While the MHPI has led to some improvements in military housing in some areas, it has also been plagued by reports of MHPI contractors, including Balfour, prioritizing profits over their obligation to provide safe and habitable housing to service members and their families.

179.    In 2019, military families testified to the Senate Armed Services Committee about their substandard military housing conditions. Issues included black mold, rodents, termites, lead paint, and broken HVAC units. The families discussed their difficulties in getting the private housing partners to take their complaints seriously – even as black mold was growing out of walls, floors, and ceilings, and entire families were getting sick.

180.    Reports of mold were the number one tenant complaint in Marine Corps and Navy Housing. Rene Kladzyk, *"Operation Counter-Mold": The Hidden Battle in Military Homes*, PROJECT ON GOV'T OVERSIGHT (Oct. 24, 2024), https://perma.cc/3YYD-4UJC.

181.    In response to these concerns, the 2020 National Defense Authorization Act created a MHPI Tenant Bill of Rights. The Tenant Bill of Rights specifies that military families have the right to reside in a housing unit that meets applicable health and environmental standards. They have the right to reside in a housing unit that has working fixtures, appliances, and utilities. They have the right to receive property management services provided by a landlord that meet or exceed

industry standards and that are performed by professionally and appropriately trained, responsive, and courteous customer service and maintenance staff. *See* 10 U.S.C. § 2890.

182.	Defendants have purported to embrace the Tenant Bill of Rights and to incorporate its protections into their MHPI programs and activities. For example, BBC's website informs visitors that "Balfour Beatty Communities fully supports the MHPI Tenant Bill of Rights and Universal Lease, and we are very proud to extend these rights to all military service members across our military housing portfolio."

183.	In March 2020, the Government Accountability Office ("GAO") released its investigation of reports of mold and pest infestations in privatized military housing. The GAO found, among other things, that MHPI performance metrics do not offer meaningful information on housing conditions, and that maintenance data are not recorded reliably or consistently. United States Government Accountability Office, March 26, 2020. Military Housing: DOD Needs to Strengthen Oversight and Clarify Its Role in the Management of Privatized Housing, GAO-20-281 (Mar. 26, 2020), https://perma.cc/FSD3-2C22.

184.	In April 2022, the DoD released a report of medical conditions among privatized military housing residents. It estimated that 58 percent of housing units with open work orders had a condition that was unsafe or unhealthy. Significantly, DoD noted that hazards such as dampness or microbial growth, lead-based paint, and asbestos have the potential to cause adverse health effects, including asthma, cancer, and developmental delays.

185.	These problems with military housing are ongoing. From October 2022 to October 2024, there were over 20,000 mold-related work orders in Army housing units alone. Project on Government Oversight, October 24, 2024.

186.    In July 2024, the Congressional Research Service found that cumulative DOD contributions to the MHPI contractors to date total over $28 billion.

**Balfour's Prior Misconduct**

187.    The Balfour conglomerate leases and manages over 43,000 homes across 55 United States military installations. This includes over 700 homes at NAS Key West.

188.    In December 2021, BBC pled guilty to committing major fraud against the United States and was ordered to pay $65.4 million in fines and restitution for misconduct relating to its MHPI programs and activities. Balfour also agreed to pay $35,200,000 to resolve a False Claims Act civil suit brought by the United States.

189.    According to a Department of Justice press release issued on December 22, 2021: "Specifically, Balfour employees altered or manipulated data in property management software and destroyed and falsified resident comment cards to falsely inflate these metrics and, ultimately, to fraudulently induce the service branches to pay performance incentive fees which Balfour had not earned. As a result, according to court documents, there were lengthy and unnecessary delays in the resolution of maintenance issues to the detriment of servicemembers and their families. In addition, the military service branches were provided an inaccurate assessment of the state of Balfour's military housing communities and were unable to assess, and potentially correct, Balfour's performance." *Justice Department Announces Global Resolution of Criminal and Civil Investigations with Privatized Military Housing Contractor for Defrauding U.S. Military*, U.S. DEP'T OF JUST. (Dec. 22, 2021), https://perma.cc/YYB3-ARMC.

190.    Then Deputy Attorney General Lisa O. Monaco stated: "Instead of promptly repairing housing for U.S. servicemembers as required, Balfour lied about the repairs to pocket millions of dollars in performance bonuses[.] This pervasive fraud was a consequence of Balfour's broken corporate culture, which valued profit over the welfare of servicemembers."

191.    As part of the plea agreement, Balfour agreed to, *inter alia*, implement an ethics and compliance program to detect and deter violations of anti-fraud law.

192.    A year later, in April 2022, the Senate Permanent Subcommittee on Investigations released a Staff Report titled, *Mistreatment of Military Families in Privatized Housing*. The Subcommittee found "ongoing mistreatment of [] service members and their families and mismanagement by one of the largest private military housing companies – Balfour – that has put the health and safety of military families at risk."

193.    Among the key findings of the Subcommittee:

   a.    "Balfour's staff at Ft. Gordon frequently ignored or delayed responding to urgent requests from military families to address conditions such as mold and roof leaks that threatened the families' health and safety."

   b.    "The Subcommittee uncovered numerous examples of inaccuracies and omissions in Yardi, Balfour's internal work order data tracking system after 2019, when the company initially vowed to correct these problems."

   c.    "A senior Balfour executive acknowledged to the Subcommittee that she was made aware of concerns of inaccurate and incomplete work order data at Ft. Gordon after 2019 but failed to ensure that Balfour took any action to investigate or correct these concerns, highlighting ongoing internal oversight weaknesses at Balfour."

   d.    The "Subcommittee found that as of late 2021, significant gaps in compliance procedures continued to exist at Balfour."

**NAS Key West Housing**

194.    NAS Key West housing is comprised of three neighborhoods: Trumbo Point, Truman Annex, and Sigsbee Park. Trumbo Point consists of officer housing with three and four-bedroom homes. Truman Annex consists of two-, three- and four-bedroom, single or duplex homes, many of which were built in 1962. Sigsbee Park consists of over 500 two- and three-bedroom townhouse units, many of which were built between 1962 and 1965.

195.    Military families sign leases directly with Southeast Housing, which is listed as the "Owner" in the lease.

196.    Plaintiffs in this matter, except for the Non-Resident Figueroa Plaintiffs, signed leases with Southeast Housing.

197.    Each of those Plaintiffs signed leases based on one of four different form leases.

198.    Each form lease includes provisions indicating that it is governed by the law of the State of Florida.

199.    The leases provide that prior to or shortly after moving in, tenants and representatives of Defendants are to conduct a walkthrough inspection of the unit.

200.    Defendants are also required to provide a maintenance history for the preceding seven years, including mold and asbestos addenda.

201.    Each of the four form leases contained a representation that the lessees were being provided homes in a habitable condition. Plaintiffs relied on these representations regarding the current condition of the homes when signing their leases.

202.    The MHPI Tenant Bill of Rights is expressly incorporated in many of the lease packets.

**In Key West, Balfour's Improper Maintenance Led to Dangerous Living Conditions**

203.     Despite multiple investigations and admissions of guilt by Balfour entities, Defendants continued the same dangerous course of conduct with respect to military housing at NAS Key West. Their improper maintenance exposed Plaintiffs to unsafe conditions. These unsafe conditions included exposing residents to toxic mold, asbestos, cockroaches, termites, ants and other pest infestations, lead-based paint, and faulty wiring. These conditions caused Plaintiffs to come directly into contact with such dangerous substances, either touching them, inhaling them, or ingesting them.

204.     Plaintiffs signed leases on the basis of Balfour's false assurances that their homes would be safe and fit for human habitation and/or on the basis of Balfour's intentional, negligent, or grossly negligent failure to disclose conditions that rendered those homes unsafe and uninhabitable. Defendants concealed facts and/or made deceptive assurances (including assurances that Plaintiffs' homes were in habitable condition) that caused Plaintiffs to sign leases that they never would have signed had they known the truth. In the leases, Defendants falsely warranted that the NAS Key West housing was safe, habitable, and free from defects. Plaintiffs justifiably relied on Defendants' assurances and representations.

205.     Key West is a hot, humid region where mold grows rapidly in a home if any sort of leaks or water exposure occur. This makes it crucial to minimize moisture intrusion and respond immediately to wet materials—which Balfour failed to do repeatedly.

206.     Balfour employees ignored work orders even when residents called on a daily basis. When they did respond, Balfour sent non-certified technicians and contractors to deal with the issues. These workers provided grossly subpar maintenance and often made matters much worse.

41

This included covering wet and drooping ceilings with shiplap and painting over mold rather than remediating it.

207. Defendants' "maintenance" was often worse than subpar—it was dangerous. At times, Balfour employees opened up walls or ceilings to remove mold, in the process exposing the residents to additional mold and asbestos, which, on information and belief, Plaintiffs inhaled.

208. Defendants often falsely claimed that they would take adequate steps to remediate or otherwise address unsafe and hazardous conditions in Plaintiffs' homes. Defendants also often made false, misleading, and/or deceptive representations that repairs and remediation efforts in Plaintiffs' homes were performed completely and to the standard of care required of professional landlords. Plaintiffs justifiably relied on Defendants' false assurances and representations in deciding to remain in their homes and, in some cases, to renew their leases. Defendants also often failed to disclose the grossly inadequate nature of their repair and remediation efforts.

209. Balfour employees would also often close work orders early, at times without even entering Plaintiffs' homes. Employees sometimes uploaded photos of other homes to work orders to provide fraudulent evidence that the work order was completed. This allowed Balfour to receive incentive management fees (bonus payments for good performance) from the Navy, the very behavior for which Balfour was prosecuted and paid more than $64 million in criminal fines and restitution.

210. Due to these conditions, Plaintiffs' homes were not reasonably fit to be lived in.

211. Plaintiffs' homes would be considered unsafe or unfit under Key West's housing ordinances. Key West, Fla. Mun. Code, §§ 14-71, 14-75, *et seq*.

212. The homes would be considered unsafe under the Monroe County housing code. *Id.* § 6-27.

213.    Across the military housing at NAS Key West owned and managed by Defendants, dozens of ceilings have caved in due to water damage. Even as residents warned of bubbling in the ceiling and signs of the ceiling caving in, Balfour employees continued to ignore concerns, leading to scenes at numerous homes such as this collapsed ceiling at one family's (the Potter Plaintiffs') home.



214.    Residents had to call multiple times for Balfour technicians to address ceiling concerns like these. Rather than addressing the root cause, Balfour employees instead often covered the areas with shiplap.

### Balfour Knowingly Exposed Plaintiffs to Toxic Mold

215.    Balfour refused to follow its mold policies, despite knowing very well that failure to do so leads to the growth of toxic mold.

216.    Environmental testing of many Plaintiffs' homes revealed extremely elevated levels of toxic mold. Multiple homes were found to have millions of spores per cubic meter of toxic mold (including Aspergillus/Penicillium), significantly more than outside controls.

217.     Mold is a fungus that reproduces by creating spores or microscopic cells. The spores and cells generate in large numbers and in chains that easily disperse into the air. Mold spores are generally invisible to the human eye. If adequate moisture is present when a mold spore lands on a suitable carbon-containing food source, such as the paper on drywall, furniture, clothing, and furnishings, it begins to grow. Mold can grow with liquid water and even simply due to the presence of high relative humidity in the air.

218.     When certain species of mold grow and process nutrients, they produce chemicals called mycotoxins and excretory chemicals. Mycotoxins are known to be used in biological warfare. These microbes and their chemistries can be toxic to human cells and can cause immune and other organ inflammation, injury, and disease. Mycotoxins attack the nervous, respiratory, immune, and muscular systems and can enter the body via ingestion, inhalation or direct skin contact and can lodge in the digestive tract, lungs, or brain. The mycotoxin *aflatoxin* is a listed human carcinogen.

219.     Toxic mold is known to harm human health. Medical and toxicology organizations agree that all occupants of moldy buildings have an increased risk for respiratory problems such as asthma.

220.     The National Institutes of Health ("NIH") recognizes that mold is linked to asthma, cognitive problems such as memory loss and dizziness, mental health issues such as depression and anxiety, and immune effects and inflammation.

221.     Toxic mold can easily gain entrance inside the human body, including by inadvertent ingestion or inadvertent inhalation. Stephanie Kraft et al., *Mold, Mycotoxins and a Dysregulated Immune System: A Combination of Concern?*, 22 INT'L J. MOL. SCI. (2021), https://perma.cc/3WU3-YB5K.

222.     The CDC, the Institute of Medicine of the U.S. National Academy of Sciences, the American Academy of Allergy, Asthma & Immunology, and the World Health Organization all agree that living or working in a building with mold-damaged building materials results in increased health risks to its occupants.

223.     Several mold species, including Stachybotrys, Aspergillus, Chaetomium, and Penicillium, produce a wide variety of mycotoxins that are poisonous or toxic to virtually all persons who come in contact with them. Apart from being toxic, exposure to these microbes and chemistries is known to cause inflammation and immune system injury or dysfunction. Often, due to the latency periods between exposure and disease, one may be harmfully exposed, but the symptoms and disease may not be apparent for years. Medical monitoring is essential to deal with the effects of the chemical and microbial assault.

224.     Symptoms of mold and microbe exposure can include upper respiratory infections, coughs, sore throats, headaches, nausea, fibromyalgia, fatigue, hemorrhaging, convulsions, skin irritation, cancer, and organ and tissue damage including liver, kidney, neurological and immunological disease.

225.     For all these reasons, water damage and mold must be immediately and properly remediated. At a minimum, proper remediation requires the removal of the water damage and mold source. In general, the process includes (i) identification of the mold source; (ii) containment of the affected area; (iii) removal of the mold and contaminated materials under containment; (iv) cleaning the contaminated area; and (v) clearance testing.

226.     Defendants' grossly inadequate housing maintenance practices—and their conduct thereafter—have resulted in extraordinary injuries to numerous Plaintiffs, including illness, economic injury, and emotional distress.

**Balfour Knowingly Exposed Plaintiffs to Asbestos**

227.   Cleaning up water damage and leaks related to mold often requires drilling into walls. Despite knowing of presumed positive asbestos-containing materials in the walls at Plaintiffs' homes, Balfour regularly drilled or cut into walls during mold remediation without following critically important asbestos abatement procedures. Balfour did this while Plaintiffs occupied the residences and were forced to live in contaminated houses where asbestos-containing surfaces had been disturbed.

228.   Balfour sent letters instructing residents not to put screws in the ceilings because of asbestos. For at least one Plaintiff (Michelle Wylie), this letter came after maintenance dropped her ceiling multiple times without containment.

229.   Balfour failed to follow its own asbestos policies. Balfour ignored warnings of presumed positive asbestos-containing materials and drilled into walls regardless.

230.   Asbestos is known to harm human health. Asbestos exposure increases the risk of serious lung diseases including lung cancer, mesothelioma, and asbestosis.

**Balfour Knowingly Exposed Plaintiffs to Lead-Based Paint**

231.   Balfour hired Lead Consultants of America, Inc. to assess lead-based paint in NAS Key West housing. The lead consultants tested over 600 residences in 2008. Testing found that lead-based paint was present all over the subject buildings. It was found inside and outside homes on walls, ceilings, doors, windows, shelving, and baseboards.

232.   This report was submitted to Balfour in April 2012, giving Balfour ample warning to remediate lead-based paints in NAS Key West housing. Over a decade later, Balfour's homes continue to expose residents to lead-based paints.

233. Lead is known to harm human health. It causes serious brain damage, cardiovascular problems, decreased kidney function, and developmental issues in children.

234. Due to Defendants' grossly inadequate housing maintenance practices, multiple Plaintiffs were exposed to lead from chipping and peeling paint, including paint that was caused to chip and peel because of water leaks, mold infestation, and repairs done without proper containment.

## CAUSES OF ACTION

### COUNT I: Breach of Contract
### (by all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)

235. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

236. Plaintiffs, except for Non-Resident Plaintiffs, have or had valid leases with the Balfour Defendants. Under the leases signed by those Plaintiffs, Balfour owed contractual obligations to Plaintiffs to provide and maintain habitable housing and remedy leaks, mold, and other issues with the housing.

237. Balfour failed to comply with the material terms of each Lease by failing to ensure the houses were fit for human habitation and by failing to timely and adequately repair and remedy the conditions at the premises.

238. Although Defendant Southeast Housing was identified as the lessor in Plaintiffs' leases, the other Defendants were bound in agency and alter-ego relationships in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West. In addition, Southeast Housing relied on the other Defendants to attempt to fulfill the leases' contractual obligations with respect to the provision of safe and habitable housing and to redress and remediate unsafe and unhealthy conditions.

239.    As direct and foreseeable results of Defendants' breaches, Plaintiffs suffered physical, psychological, emotional, and financial harm.

240.    As a direct and foreseeable result of Defendants' breaches, Plaintiffs suffered substantial actual damages, including personal and property damages, future economic damages, damages that require medical monitoring, and attorney's fees and costs.

241.    Current Florida law governs this claim because NAS Key West is a concurrent federal enclave.  However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

**COUNT II: Negligence**
**(by all Plaintiffs against all Defendants)**

242.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

243.    Defendants, both separately and collectively, owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their homes at NAS Key West. Defendants negligently failed to meet the standard of care in performing those duties.

244.    Defendants' acts and omissions, as detailed in this Complaint, in performance of their duties as Plaintiffs' landlords and property managers, and as the employer of Non-Resident Plaintiffs, fell far below the standard of care owed to Plaintiffs under Florida law.

245.    Defendants' acts and omissions breached the duty of reasonable care owed to Plaintiffs by failing to maintain Plaintiffs' housing to ensure the homes were not a threat to the health and safety of Plaintiffs, and that they were otherwise fit for human habitation.

48

246.     Defendants breached the duty to exercise ordinary care, as detailed in this Complaint and in Short-Form Complaints, in multiple respects including:

a. Defendants failed to remediate defects they knew, or should have known, with the exercise of reasonable diligence, would cause moisture intrusion, elevated indoor

humidity, and microbial growth;

b. Defendants failed to reasonably repair and remediate residents' complaints of mold, water leaks, faulty wiring, lead, asbestos, and pests;

c. Defendants failed to implement appropriate safety protocols to protect residents from toxic mold, lead, and asbestos;

d. Defendants failed to respond timely to mold complaints;

e. Defendants failed to properly install or replace HVAC systems;

f. Defendants knew or should have known of the hazardous conditions in Plaintiffs' homes and failed to take corrective action;

g. Defendants failed to warn Plaintiffs that they were being exposed to toxic mold, lead paint, and asbestos;

h. Defendants used untrained and unlicensed workers to repair and remediate Plaintiffs' homes;

i. Defendants knew or should have known that maintenance failures had compromised the safety of Plaintiffs' homes; and,

j. Defendants engaged in additional safety violations and breaches of the duty of care to be determined upon discovery.

247.    As direct and foreseeable results of Defendants' negligence, Plaintiffs suffered physical, psychological, emotional, and financial harm.

248.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered substantial damage to their personal property, physical injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

249.    Defendants were bound in agency and alter-ego relationships in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

250.    Current Florida law governs this claim because NAS Key West is a concurrent federal enclave.  However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

<b>COUNT III: Gross Negligence<br>(by all Plaintiffs against all Defendants)</b>

251.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

252.    Defendants, both separately and collectively, owed a duty to Plaintiffs to exercise reasonable care in the operation, management, maintenance, and repair of their homes at NAS Key West. Defendants' conduct fell grossly below the applicable standard of care. Defendants' acts and omissions have been grossly below the applicable standard of care. Moreover, Defendants were recklessly indifferent to the consequences of their acts and omissions and failed to demonstrate even the slight diligence that a reasonable landlord would have exercised under the same or similar circumstances.

253.     Defendants were aware that the circumstances in the homes constituted an imminent or clear and present danger amounting to more than normal or usual peril.

254.     Defendants' acts and omissions, as detailed in this Complaint and in Short-Form Complaints, fell grossly below the standard of care owed to Plaintiffs, and exhibited a conscious disregard for the consequences of their behavior, in multiple respects:

    a.   Defendants failed to remediate defects they knew, or should have known, with the exercise of reasonable diligence, would cause moisture intrusion, elevated indoor humidity, and microbial growth.

    b.   Defendants failed to reasonably repair and remediate residents' complaints of mold, water leaks, faulty wiring, asbestos, lead, and pests;

    c.   Defendants failed to implement appropriate safety protocols to protect residents from toxic mold, lead, and asbestos;

    d.   Defendants failed to respond timely to mold complaints;

    e.   Defendants failed to properly install or replace HVAC systems;

    f.   Defendants knew or should have known of the hazardous conditions in Plaintiffs' homes and failed to take corrective action;

    g.   Defendants failed to warn Plaintiffs that they were being exposed to toxic mold, asbestos, and lead;

    h.   Defendants used untrained, inexperienced, unlicensed, non-certified workers to repair and remediate Plaintiffs' homes; and,

    i.   Defendants knew or should have known that maintenance failures had compromised the safety of Plaintiffs' homes.

255.    As direct and foreseeable results of Defendants' gross negligence, Plaintiffs suffered physical, psychological, emotional, and financial harm.

256.    As a direct and proximate result of Defendants' gross negligence, the Plaintiffs suffered substantial damage to their personal property, physical injuries and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

257.    Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

258.    Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located."  Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

**COUNT IV**
**(Removed from First Amended Master Complaint)**

**COUNT V: Negligent Infliction of Emotional Distress**
**(by all Plaintiffs against all Defendants)**

259.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

260.    By its acts and omissions, Balfour caused physical injuries to Plaintiffs, which caused the Plaintiffs to suffer emotional distress including worry, anxiety, anguish, suffering, and grief.

261.    Defendants' conduct caused Plaintiffs severe emotional distress.

262.    Many Plaintiffs suffered physical injury as a result of the emotional distress.

263. Balfour knew or should have known that Plaintiffs' homes were unsafe to reside in or to work in, and that it was probable that additional problems, including exposure to and contact with dangerous or toxic substances, would inevitably occur and cause substantial damage if it did not act.

264. As a direct result of Defendants' negligence and gross negligence, Plaintiffs came into physical contact with (including, inhaling, or ingesting) hazardous substances including mold, asbestos, and lead paint.

265. Balfour is liable for the consequences that it knew or should have known would happen.

266. Plaintiffs, as well as their children, spouses, and other occupants of their homes, have suffered, are suffering, and will continue to suffer because of the Defendants' acts and omissions.

267. Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

268. Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

**COUNT VI: Intentional Infliction of Emotional Distress
(Removed from First Amended Master Complaint in light of Court's May 14, 2026
Order, Doc. 171)[3]**

**COUNT VII: Breach of Warranty of Habitability
(by all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)**

269.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

270.    Defendants owed Plaintiffs a duty to provide Plaintiffs with habitable living conditions, under Fla. Stat. § 83.51, including but not limited to a duty to exercise reasonable care in the operation, management, maintenance, and repair of Plaintiffs' homes at NAS Key West. Defendants failed to meet the standard of care in performing those duties.

271.    In the leases between the Defendants and Plaintiffs, Defendants warranted that the NAS Key West housing was safe, habitable, and free from defects. Defendants did not reasonably maintain the homes to meet the ordinary and normal standards of fitness and rendered them uninhabitable.

272.    Defendants breached the express and implied warranty of habitability.

273.    As a direct and proximate result of Defendants' breach of the express and implied warranty of habitability, the Plaintiffs have been injured.

274.    As direct and foreseeable results of Defendants' breaches, Plaintiffs suffered physical, psychological, emotional, and financial harm.

275.    As a direct and proximate result of Defendants' breach of the express and implied warranty of habitability, the Plaintiffs suffered substantial physical injuries and damages, as well as mental and emotional distress related to those physical injuries.

---

[3] Plaintiffs reserve all rights, including appellate rights, with respect to the Court's dismissal of Count VI.

276.     As a direct and proximate result of Defendants' breach of the express and implied warranty of habitability by Defendants, the Plaintiffs suffered special damages and will require testing/medical monitoring.

277.     As a direct and proximate result of Defendants' breach of the express and implied warranty of habitability, Plaintiffs suffered damage to their personal property.

278.     Plaintiffs are entitled to actual damages in an amount to be determined at trial.

279.     Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

280.     Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

### COUNT VIII: Third-Party Beneficiary Contract
### (by all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)

281.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

282.     Defendants are bound by the contracts they entered into with the United States and Department of the Navy respecting MHPI housing at NAS Key West.

283.     Each of those contracts was entered into to further the goal of the MHPI to improve housing for service members.

284. The Southeast Housing Operating Agreement contains language establishing that Plaintiffs were intended beneficiaries of certain Defendants' contractual obligations with respect to the provision of housing at NAS Key West.

285. The Ground Lease entered into by the Navy and BBC-NSE's predecessor-in-interest contains language indicating that Plaintiffs were intended beneficiaries.

286. The Property Management Agreement between Southeast Housing and BBMHM contains language indicating that Plaintiffs were intended beneficiaries.

287. It was the intent of Balfour, the United States, and the Department of the Navy to benefit the service members living at NAS Key West.

288. These obligations were included in the underlying contracts to ensure military service members, including Plaintiffs and their families, would be provided with safe and habitable housing.

289. Balfour breached the requirements of the underlying contracts by failing to provide adequate and professional management, maintenance, operations, and renovation of the homes at NAS Key West.

290. Balfour also breached the requirements of the underlying contracts by failing to adhere to federal, state, and local lead-based paint regulations and local housing codes.

291. Balfour's conduct also breached the duty of good faith and fair dealing implied in the underlying contracts.

292. As a direct, proximate, and foreseeable result of the Balfour breaches of the underlying contracts, the service members, as intended, direct, third-party beneficiaries of such contracts, sustained damages. They are entitled to recover from Balfour Defendants, jointly and

severally, all actual damages, economic damages incurred in the past, and economic damages to be incurred in the future.

293. Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

294. Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

### COUNT IX: Negligence Per Se
### (by all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)

295. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

296. Defendants owed Plaintiffs a particular duty to take steps to protect them from the specific injuries outlined in this Complaint and in Short-Form Complaints.

297. This duty was created by statutes specifically intended to protect Plaintiffs from those harms.

298. Plaintiffs' houses were "unfit for habitation" pursuant to Key West's Unsafe and Unsanitary Buildings Ordinance. Key West, Fla. Mun. Code § 14-71 *et seq.*

299. Defendants were required to abate the dangers posed by such homes due to their potential to be "injurious to the health of the people." *Id.* § 14-74.

300. Plaintiffs' houses were unsafe buildings as defined by Monroe County Building Code § 6-27.

301.    Defendants were required to abate the danger posed by those homes pursuant to § 6-27(c).

302.    The purpose of Key West's Unsafe and Unsanitary Buildings Ordinance is to protect city residents from dwellings that are "unsafe or insanitary or dangerous or detrimental to the health, safety or morals, or otherwise inimical to the welfare."  Key West, Fla. Mun. Code § 14-75.

303.    The purpose of Monroe County Building Code § 6-27 is to protect residents from buildings that are "unsafe, unsanitary … or otherwise harmful or dangerous to human life, or which in relation to existing use, constitute a hazard to safety or health."

304.    Florida has a statutory framework regulating mold-related services in order to protect Plaintiffs from the injuries described above. Fla. Stat. § 468.84 *et seq*.

305.    The Florida legislature determined that this statutory framework is "necessary in the interest of the public safety and welfare, to prevent damage to real and personal property, to avert economic injury to the residents of this state, and to regulate persons and companies that hold themselves out to the public as qualified to perform mold-related services." *Id.* § 468.84.

306.    Defendants failed to comply with the following statutory requirements:

    a.  "A person may not … perform or offer to perform any mold assessment unless the mold assessor has documented training in water, mold, and respiratory protection under s. 468.8414(2)." *Id.* § 468.8419(1)(a);

    b.  "A person may not …  Perform or offer to perform any mold remediation to a structure on which the mold assessor or the mold assessor's company provided a mold assessment within the last 12 months." *Id.* § 468.8419(1)(d);

c.  "A person may not … accept an engagement to make an omission of the assessment or conduct an assessment in which the assessment itself, or the fee payable for the assessment, is contingent upon the conclusions of the assessment." *Id.* § 468.8419(1)(h);

d.  "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest in a company employing a mold remediator may not …Perform or offer to perform any mold remediation unless the remediator has documented training in water, mold, and respiratory protection under s. 468.8414(2)." *Id.* § 468.8419(2)(a); and,

e.  "A mold remediator, a company that employs a mold remediator, or a company that is controlled by a company that also has a financial interest in a company employing a mold remediator may not …Perform or offer to perform any mold assessment to a structure on which the mold remediator or the mold remediator's company provided a mold remediation within the last 12 months." *Id.* § 468.8419(2)(d).

307.    Plaintiffs are members of the class that each of the above statutes were designed to protect.

308.    The statutes were intended to protect residents from the sorts of exposure-based injuries suffered by Plaintiffs and described in this Complaint.

309.    The violation of those statutes constitutes negligence per se and was the proximate cause of Plaintiffs' injuries.

310.    Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

311.    Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

## COUNT X: Medical Monitoring
### (by all Plaintiffs against all Defendants)

312.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

313.    Plaintiffs suffered physical injuries when they were exposed to greater than normal background levels of hazardous substances, as described in this Complaint and in Short-Form Complaints (including, in combination and separately, mold, lead, and asbestos).

314.    Plaintiffs have a significantly increased risk of contracting serious latent diseases because of that exposure.

315.    Monitoring procedures make early detection of those diseases possible. Different monitoring procedures will be necessary depending on the exposure of each Plaintiff, but all Plaintiffs would benefit from monitoring.

316.    The monitoring procedure would be unnecessary in the absence of Plaintiffs' exposure.

317.    Given the exposure, the prescribed monitoring regimes are reasonably necessary according to contemporary scientific principles.

318.     Plaintiffs request the cost of medical monitoring necessary to detect the onset of physical harm and/or, in the alternative, that this Court use its equitable powers to create and supervise a medical monitoring fund.

319.     Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

320.     Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

**COUNT XI: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA)**
**(Unfair Conduct)**
**(By all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)**

321.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

322.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts, or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204.

323.     At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at NAS Key West, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA, *see, e.g.*, *id*. § 501.203.

324.     At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA, *see, e.g.*, *id*.

61

325. Defendants' practices relating to Plaintiffs' Balfour housing at NAS Key West, as described in this Complaint and in Short-Form Complaints, constituted unfair and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

326. Defendants failed to follow their own policies and procedures relating to the treatment of harmful conditions including policies and procedures for the treatment and remediation of asbestos, mold, and lead contamination.

327. In many instances, Defendants' purported attempts at remediation actually increased Plaintiffs' exposure to mold, lead paint, and asbestos.

328. Defendants' acts and practices at NAS Key West exposed Plaintiffs to unsafe and unhealthy conditions, including structural defects, collapsed ceilings, water leaks, HVAC issues, and pest and vermin infestations. These abhorrent conditions were known to Defendants. These conditions exposed Plaintiffs to hazardous substances, including toxic mold, asbestos, and lead. Given those unconscionable conditions, Plaintiffs' interests in their Balfour homes were only worth a small fraction of the rental payments for those homes. Defendants' acts and practices offended established public policy and were immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. As such, those acts and practices were unfair and unconscionable within the meaning of FDUTPA and thus violated the FDUTPA.

329. As a result of Defendants' unfair and unconscionable acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorney fees, and court costs. *See, e.g.*, *id.* § 501.211.

330. Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

331.   Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. Current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

**COUNT XII: Violation of Florida Deceptive and Unfair Trade Practices Act (FDUTPA)**
**(Deceptive Conduct)**
**(By all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)**

332.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

333.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts, or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204.

334.   At all relevant times, Defendants solicited, advertised, offered, and/or provided goods, services, and/or property by leasing military housing at NAS Key West, and by providing property management services relating to such military housing. Defendants were thereby engaged in trade or commerce within the meaning of the FDUTPA, *see, e.g.*, *id*. § 501.203.

335.   At all relevant times, Plaintiffs were consumers within the meaning of the FDUTPA, *see, e.g.*, *id*.

336.   Defendants' practices relating to Plaintiffs' Balfour housing at NAS Key West, as described in detail in this Complaint and in Short-Form Complaints, constituted unfair, false, misleading, deceptive, and/or unconscionable acts or practices within the meaning of the FDUTPA and thus violated the FDUTPA.

337.   Defendants concealed facts and made deceptive assurances that caused Plaintiffs to sign leases that they never would have signed had they known the truth. Defendants made false, misleading, and/or deceptive representations that Plaintiffs' Balfour homes were in habitable condition and thus far more valuable than they were in reality. In the leases between Defendants and

Plaintiffs, Defendants falsely warranted that the NAS Key West housing was safe, habitable, and free from defects. Such acts and practices were unfair, false, misleading, deceptive, and unconscionable within the meaning of FDUTPA.

338.    Defendants failed to disclose information about the condition of Plaintiffs' Balfour housing that was known to Defendants when they leased the homes to Plaintiffs with the intention to induce Plaintiffs into leasing the homes at a cost beyond what they were actually worth.

339.    Once Plaintiffs discovered the unsafe and hazardous conditions in their homes, Defendants falsely claimed that they would take steps to mitigate or fix those problems. Defendants made these false statements in order to prevent Plaintiffs from taking measures to protect their safety, and to ensure that they would keep receiving payment even after Plaintiffs discovered that their homes were unsafe and did not conform to the Defendant's promises. Plaintiffs suffered injuries based on their reliance on these misrepresentations.

340.    Defendants also made false, misleading, and/or deceptive representations that repairs and remediation efforts in Plaintiffs' Balfour homes were performed completely and to the standard of care required of professional landlords. In fact, those repair and remediation efforts often fell far below the standard of care, and failed to adequately address the unsafe, unhealthy, and hazardous conditions in Plaintiffs' homes. Defendants failed to disclose the grossly inadequate nature of their repair and remediation efforts. Plaintiffs therefore paid far more in rent than their homes were actually worth. Such acts and practices were unfair, false, misleading, deceptive, and unconscionable within the meaning of FDUTPA.

341.    As a result of Defendants' false, misleading, and deceptive acts or practices, Plaintiffs suffered losses and are entitled to recover actual damages, attorney fees, and court costs. *See, e.g.*, *id*. § 501.211.

342.     Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

343.     Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. Current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

**COUNT XIII: Negligent Misrepresentation Concerning Condition of Home**
**(by all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)**

344.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

345.     Defendants falsely represented that Plaintiffs' homes were safe and fit for human habitation before they moved in.

346.     Defendants either knew that Plaintiffs' homes were in fact unsafe and unfit for human habitation, made the representation without knowledge of its truth or falsity, or should have known the representation was false.

347.     Defendants intended to convince Plaintiffs to sign leases and move into their homes based on these representations and omissions.

348.     Plaintiffs justifiably relied on Defendants' assurances that their homes were safe and fit for human habitation at the time that they moved in.

349.     As direct and foreseeable results of Defendants' negligence, Plaintiffs suffered physical, psychological, emotional, and financial harm.

350.     As a direct and proximate result of Defendants' negligence, the Plaintiffs suffered substantial damage to their personal property, physical injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

351. Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

352. Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

**COUNT XIV: Negligent Misrepresentation Concerning Remediation of Unsafe Conditions (by all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)**

353. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

354. Once Plaintiffs discovered the unsafe and hazardous conditions in their homes, Defendants falsely claimed that they would take steps to mitigate or fix those problems.

355. Defendants either knew that they would never take those steps, made the representations without knowledge of their truth or falsity, or should have known the representations were false.

356. Defendants intended to convince Plaintiffs to remain in their homes based on these false representations.

357. Plaintiffs justifiably relied on Defendants' assurances that they would take steps to make their homes safe.

358. As a direct and proximate result of Defendants' negligence, the Plaintiffs suffered substantial damage to their personal property, physical injuries and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

359.     Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

360.     Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located."  Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

## COUNT XV: Fraudulent Inducement
### (by all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)

361.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

362.     Defendants deliberately and willfully made knowingly false and material statements regarding the habitability and safety of the Plaintiffs' housing as described in detail in this Complaint in order to induce Plaintiffs to sign leases for NAS Key West Homes.

363.     These representations were material to Plaintiffs' decisions to enter into their leases causing Plaintiffs' BAH to be paid to Defendants.

364.     Defendants knew or reasonably should have known that the statements concerning the condition of the homes were false. But for the Defendants' false statements, Plaintiffs would not have signed the leases for their Balfour homes.

365.     As a direct and proximate result of Defendants' fraudulent inducement, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

366. Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

367. Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

### COUNT XVI: Fraudulent Misrepresentation
### (by all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)

368. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

369. Defendants deliberately and willfully made false and material statements regarding the habitability and safety of the Plaintiffs' housing as described in detail in this Complaint and in Short-Form Complaints in order to cause Plaintiffs to remain in their NAS Key West homes notwithstanding the unsanitary and dangerous conditions.

370. Defendants made false statements to Plaintiffs that their homes were suitable for habitation throughout the course of Plaintiffs' residence in the homes.

371. Defendants falsely assured Plaintiffs that they would remediate any problems that existed in their homes and make them safe for human habitation.

372. Defendants knew that the statements concerning the condition of the homes and the promised remediation were false.

373. These representations were material to Plaintiffs' decisions to remain in their homes, and even to the decisions of some Plaintiffs to renew their leases.

374. But for Defendants' false statements, Plaintiffs would not have remained in their Balfour homes.

375. As a direct and proximate result of Defendants' fraudulent misrepresentation, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

376. Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

377. Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

### COUNT XVII: Fraudulent Concealment of Condition of Housing
### (by all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)

378. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

379. Defendants deliberately and willfully actively concealed material facts regarding the habitability and safety of the Plaintiffs' housing as described in detail in this Complaint and in Short-Form Complaints in order to cause Plaintiffs to sign leases for NAS Key West homes.

380. Additionally, Defendants had knowledge of the defects in the homes or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

381.     Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to sign leases and move into their homes and should have been disclosed.

382.     Defendants knew that their concealments would induce the Plaintiffs to act.

383.     But for the Defendants' false statement and material omissions, Plaintiffs would not have signed the leases for their Balfour homes.

384.     As a direct and proximate result of Defendants' fraudulent concealment, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

385.     Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

386.     Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

**COUNT XVIII: Fraudulent Concealment Leading to Decisions to Remain in Homes
(by all Plaintiffs (except Non-Resident Plaintiffs) against all Defendants)**

387.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

388. Defendants deliberately and willfully actively concealed material facts regarding the habitability and safety of the Plaintiffs' housing as described in detail in this Complaint and in Short-Form Complaints in order to cause Plaintiffs to remain in their NAS Key West Homes.

389. Additionally, Defendants had knowledge of the defects in the homes or were better positioned to discover such defects and therefore had a duty to disclose those material facts to Plaintiffs and failed to do so.

390. Defendants knew or reasonably should have known that the concealed or omitted facts were material to Plaintiffs' decisions to remain in their homes and should have been disclosed.

391. Defendants knew that their concealment or omission would induce the Plaintiffs to act or refrain from acting.

392. Defendants had a duty to disclose those material facts to Plaintiffs.

393. But for the Defendants' false statements and material omissions, Plaintiffs would not have remained in their Balfour homes.

394. As a direct and proximate result of Defendants' fraud, the Plaintiffs suffered substantial physical injuries and damages, as well as mental and emotional distress related to those physical injuries.

395. As a direct and proximate result of Defendants' fraudulent concealment, the Plaintiffs suffered substantial damage to their personal property, physical injuries, financial injuries, and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

396. Defendants were bound in agency and alter-ego relationships as described above in leasing, operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

71

397.    Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located." Finally, current Florida law also applies because each of the leases in this case contains a choice of law provision selecting Florida law.

### COUNT XIX: Fraudulent Misrepresentation
### (by Non-Resident Plaintiffs against all Defendants)

398.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

399.    Defendants falsely assured Non-Resident Plaintiffs that they were being sent into safe working environments.

400.    Defendants knew that, contrary to their assurances, Non-Resident Plaintiffs would be exposed to hazardous substances while working in homes at NAS Key West.

401.    Defendants intended Non-Resident Plaintiffs to enter into and work in houses at NAS Key West based on their false representations.

402.    Non-Resident Plaintiffs justifiably relied on Defendants' assurances that their work environment would be safe.

403.    As a direct and proximate result of Defendants' fraudulent misrepresentations, Non-Resident Plaintiffs were exposed to hazardous substances and suffered damages that will require medical testing/monitoring, as well as mental and emotional distress caused by that exposure.

404.    Defendants were bound in agency and alter-ego relationships as described above in operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

72

405. Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located."

### COUNT XX: Fraudulent Concealment
### (by Non-Resident Plaintiffs against all Defendants)

406. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

407. Defendants gave Non-Resident Plaintiffs some information regarding safety conditions in NAS Key West homes but many times failed to inform them that they would be exposed to hazardous substances such as mold.

408. Defendants knew that Non-Resident Plaintiffs would be exposed to mold, lead paint, and asbestos while working in homes at NAS Key West.

409. Defendants intended Non-Resident Plaintiffs to enter into and work in houses at NAS Key West based on their concealment and omissions.

410. Non-Resident Plaintiffs did not have an equal opportunity to become apprised of these dangers.

411. Having started to provide Non-Resident Plaintiffs with information relating to the safety at NAS Key West, Defendants had a duty to disclose the whole truth.

412. Non-Resident Plaintiffs reasonably and detrimentally relied on the incomplete information provided by Defendants.

73

413.    As a direct and proximate result of Defendants' fraud, Non-Resident Plaintiffs suffered substantial physical injuries and damages, as well as mental and emotional distress related to those physical injuries.

414.    As a direct and proximate result of Defendants' fraudulent concealment, Non-Resident Plaintiffs suffered physical injuries and damages that will require medical testing/monitoring, as well as mental and emotional distress related to those physical injuries.

415.    Defendants were bound in agency and alter-ego relationships as described above in operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

416.    Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located."

### COUNT XXI: Negligent Misrepresentation
### (by Non-Resident Plaintiffs against all Defendants)

417.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1–234 as if fully set forth here at length.

418.    Defendants falsely assured Non-Resident Plaintiffs that they were being sent into safe working environments.

419.    Defendants either knew or should have known Non-Resident Plaintiffs would be exposed to hazardous substances while working in homes at NAS Key West, and knew or should have known that the representations were false and/or made the representations without knowledge of their truth or falsity.

420.   Defendants intended Non-Resident Plaintiffs to enter into and work in houses at NAS Key West based on their false representations.

421.   Non-Resident Plaintiffs justifiably relied on Defendants' assurances that their work environment would be safe.

422.   As direct and foreseeable result of Defendants' negligence, Non-Resident Plaintiffs suffered physical, psychological, emotional, and financial harm.

423.   As a direct and proximate result of Defendants' negligence, Non-Resident Plaintiffs were exposed to hazardous substances and suffered damages that will require medical testing/monitoring, as well as mental and emotional distress caused by that exposure.

424.   Defendants were bound in agency and alter-ego relationships as described above in operating, managing, maintaining, and repairing the homes at Naval Air Station Key West.

425.   Current Florida law governs this claim because NAS Key West is a concurrent federal enclave. However, even if that were not the case, current Florida law would apply because, under 28 U.S.C. § 5001(b), "in a civil action brought to recover on account of a[] [personal] injury" sustained in a federal enclave, "the rights of the parties shall be governed by the law of the State in which the [enclave] is located."

## DAMAGES

As a result of the Defendants' breaches, negligence, gross negligence, fraud, and other acts and omissions described in this Complaint, Plaintiffs have sustained damages and injuries and are entitled to recover damages related to the following, including but not limited to:

a.   Past and future physical pain and suffering;

b.   Past and future mental anguish and emotional distress;

c.   Past and future medical, healthcare, and attendant care expenses;

75

d.  Past and future lost income and earning capacity;

e.  Past and future physical impairment;

f.  Past and future loss of enjoyment and quality of life;

g.  Past and future loss of enjoyment of property;

h.  Increased risk of future harm and medical monitoring for life;

i.  Loss of life expectancy;

j.  Nuisance damages, including inconvenience, illness, and fear;

k.  Out of pocket expenses;

l.  Loss of personal property;

m.  Costs, expenses, and fees (including attorney fees); and,

n.  Punitive damages.

### PRAYER FOR RELIEF

Plaintiffs pray that this Court:

a.  Award the Plaintiffs compensatory damages, in an amount to be determined at trial; and,

b.  Award punitive damages as appropriate including for counts III, V, VII, IX, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, and XXI, in an amount to be determined at trial; and,

c.  Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees, including attorneys' fees, to which they may be entitled by law; and,

d.  Grant the Plaintiffs such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

DATED: May 27, 2026.                    Respectfully submitted,

/s/ *Robert J. McKee*
**Robert J. McKee**
Florida Bar No.: 972614
**THE MCKEE LAW GROUP, LLC**
2800 South Flamingo Road
Davie, Florida 33330
Tel: (954) 888-9877
Fax: (954) 217-0150
Email: rmckee@themckeelawgroup.com

Kristina Baehr *(Pro Hac Vice)*
Christopher LaCour *(Pro Hac Vice)*
**JUST WELL LAW, PLLC**
2606 W. 8th Street, Units 1-2
Austin, Texas 78703
Tel: (512) 693-8029
Email: kristina@well.law
Email: chris@well.law
Email: militaryhousing-lit_PLslistserv@well.law

Vincent J. Colatriano *(Pro Hac Vice)*
Michael Weitzner *(Pro Hac Vice)*
**COOPER & KIRK, PLLC**
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Tel: (202) 220-9600
Email: vcolatriano@cooperkirk.com
Email: mweitzner@cooperkirk.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed and served on all counsel of record via the U.S. District Court's CM/ECF electronic filing system on May 27, 2026.

/s/ Robert McKee
Robert McKee
Florida Bar No. 972614