**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 4:25-10037-Civ-LEIBOWITZ/TORRES

IN RE: KEY WEST NAS LITIGATION

THIS DOCUMENT RELATES TO: ALL CASES
_____/

***REPORT AND RECOMMENDATION ON DEFENDANT***
***BALFOUR BEATTY INVESTMENTS, INC.'S MOTION TO***
***DISMISS FOR LACK OF PERSONAL JURISDICTION***

Defendant Balfour Beatty Investments, Inc. ("BBI") has moved to dismiss the claims against it for lack of personal jurisdiction. The question presented boils down to whether this Court may exercise personal jurisdiction over BBI, when the facts underlying that jurisdiction, especially BBI's own participation in the management of military housing at Naval Air Station Key West, are hotly disputed and based largely on the same facts that will decide whether BBI is ultimately liable on the merits. BBI says the answer is no because BBI is a Delaware corporation headquartered in Pennsylvania; it is not registered to do business in Florida, owns no property here, and signed none of the contracts at the heart of this case. BBI protests that it is merely a remote corporate parent swept into a Florida lawsuit solely because it sits one or more rungs up the ownership ladder from the entities that actually ran the housing operation.

But based on the available record in the light most favorable to the Plaintiffs, the answer at this stage is yes. The Second Amended Complaint ("the Master Complaint"), which the Court in its May 14, 2026 Order found well-pleaded, alleges that BBI did not merely own; it acted in several ways relevant to the action. Personnel bearing the "Balfour Beatty Investments" name scheduled and attended calls with residents about conditions in their homes, answered maintenance and health-and-safety complaints, signed leases, and operated a "BBI Helpdesk" to which residents were directed. And BBI shares multiple officers and functions in common with its local subsidiary, Balfour Beatty Communities ("BBC") that evidence overlapping liability. These allegations, if proven true, could help support Plaintiffs' theory of liability against BBI, while at the same time serving as a basis to hold BBI liable in this jurisdiction under Florida's long-arm statute and consistent with Due Process.

BBI takes issue with Plaintiffs' allegations and declares that these were really operational employees of its subsidiary, BBC, using a "brand" rather than acting for the corporation. Plus, BBI maintains that even though it shared a Senior Vice President, Controller and Treasurer with BBC, and BBI officers served in other capacities with BBC (including Chief Compliance Officer), it had nothing to do with operations at the Key West facilities and cannot be held liable together with BBC.

BBI's position may ultimately prevail. But it asks the Court to resolve, on competing affidavits and without a trial, the very factual dispute (who was acting for whom) that also effectively decides the merits of the case. That the Court cannot do at this stage. As explained further below, BBI's motion should be Denied, and the

jurisdictional issue should be carried with the case at least through discovery and summary judgment. For now, Plaintiff has alleged more than enough facts to assert a prima facie case for personal jurisdiction over BBI.

## I.     BACKGROUND

### A.     *The Parties and the Corporate Structure*

Plaintiffs and their families are current and former residents of privatized military housing at Naval Air Station Key West ("NAS Key West"). They allege that they were exposed to toxic mold and other hazardous conditions in their homes and subjected to reckless indifference by the BBI personnel managing the housing facilities. They assert claims sounding in negligence, breach of contract, misrepresentation, fraud, and related theories. [D.E. 136].

The housing is owned and operated through a chain of entities. Southeast Housing, LLC (a public-private venture between the United States Department of the Navy and BBC Military Housing–Navy Southeast LLC ("BBC-NSE")) leases the land from the Navy and leases the housing to military families. BBC-NSE is owned, through an intermediary, by BBC. And BBC in turn is the sole member-managed entity beneath BBI. BBI is the sole member of BBC. Affidavit of Sarah Bitto ¶ 14 [D.E. 161-9, 40-1].[1] BBI, in turn, is a subsidiary of the publicly traded parent, Balfour Beatty PLC ("BBPLC") (an entity not a party to the action).

---

[1] Affiant Bitto submitted multiple affidavits on the docket in support of BBI's jurisdictional arguments. References to her affidavit shall relate to [D.E. 161-9] unless otherwise identified.

BBI describes itself as a passive "investment ownership vehicle." According to the affidavit of Ms. Bitto, BBI is the investment ownership vehicle for three privatized military housing projects—all United States Air Force projects, none in Florida—awarded after April 2008. But *BBC* is the investment ownership vehicle for the projects awarded earlier, including NAS Key West. Bitto Aff. ¶¶ 11–12. BBI avers that it has no offices, employees, registered agent, real estate, or bank accounts in Florida; receives no direct revenue from Florida; is not a party to the Project Agreements or the residential leases; and plays no role in the day-to-day operation, financing, or policy-setting for NAS Key West housing. *Id.* ¶¶ 6–8, 15–16. BBC is where Plaintiffs should turn for relief in this action, not BBI.

### B.     *The Direct-Participation Allegations and Evidence*

The Complaint does not rest on BBI's ownership and organizational chart. It first alleges that BBI itself participated in the operation of NAS Key West housing, and it identifies that participation with specificity. Compl. ¶¶ 122–124, 130–136. Plaintiffs plead, and have submitted declarations and documentary evidence to support, the following:

- Patti Avey, identified in her own communications as a "Balfour Beatty Investments" "Regional Operations Director," scheduled and attended calls with Plaintiff Talarico to discuss problems with his home, and communicated with multiple other Plaintiffs about housing issues. LaCour Decl. ¶¶ 4–5, 11, 14 & Exs. 2–3, 9, 12 [D.E. 172-1].
- Lee Tysinger, who identified himself as a "Life Health Safety Service Manager" for "Balfour Beatty Investments," sent Plaintiffs numerous emails responding to concerns about mold and other hazardous conditions.

The email address used was from a "bbcgrp.com" domain. LaCour Decl. ¶¶ 6, 9–12, 15 & Exs. 4, 7–10, 13.

- Demetraise Wynn, identified as "Assistant Community Manager, Balfour Beatty Investments," electronically signed, from the same "bbcgrp.com" domain, Plaintiffs' leases. LaCour Decl. ¶¶ 16, 18 & Exs. 14, 16.

- Additional individuals—a "Customer Experience Specialist," a "Facility Director," and others—likewise interacted with Plaintiffs while identifying themselves with "Balfour Beatty Investments" and from the "bbcgrp.com" domain. LaCour Decl. ¶¶ 3, 7–8, 13, 17 & Exs. 1, 5–6, 11, 15.

- Lease packets advised Plaintiffs that "from time to time, *Balfour Beatty Investments* (we, us or Company) may be required by law to provide … certain written notices or disclosures," and gave instructions for contacting "Balfour Beatty Investments" care of another individual from a "bbcgrp.com" domain. LaCour Decl. Ex. 14.

- Residents were referred to a "BBI Helpdesk" to log support requests, and BBI prepared at least one "Community Incident Report" regarding mold at NAS Key West homes. That Report references email domains used for log support requests as all being various "bbcgrp.com" addresses. Compl. ¶ 136; LaCour Decl. ¶ 19 & Ex. 17.

BBI cannot deny that these communications occurred, at least for purposes of its motion to dismiss. It contends instead that, in every instance cited, the individual identified was actually employed by and working for BBC, not BBI, and that the employee's use of the "Balfour Beatty Investments" name reflected a "Specialist Brand" of the corporate group rather than the legal entity. Supp. Affidavit of Mauren Omrod ¶¶ 4–9 [D.E. 173-1]; Bitto Aff. ¶¶ 26–33. It supports that contention with affidavits and, on reply, with an internal document—a "Branded Emails & Business Cards Policy & Procedure." Supp. Omrod Aff. Ex. B. Notably, however, the document

lists "Investments," "Communities," and "Campus Solutions" in a "Company" drop-down from which personnel select "based on the division that you work for," and it directs personnel handling "Environmental" or "Health & Safety" functions to use the very "Balfour Beatty Investments" signature that BBI now says was used in error. BBI's supporting materials insist that the employees at issue in the Complaint were acting as BBC, but it does not really tackle why some personnel identified with "Balfour Beatty Investments" while others identified with "Balfour Beatty Communities." Nor does it offer a statement from any of the individuals themselves. We are left to apply the document it relies on, says BBI, based on its representation of what was supposed to have happened.

### C.     *The Overlap Between BBI and BBC*

Normally on a motion to dismiss, however, a defendant's representations of fact do not overcome facts alleged in a complaint. We assume the complaint's allegations will be proven true. Thus, on the face of that document and given that standard of review, one could still conclude that there is material overlap between BBI and its subsidiary, so much so that Plaintiff's prima facie allegations would prevail on this motion.

And, to reiterate what the Complaint alleges with respect to BBI, it pointedly claims that BBI is simply one of various subsidiaries controlled by the BBPLC enterprise. Compl. ¶¶ 116-20. It derives "substantial direct or indirect revenue" from its investments in military housing including housing in Florida such as NAS Key West, which represents nearly half the value of its investments. Compl. ¶ 122. It indeed describes itself as "an active owner/investor, developer and manager of

residential real estate in the . . . military markets." Compl. ¶ 123. BBI's general counsel signed the legal documents governing the NAS Key West operations. Compl. ¶ 131-32.

The Complaint further alleges that BBI had direct involvement in the operations of the Key West facilities, which are quite relevant to this action. For instance, BBI established mold-management policies applicable throughout the enterprise. Compl. ¶ 133. Its compliance manager and other officers are designated to receive reports of illegal or unethical conduct regarding the facilities' operations. Compl. ¶ 134. This explains why many of the interactions that the Plaintiffs themselves had with self-identified "BBI" personnel. Compl. ¶¶ 136(a)-(f).

The Complaint, therefore, is replete with specific, plausible allegations that tie BBI directly to the management and operation of the Key West facilities, to BBI personnel engaging with the Plaintiffs, and with BBI shouldering compliance responsibility over BBC. But that is not the extent of that showing of overlap in this record. BBI's own affidavits acknowledge that BBI and BBC share a number of senior officers—for positions including Senior Vice President, Corporate Controller, Treasurer, Chief Financial Officer, Chief Compliance Officer, Executive Vice President and Secretary, and Assistant Vice President and Assistant Secretary—and that the two companies share business departments including Human Resources, Legal, Accounting, Information Technology, Environmental/Health & Safety, and Marketing. Bitto Aff. ¶¶ 7-8 [D.E. 40-1]. Indeed, at least one BBI Executive Vice President simultaneously served as President of BBC. *Id.* ¶ 7. And, curiously, the

affiant who submitted record evidence on BBI's behalf, Sarah Bitto, self-identifies as BBI's Director, Senior Vice President, Corporate Controller, and Treasurer, at the same time as she is the Senior Vice President, Corporate Controller, and Treasurer of BBC. *Id.*

BBI may not find those facts remarkable or persuasive, but they are certainly record evidence on the motion that, drawing inferences in Plaintiffs' favor, support the notion that BBI and BBC may share liability here. And even the ultimate parent's annual report provides Plaintiff with evidence of the overlap between BBI and BBC. BBPLC's 2024 Annual Report and BBI's own website describe BBI as continuing "to develop and maintain a large network of privatised military housing facilities across the U.S.," and further that U.S. military housing comprises roughly 48% of the value of BBI's portfolio. Weitzner Decl. Ex. 1, at 21, 263 [D.E. 62-1].

Plaintiffs point to all this evidence in the record as ample prima facie support for their contention that BBI is directly involved in the case, not just as the sole member of BBC that itself runs the day-to-day operations of NAS Key West. BBI, however, points to this same evidence and concludes otherwise; BBI has no connection to or involvement with NAS Key West, as it does not own, operate, or manage any of the on-base housing at the facilities. Moreover, BBI says it played no role in negotiating the Ground Lease, the Operating Agreement, or the Property Management Agreement. Bitto Aff. ¶ 19 [D.E. 40-1]. Indeed, BBI does not pay the salaries of BBC employees, and BBC has its own employees. *Id.* ¶ 22. Except of course BBC's President, Senior Vice President, Executive Vice President, Assistant Vice

President, Chief Financial Officer, Chief Compliance Officer, Corporate Controller, and Treasurer. *Id.* ¶ 7. So, again in the light most favorable to Plaintiffs, BBI may not directly pay *most* of BBC's employees except the ones that set policy and conduct overall supervision of BBC's financials, operations, and legal compliance.

### D.    *Procedural Posture*

In conjunction with the filing of this motion to dismiss on jurisdictional grounds, BBI as well as the other named Defendants moved to dismiss the Amended Complaint. [D.E. 100]. Like other Defendants, BBI argued that the complaint failed to state a claim against it either directly or through alter ego or vicarious liability. On May 14, 2026, the District Court resolved the Rule 12(b)(6) motion and held specifically that the Complaint states claims against BBI, finding "[s]ignificant direct participation … alleged against BBI" and "a litany of activities whereby BBI directly participates in NAS Key West operations." Order at 7–9 [D.E. 171]. That Order acknowledged that it "addresses only whether claims asserted against BBI survive dismissal under Rule 12(b)(6)," and not personal jurisdiction. *Id.* at 5 n.2. The present motion, BBI's Rule 12(b)(2) motion [D.E. 161], is addressed here.

Following the Order, the Court directed supplemental briefing on the effect of the Rule 12(b)(6) ruling, and the parties complied. [D.E. 180, 181]. BBI insists that the May 14th Order casts no shadow on BBI's jurisdictional challenge because a different standard applies. BBI is half right; Rule 12(b)(6) findings do not control a jurisdictional question. The two inquiries apply different standards to an overlapping set of facts. But BBI's attempt to swat away the Court's Order is also wrong in an important respect. The Court now treats the 12(b)(6) findings not as binding on

jurisdiction, but as confirmation that the direct-participation allegations are concrete and well-pleaded—which certainly bears on the prima facie inquiry described below.

## II.   ANALYSIS

Plaintiffs do not assert general jurisdiction, and rightly so; BBI is not "at home" in Florida. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). The only question in dispute goes to specific jurisdiction, which turns initially on three subsections of the long-arm statute cited in the Master Complaint: § 48.193(1)(a)(1) (operating or carrying on a business in Florida), and § 48.193(1)(a)(2) (committing a tortious act within Florida), and § 48.193(1)(a)(7) (breaching a contract by failing to perform acts required to be performed in Florida). Plaintiffs invoke all three. The Court addresses each, then turns to the two imputation theories, agency and alter ego, that Plaintiffs press in the alternative.

### A.   *Standards of Review*

A federal court sitting in Florida exercises personal jurisdiction over a nonresident defendant only if two requirements are met: the defendant's conduct falls within Florida's long-arm statute, Fla. Stat. § 48.193, and the exercise of jurisdiction comports with the Due Process Clause. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013); *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1271 (11th Cir. 2002).

Specific personal jurisdiction is permitted when a suit "aris[es] out of or relat[es] to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017) (quoting

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).  A plaintiff must first allege a prima facie basis of specific of jurisdiction, under a state's long-arm statute, by pleading material facts that track the given statute's language and demonstrate how its elements are satisfied. *E.g., Intercarga Internacional De Carga, S.A. v. Harper Group, Inc.*, 659 So. 2d 1208, 1210 (Fla. 3d DCA 1995); *see also Wendt v. Horowitz*, 822 So. 2d 1252, 1257 (Fla. 2002) (under the first prong of the test for long-arm jurisdiction "it must be determined that the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of the statute") (quoting *Execu–Tech Bus. Sys., Inc. v. New Oji Paper Co.,* 752 So. 2d 582, 584 (Fla. 2000)).

Florida courts exercise specific personal jurisdiction if a defendant is operating a business or engaged in a "business venture" in the state under Fla. Stat. § 48.193(1)(a)(1), or commits a "tortious act" within the state under § 48.193(1)(a)(2), or "fail[s] to perform acts required by the contract to be performed in [Florida]" under § 48.193(1)(a)(7). Florida's long-arm statute must be strictly construed. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (citing *Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 891 (11th Cir. 1983)).

A Plaintiff bears the initial burden of establishing a prima facie case of specific personal jurisdiction. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)). The defendant may then submit affidavits contesting those facts. If it does, the burden shifts back to the plaintiff to substantiate the jurisdictional allegations "by affidavits or other competent proof, and not merely [to] reiterate the factual

allegations in the complaint." *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). Whether the plaintiff has made a prima facie showing is a legal question, and the Court does not weigh evidence or make credibility determinations. *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364–65 (11th Cir. 2021). And "[t]o the extent that 'the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.'" *Ibid.* (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010)); *see also Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000); *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

That last principle is important here (which is elaborated on in Part II.E below). If the jurisdictional facts and the merits facts are one and the same, i.e., when deciding who acted in Florida also decides who is liable for what happened there, the court need not resolve the dispute against the plaintiff on the papers. It can accept the plaintiff's prima facie showing and reserve the contested facts for trial or for a full and fair evidentiary hearing even after trial. *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 729–32 (11th Cir. 1982); *see also Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241–42 (5th Cir. 2008); *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214–16 (6th Cir. 1989). A court has complete discretion to do so under Rule 12(i) if it deems it too premature to adjudicate that ultimate factual question by having to weigh the credibility of witness testimony, which is more appropriate for trial. *AcryliCon*, 985 F.3d at 1364-65 (quoting Fed. R. Civ. P.

12(i) ("If a party so moves, any defense listed in Rule 12(b)(1)-(7) – whether made in a pleading or by motion – and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial.")).

Otherwise, difficult constitutional or preclusion issues may arise, as a First Circuit case warned against, which the Eleventh Circuit relied upon:

> Especially troubling issues of this kind arise when, for example, long-arm jurisdiction depends on a finding that the claim on the merits arises out of the defendant's contacts with the forum state. A similar concern with the right to trial by jury is what animates the constitutional requirement that factual issues common to both legal and equitable claims in the same proceeding be tried to a jury first. . . . Moreover, when factual issues are common to both the jurisdictional question and the claim on the merits, requiring the plaintiff to prove jurisdiction by a preponderance of the evidence in a Rule [12(i)] preliminary proceeding may be an inefficient use of scarce judicial resources. . . . Postponing proof by a preponderance of the evidence until trial has the additional advantage of allowing a plaintiff, when required to prove by a preponderance of the evidence, to present proof "in a coherent, orderly fashion and without the risk of prejudicing his case on the merits."

*Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 677 (1st Cir. 1992) (quoting *Data Disc, Inc., v. Systems Tech. Assoc., Inc.,* 557 F.2d 1280, 1285 n.2 (9th Cir. 1977)), *cited and quoted with approval, AcryliCon*, 985 F.3d at 1365.

We will focus on this important aspect in Part II.E, because it ultimately governs how the merits-laden disputes in this case should be handled.

### B.     *BBI'S Direct Participation in Business and Tortious Activity*

The Court begins with Plaintiff's best case for long arm jurisdiction: BBI's own alleged conduct in Florida does not rely on imputation of its subsidiary's contacts. If BBI's own personnel, acting for BBI, scheduled calls about residents' homes, answered mold complaints, signed leases, and ran a helpdesk for NAS Key West, then

BBI itself "commit[ted] a tortious act within this state" for purposes of the long arm statute if those acts contributed to the negligence and malfeasance that gives rise to the claims in the case. They would also evidence the type of ongoing business activities in the state sufficient to show that BBI "carr[ied] on a business" here under § 48.193(1)(a)(1) of the statute. No corporate veil need be pierced and no agency relationship established; BBI's own direct contacts are enough to trigger long arm jurisdiction.

Specifically, under § 48.193(1)(a)(1), the defendant's activities "must be considered collectively and show a general course of business activity in the State for pecuniary benefit." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (quoting *Dinsmore v. Martin Blumenthal Assocs., Inc.*, 314 So. 2d 561, 564 (Fla. 1975)). Even "sporadic" efforts generating "relatively insignificant" revenue can satisfy the standard when viewed collectively. *Id.* at 628. The factors BBI itself invokes, like having no offices, licenses, clients, and negligible percentage of revenue from Florida, are factors to weigh rather than prerequisites that must each be met. *See, e.g., Prunty v. Arnold & Itkin LLP*, 753 F. App'x 731, 735 (11th Cir. 2018). But the collective picture Plaintiffs paint, which include named BBI personnel performing ongoing operational work at a Florida installation from which BBI derives value, states a prima facie case for directly carrying on business here.

And those business activities are among the type of operations that the Master Complaint alleges contributed to the Plaintiffs' injuries in the case. Plaintiffs are alleging that their claims arise from the same nucleus of operative facts, relating to

BBI's and other Defendants' conduct in leasing, managing, and maintaining Plaintiffs' housing. More precisely, these claims are premised on BBI's failure to adequately maintain the properties and their attempts to conceal and cover up that failure. As the Complaint takes pains to allege, those attempts involved a whole host of acts of malfeasance and nonfeasance that included the very same type of interactions that BBI employees allegedly had with the residents. The evidence of the interactions of BBI representatives with Plaintiffs thus relate, as alleged, directly to the leasing, management, and failure to adequately maintain Plaintiffs' homes. In that respect, BBI's direct activities in connection with operating the facility, if true, would certainly support the connexity requirement for long-arm/specific jurisdiction under this provision. *See, e.g., Golant v. German Shepherd Dog Club of Am., Inc.*, 26 So. 3d 60, 63 (Fla. 4th DCA 2010) ("This activity, when considered collectively, shows a 'general course of business activity in the State for pecuniary benefit.'") (quoting *Dinsmore,* 314 So.2d at 564); *Citicorp Ins. Brokers (Marine), Ltd. v. Charman*, 635 So. 2d 79, 81-83 (Fla. 1st DCA 1994) (deriving commissions over five years, sending letters and telefaxes back and forth to negotiate deals, and responding to Florida customer requests, evidenced general course of business activities, which collectively had a sufficient nexus to claims alleged to sustain long-arm jurisdiction).

Next, under § 48.193(1)(a)(2) a defendant commits a tortious act "within" Florida when it directs tortious conduct at the State, even from afar. *See Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1275–76 (11th Cir. 2022). Acts aimed at Florida residents that cause harm in Florida can satisfy the statute regardless of where the

actor was physically located. So a nonresident defendant who commits a tortious act elsewhere that causes injury in the state can be subject to specific jurisdiction under this provision of the statute. *See, e.g., Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008) (alleged trademark infringement, which occurred through a website accessible in Florida, satisfied this long-arm provision because it caused injury to a Florida resident); *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1216 (11th Cir. 1999) (adopting broad interpretation of long-arm statute by Florida courts that allows personal jurisdiction over nonresident defendant alleged to have committed a tort causing injury in Florida); *Wendt,* 822 So. 2d at 1260 (Florida Supreme Court agreed that a tortious act "can occur through the nonresident defendant's telephonic, electronic, or written communications into Florida" so long as "the cause of action . . . arise[s] from the communications.").

In this Master Complaint, Plaintiffs' allegations and supporting evidence that BBI-identified personnel handled mold and maintenance complaints about specific Florida homes (the very conditions underlying the tort claims) supplies that connection, whether or not the personnel were stationed in Florida or elsewhere.

BBI's primary response to this conclusion is the "brand, not the company" argument: the personnel were *BBC* employees using a group brand, and so their conduct was BBC's, not BBI's. But this theory (attested to by C-suite executives for BBI and not the personnel themselves) is, at bottom, a factual assertion that contradicts Plaintiffs' documentary evidence that includes seventeen exhibits in which individuals identified themselves to residents as "Balfour Beatty Investments."

On a motion where conflicting evidence is construed in the plaintiff's favor, the Court cannot resolve that conflict against Plaintiffs now. And resolving it would do more than decide jurisdiction; because the same personnel and the same conduct underlie the merits, deciding that they acted for BBC rather than BBI would effectively adjudicate BBI's liability. That is precisely what the intertwined-facts rule forbids at this stage. *See infra* Part II.E.

And even if we were inclined to adjudicate the dispute now, BBI's reply submission deepens, rather than dispels, that dispute. BBI now relies on its "Branded Emails & Business Cards Policy & Procedure" to argue that the resident-facing personnel used the "Balfour Beatty Investments" designation in violation of company policy. Omrod Aff. Ex. B. But the policy arguably cuts the other way if one looks at it in a light favorable to Plaintiffs. It instructs personnel, in building an email signature, to "[s]elect 'Investments,' 'Communities,' or 'Campus Solutions' from the 'Company' drop-down list based on the division that you work for"—language that treats "Investments" as a "Company" an employee may "work for," and that ties the choice to the work performed rather than to a free-floating logo. *Id.* The policy further directs personnel performing "Environmental" or "Health & Safety" functions to use the Balfour Beatty Investments signature. *Id.*

That instruction fits the conduct alleged here: Lee Tysinger, who repeatedly answered Plaintiffs' mold and safety complaints, identified himself as a "Life Health Safety Service Manager." On BBI's own document, Tysinger's use of the "Balfour Beatty Investments" signature thus appears to be the prescribed practice, not a

departure from it. In other words, Tysinger appears to be designating himself as a BBI representative, not BBC, as per the policy itself. And even if there are explanations for that, the inferences to be drawn from the paper record at this stage support Plaintiffs' interpretation, not BBI's.

Nor is BBI's evidence internally consistent. The supplemental Omrod affidavit describes "Balfour Beatty Investments" as one of three corporate-group brands, the other two being "Balfour Beatty Construction" and "Balfour Beatty Infrastructure." Supp. Omrod Aff. ¶ 4. Yet the "Company" drop-down in BBI's own policy lists "Investments," "Communities," and "Campus Solutions"—not Construction or Infrastructure—and neither Construction nor Infrastructure appears on the roster of "Specialist Brands" on Balfour Beatty plc's website that BBI itself submitted. *Id.* ¶ 5 & Ex. A. Again, inferences from this record must be drawn in Plaintiffs' favor.

The scale of the conduct compounds the difficulty for BBI. This is not the case of a lone employee who mistakenly selected the wrong signature on a stray email. Plaintiffs have come forward with at least sixteen examples of communications in which at least six individuals—holding titles such as Facility Director, Regional Operations Director, Customer Experience Specialist, Assistant Community Manager, and Life Health Safety Service Manager—identified themselves to residents as representatives of "Balfour Beatty Investments." Laclor Decl. ¶ 2. BBI, which presumably holds the personnel's own employment records and could have submitted their accounts, offers no testimony from any of them explaining the practice. Drawing the inferences the governing standard requires in Plaintiffs' favor,

the repeated, role-matched use of BBI's name by operational personnel is evidence that they were doing BBI's work, not just BBC's.

None of this proves of course that the personnel were in fact acting for BBI rather than BBC. Ultimately BBI's reading (that "Company" in a signature template denotes an internal division rather than a legal employer, and that an employee's self-designation cannot bind the corporation) may prevail on a fully developed record. But on a Rule 12(b)(2) motion, BBI's own policy documents and affidavits raise at least as many questions as they answer, and so they cannot justify resolving the controlling factual dispute on the papers in BBI's favor. Just as the Court found in its May 14th Order, these allegations raise colorable factual disputes that preclude dismissal.

For similar reasons, BBI's reliance on the "out-of-state person" cases does not change the result. It is true that simple "contact with out-of-state [persons] does not constitute conduct 'within this state.'" *Dvoinik v. Rabl*, No. 1:22-cv-24116, 2024 WL 923917, at *10 (S.D. Fla. Jan. 30, 2024), *report and recommendation adopted*, 2024 WL 655936 (S.D. Fla. Feb. 16, 2024). But that principle reaches only BBI's communications with BBC that is itself a non-Florida entity. It does not touch BBI's alleged direct contacts with the Florida-resident Plaintiffs, which are "within" Florida no matter where BBI is incorporated because the Complaint relies on many acts committed within Florida – the resident-facing conduct catalogued above. *Cf. Rautenberg v. Falz*, 193 So. 3d 924, 930 (Fla. 2d DCA 2016) ("A complaint is not legally sufficient to allege personal jurisdiction based on tortious acts when the

complaint fails to allege that the acts were committed within Florida" or otherwise "directed at listeners who were located in the state").

To bolster its position, BBI then turns to a recent 2026 decision from our court, *Egenberg v. Fish*, No. 24-cv-24101, 2026 WL 989009 (S.D. Fla. Apr. 13, 2026). *Egenberg* held that an out-of-state defendant's work directed toward a non-Florida resident, on a deal unrelated to the specific claim asserted, did not establish jurisdiction under § 48.193(1)(a)(2). *Id.* at *4–5. That holding follows the principle that incidental, claim-unrelated contacts do not suffice; it does not displace jurisdiction founded on resident-facing conduct that is directly connected to the claims, as Plaintiffs allege here. And in that case a non-Florida plaintiff was making arguments in opposition to the motion that were founded on facts *not alleged* in the complaint. Plus, the facts that were alleged could not sustain the plaintiff's burden as the communications cited were directed at a foreign plaintiff in a foreign state, not against a Florida resident doing business in or residing in Florida. *Id.* at *3 ("the facts alleged reflect that any actions Star Investment took in 'orchestrat[ing] the Jet Fuel Deal' were directed to Plaintiff Egenberg, who is a citizen of New York. . . . These alleged contacts do not help satisfy Network Freight's burden because 'contact with out-of-state [persons] does not constitute conduct 'within this state.' ") (quoting *Dvoinik v. Rabl,* No. 22-cv-24226, 2024 WL 923917, at * 10 (S.D. Fla. Jan. 30, 2024), *report and recommendation adopted by* 2024 WL 655936, at * 2 (S.D. Fla. Feb. 16, 2024)).

So rather than supporting BBI's position, Judge Becerra's analysis in *Egenberg* only further highlights how different the allegations in this Master Complaint are. The type of allegations that she found to be missing in that case are precisely present, in spades, in this case. *Ibid.* ("There are no factual allegations that Star Investment took actions directed to Network Freight, or anyone else in Florida, in connection with allegedly orchestrating the Jet Fuel Deal.").

Finally, § 48.193(1)(a)(7) supplies a colorable additional basis to sustain long-arm jurisdiction. To the extent BBI personnel signed lease documents and disclosures calling for ongoing performance at NAS Key West—and the lease packets told residents that BBI "may be required by law to provide . . . certain written notices or disclosures"—the statute's contract-performance provision is implicated. *See, e.g., ripKurrent LLC v. Richard Ballard IRA LLC*, 530 F. Supp. 3d 1281, 1297–98 (S.D. Fla. 2021) (denying motion to dismiss on jurisdiction grounds where inferences drawn from complaint supported breach of performance due in Florida). The Court does not rest its recommendation on this provision, but notes it as reinforcing the prima facie showing already made under subsections (1) and (2) of § 48.193(1)(a).

### C. *Agency Principles Supply an Additional Basis for Jurisdiction*

Plaintiffs also seek to impute BBC's undisputed Florida contacts to BBI through agency principles. A subsidiary's contacts may be attributed to a parent "when the [subsidiary] is merely an agent through which the parent company conducts business" or has "no separate identity." *Meier*, 288 F.3d at 1272. The elements of actual agency are acknowledgment by the principal that the agent will act for it, acceptance by the agent, and the principal's control over the agent's actions.

*See, e.g., Taylor Grp., Inc. v. Indus. Distribs. Int'l Co.*, 859 F. App'x 439, 448 (11th Cir. 2021). Florida recognizes agency where affiliated companies form a "confusing conglomerate" and are "essentially one and the same company both financially and structurally, including the employment of common directors, officers, and representatives." *Meier*, 288 F.3d at 1273 (quoting *Pappalardo v. Richfield Hosp. Servs., Inc.*, 790 So. 2d 1226, 1228 (Fla. 4th DCA 2001)).

Plaintiffs make a persuasive case on this record that, notwithstanding Ms. Bitto's denials and explanations in her three affidavits, BBI has an agency relationship with BBC such that BBC's contacts with the Plaintiffs and Florida are imputed to BBI. For example, on its web page, BBI proudly promotes its "[r]esidential ventures in North America are managed through [BBC], a full-service real estate company with capabilities that include development, financing, renovation and property and facilities management services. . . . [BBC] operates as a strategic *partner* focused on increasing property value and performance while delivering exceptional customer services." Weitzner Decl. Ex. 2 at 1 [D.E. 62-3 at 14].

In addition, BBI acknowledges in this litigation that it is the sole member and parent of BBC, its "strategic partner" in this business venture. And BBI's role as manager of that partnership is evidenced by the fact these entities share a large number of senior officers and directors as well as common business departments. So BBC is managed by a group of officers who also hold senior executive positions at BBI. This is prima facie evidence of an agency relationship because the parent ostensibly has "operational control" over the agent's "day-to-day . . . internal affairs

or basic operations." *Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231, 1241 (S.D. Fla. 2015) (analyzing *Enic, PLC v. F.F. South & Co.*, 870 So. 2d 888, 891-92 (Fla. 5th DCA 2004)); see, e.g., *BFL Metal Prods. Co. v. Eyal Nahum Grp. Mfr. Co.,* 2025 WL 2722734, at *9 (S.D. Fla. June 17, 2025) (denying motion to dismiss based on prima facie agency jurisdiction for parent that described itself as a "group" engaged in the challenged business and allegedly offending products were marketed under the brand of the parent).

Indeed, the same considerations compelled the Court to conclude that the Complaint states an agency claim against BBI, Order at 9, 11–12, which for similar reasons is sufficient to subject BBI to this Court's jurisdiction under agency principles. *See Meier,* 288 F.3d at 1272 (jurisdiction may be established under an agency theory if the plaintiff establishes "the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction"); *PFM Air, Inc. v. Dr. Ing. h.c. F. Porsche A.G.*, 751 F. Supp. 2d 1264, 1278-79 (M.D. Fla. 2010) (parent was subject to jurisdiction in Florida based on joint venture with its subsidiary that allegedly injured Florida customers; courts look to "whether the sum of the defendant's collective business activities in Florida shows a general course of business activity in the state for pecuniary benefit," and "it is not necessarily the number of transactions, but rather the nature and extent of the transactions" that controls).

BBI responds to this settled line of authority by marshaling the general rule that shared officers and directors, standing alone, do not impute control; that the

parent must conduct "substantial business activity" through the subsidiary; and that setting enterprise-wide policy is not operational control. *See Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1312 (11th Cir. 2022); *Alvarez Galvez v. Fanjul Corp.*, 533 F. Supp. 3d 1268, 1284–85 (S.D. Fla. 2021); *State v. American Tobacco Co.*, 707 So. 2d 851, 855–56 (Fla. 4th DCA 1998). But unlike those cases, the Complaint and the evidence cited here go beyond shared officers. They allege that BBI personnel, by name, performed operational acts in Florida: scheduling resident calls, handling complaints, signing leases, etc. So, while BBI and BBC shared not only key officers (including significantly the "Chief Compliance Officer" that would seem particularly relevant here where Plaintiffs are alleging repeatedly that BBI and BBC violated multiple policies and procedures), they also shared core operating departments (HR, Legal, Accounting, IT, Environmental/Health & Safety), all the while BBI publicly described itself as continuing to "develop and maintain" U.S. military housing. Drawing the required inferences in Plaintiffs' favor, that is enough at the prima facie stage to find that Plaintiffs have also alleged a colorable basis to sustain long-arm jurisdiction based on BBC's contacts with the Plaintiffs as agent of BBI.

BBI's best case in opposition, *Phillips v. Dentsply Sirona, Inc.*, No. 1:25-cv-21074, 2026 WL 871301 (S.D. Fla. Feb. 25, 2026), *adopted in part*, 2026 WL 867714 (S.D. Fla. Mar. 30, 2026), proves the point rather than refuting it. *Phillips* held that a parent's logo on a subsidiary's website, and the parent's mere awareness of complaints, were passive contacts insufficient to confer jurisdiction. *Id.* at *8. Yet, as

the Court's May 14th Order found repeatedly, the conduct alleged here is *not* passive. It is the active, resident-facing engagement of personnel using BBI's name to do the operational work of housing management. Whether that engagement was truly BBI's or BBC's is the disputed fact – again, a merits fact – that cannot be resolved on this record.[2]

For now, the motion to dismiss lacks merit because a prima facie case has been made in the Master Complaint that BBC's many contacts with the state that are directly related to the claims alleged may be imputed to BBI as BBC's "strategic partner" in this venture. *See, e.g., Third Nat. Bank in Nashville v. WEDGE Group Inc.*, 882 F.2d 1087, 1090 (6th Cir. 1989) (reversing grant of motion to dismiss for lack of specific jurisdiction; jurisdiction was founded on Tennessee long arm statute based on parent's own participation in the subsidiary's forum-state business, such as sharing of officers between parent and Tennessee subsidiary, tax-sharing agreement with the subsidiary, and dual officers participated in document negotiations).

---

[2] We note that we are not resting our agency finding on *Orlando Exec. Park, Inc. v. Robbins*, 433 So. 2d 491 (Fla. 1983), a case cited by Plaintiffs for the proposition that a brand or logo alone creates apparent agency. The Florida Supreme Court receded from that view in *Mobil Oil Corp. v. Bransford,* 648 So. 2d 119, 121 (Fla. 1995). The viable agency theory rests instead on replete allegations of conduct and control in the Complaint, not just insignia. Similarly, statements in annual reports and on websites are contributing factors, and are not, standing alone, reliable proof of operational control. *Yellow Pages Photos, Inc. v. Ziplocal, LP*, No. 8:12-cv-755, 2012 WL 5830590, at *5 (M.D. Fla. Nov. 16, 2012). Here, based on the additional record evidence cited, they corroborate the agency showing at least at this stage of the case.

### D.    *Alter Ego: A Viable Additional Theory*

Plaintiffs' third theory is alter ego. Florida requires three requisite showings: (1) domination and control so complete that the subsidiary had "no separate existence" and was in fact the parent's alter ego; (2) use of the corporate form fraudulently or for an improper purpose; and (3) injury to the plaintiff caused by that misuse. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011) (citing *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008)). The party seeking to pierce bears "a very heavy burden." *Gov't of Aruba v. Sanchez*, 216 F. Supp. 2d 1320, 1362 (S.D. Fla. 2002). "To prevail under the alter ego theory, the complaint must allege facts sufficient to pierce the corporate veil of the resident corporation. . . . Black-letter law forbids equating a subsidiary with its parent absent extraordinary justification to pierce a corporate veil." *Medlink Legal Sys., LLC v. QIMA Ltd.*, 794 F. Supp. 3d 1265, 1274 (S.D. Fla. 2025) (citing *K3 Enters., Inc. v. Sasowski,* No. 20-24441-CIV, 2021 WL 8363506, at *5 (S.D. Fla. Nov. 22, 2021) ("[T]he alter ego theory applies when a non-resident defendant controls a *resident* defendant.") (emphasis in original)); *see also Molinos,* 633 F.3d at 1350 (Florida "courts will not ignore this separate entity so long as the stockholders make 'proper use' of this fiction; they must not use limited liability to defraud creditors.") (quoting Riesen v. Md. Cas. Co., 14 So. 2d 197 (Fla. 1943)).

The Court preliminarily addresses each prong to show that this could be a basis for liability, but we do not have enough record evidence to make a finding one way or the other. Because the Complaint should not be dismissed on other grounds, however, this issue can be developed if need be as the case proceeds.

First, domination and control. The Eleventh Circuit's twelve-factor "laundry list" guides this inquiry. *Lobegeiger v. Celebrity Cruises, Inc.*, 869 F. Supp. 2d 1350, 1355 (S.D. Fla. 2012). Several factors find support here: common ownership (BBI is BBC's sole member), common officers and directors (admitted, and extending to BBC's management by BBI executives), and common business departments (admitted). Drawing inferences in Plaintiffs' favor, an intermingling of daily operations is suggested by the alleged conduct and representations of employees wearing both BBI and BBC hats. Common ownership and common management alone are admittedly insufficient to override corporate separateness, *Alvarez Galvez*, 533 F. Supp. 3d at 1284, but the showing here is not limited to those factors, and at the prima facie stage it suffices to put the control question in genuine dispute.

Second, there is also the argument, albeit a weak one at this stage, for improper purpose and injury. Florida law requires that the corporate form have been "organized or used to mislead creditors or to perpetrate a fraud," *Burris v. Green*, No. 3:12cv521, 2016 WL 5844165, at *6 (N.D. Fla. Aug. 26, 2016), and that the misuse have caused the plaintiff's injury, *S-Fer Int'l, Inc. v. Stonesheets, LLC*, No. 15-cv-23015, 2016 WL 8808749 (S.D. Fla. July 22, 2016). Plaintiffs' improper-purpose allegation is pleaded "on information and belief" so BBI may have a point that "it is never appropriate to plead jurisdictional allegations on information and belief." *Admiral Ins. Co. v. VPRART, LLC*, No. 21-cv-21312, 2021 WL 1318223, at *1 n.1 (S.D. Fla. Apr. 7, 2021).

We agree that, if we did not have the allegations of direct liability against BBI, an alter ego theory as an exception to traditional rules of personal jurisdiction would likely not be enough at this stage based on this Complaint. And that does not even take into account another problem with this theory: the non-resident anchor. BBI correctly highlights a distinct legal obstacle here: courts in this Circuit have "declined to apply the alter ego theory of jurisdiction to a non-resident via application of Florida's long-arm statute to another non-resident." And that is because "the Florida resident required for alter-ego jurisdiction" may not "be replaced by a non-resident who is only within Florida's jurisdiction via a separate application of Florida's long-arm statute." *Noah Techs., Inc. v. Rice*, No. 2:14-cv-325, 2014 WL 6473664, at *6 (M.D. Fla. Nov. 18, 2014).

That principle would seemingly apply here. BBC is not a Florida citizen. If alter ego jurisdiction stood alone, *Noah* and cases like it would pose a perhaps fatal obstacle to imputing BBC's contacts to BBI under an alter ego theory. *See, e.g., Frybarger v. Salemme*, 22-61437-CIV, 2022 WL 18530012, at *6 (S.D. Fla. Dec. 28, 2022) (declining to extend personal jurisdiction to a nonresident corporation via application of the long-arm statute to another nonresident corporation based on the alter ego theory of jurisdiction where "Plaintiff d[id] not cite, and the Court [wa]s unaware of, any cases supporting such a theory of jurisdiction."); *K3 Enters., Inc.*, 2021 WL 8363506, at *5 ("Under Plaintiff's theory, this Court would exercise personal jurisdiction over these non-resident defendant corporations based on a non-resident defendant's contacts with Florida. This theory lacks support under Florida law.").

Page 28 of 41

But, again, we need not make a final determination on this score. This rule is not necessarily a settled principle in Florida as no Florida Supreme Court or Eleventh Circuit case has addressed it. And not all district courts have uniformly embraced it. *Compare PayDay Sols., LLC v. JTL Staffing & Payroll, LLC*, 2025 WL 1101481, at *1-2 (M.D. Fla. Apr. 14, 2025) (sustaining alter-ego jurisdiction over one non-resident through another); *Budget Inns of Pensacola Inc. v. Republic Servs. Inc.*, 2025 WL 3482176, at *1-2 & n.3 (N.D. Fla. June 13, 2025) (deferring the question as too intertwined with the merits where both entities were non-resident); *with Medlink,* 794 F. Supp. 3d at 1274 ("Medlink's alter ego theory of personal jurisdiction fails because there is no resident entity.").

And, in any event, this hurdle is one Plaintiffs need not surmount because the direct-participation theory rests on BBI's own contacts and requires no imputation through BBC at all as discussed in Part II.B above. *Cf. Garcia v. Character Techs., Inc.*, 785 F. Supp. 3d 1157, 1171-72 (M.D. Fla. 2025) (denying jurisdictional challenge from non-residents who exercised direct, personal control equivalent to the company's own acts under alter ego jurisdiction). Plus, Plaintiffs have shown that BBI can be subject to jurisdiction here as agents/joint venturers with BBC. That is enough to deny this motion for further factual development and resolution at a later stage of the case. If a more reliable alter ego theory of jurisdiction arises hereafter against BBI then Plaintiff can better present it at that point.

### E.     The Intertwined-Facts Doctrine Counsels Against Resolution of this Motion by Rule 12(b)(2) Motion

The three theories above share a single feature that controls the disposition. The fact that decides each of them is also the fact that decides the merits. Did BBI "directly participate" in NAS Key West operations, or was it a passive investor? Are BBI and BBC so integrated that BBC's extensive Florida contacts are attributable to BBI? Did BBI derive substantial revenue and have de facto control over the NAS Key West operations? The answer to all these questions determines both whether BBI has sufficient Florida jurisdictional contacts, *as well as* whether BBI is ultimately liable for the harms its personnel allegedly caused or concealed. The jurisdictional question and the merits question are not merely related. They substantially overlap: the fact that decides the jurisdictional question is a necessary and central component of the merits determination.

When that is the case, the law is clear about what a court may and may not do. It may test whether the plaintiff has made a prima facie showing. It should not resolve the disputed fact against the plaintiff on competing affidavits, because doing so would decide the merits under the guise of a threshold motion, without the procedural protections that attend a merits determination. *Eaton*, 692 F.2d at 729–32. The Fifth and Sixth Circuits articulate the same rule: where the jurisdictional and merits facts overlap, the plaintiff need only make a prima facie case to survive, and final fact-finding is deferred to a "full and fair" evidentiary hearing or to trial. *Walk Haydel*, 517 F.3d at 241–42; *Serras*, 875 F.2d at 1214–16. *See also Spector v. LQ Motor Inns, Inc.,* 517 F.2d 278, 284 (5th Cir. 1975) ("The jurisdictional and

substantive issues are factually meshed. Therefore, decision on the jurisdictional issues is dependent on decision of the merits and should have been reserved until a hearing on the merits."); *McBeath v. Inter–Am. Citizens for Decency Comm.,* 374 F.2d 359, 362–63 (5th Cir. 1967) ("[W]here the factual and jurisdictional issues are completely intermeshed, the jurisdictional issues should be referred to the merits, for it is impossible to decide the one without the other.").

In an extensive discussion of such a situation, as quoted in Part II.A above, the Ninth Circuit noted that factual determinations, such as determinations of credibility based on conflicting affidavits, should only rarely be resolved by a judge on a written record. *See Data Disc,* 557 F.2d at 1284, 1285 n. 2 ("it is preferable that [a decision on the jurisdictional facts] be made at trial, where a plaintiff may present his case in a coherent, orderly fashion without the risk of prejudicing his case on the merits.").

The Eleventh Circuit has squarely adopted that principle: district courts, faced with jurisdictional challenges, can rely on this consideration and delay a full-fledged evidentiary hearing on the intertwined allegations for trial, or even post-trial proceedings. *AcryliCon*, 985 F.3d at 1364-65 (court has discretion to do so under Rule 12(i) if it deems it too premature to adjudicate, before trial, that ultimate factual question). It is thus not surprising that courts in our District have applied the same principle to deny dismissal where the jurisdictional and merits facts coincide.

Take *Nissim Corp. v. ClearPlay, Inc.*, 351 F. Supp. 2d 1343 (S.D. Fla. 2004), where Judge Huck declined to resolve a contested 12(b)(2) motion on the affidavits because "the jurisdictional facts are intermeshed with the ultimate question on the

merits," and instead deferred the jurisdictional determination so that discovery could proceed. *Id.* at 1351–52. The court reached that result even though the defendant's affidavit purported to be "uncontroverted," reasoning that crediting it on a paper record "would empower a defendant to defeat personal jurisdiction merely by filing a written affidavit contradicting jurisdictional facts alleged by a plaintiff." *Id.* at 1350–51 (quoting *Serras*, 875 F.2d at 1215).

Applying that reasoning here, BBI's submission, based on affidavits recharacterizing named, resident-facing personnel as employees of a different entity, suffers from the same problem. So too did the defendant in another closely analogous case just last year, causing the court to defer an alter-ego jurisdictional question because it was "too closely intertwined with the merits." *Budget Inns*, 2025 WL 3482176, at *1–2 & n.3 (denying motion to dismiss without prejudice "[a]lthough the record is fully developed and no further discovery is necessary, this issue is inextricably intertwined with the merits because a ruling on alter ego for purposes of personal jurisdiction is in effect a ruling directly on the merits as to RSI – the Court cannot decide one without ruling on the other.") (citing and quoting *Spector,* 517 F.2d at 284).

And this is particularly compelling here where those dispositive facts – who employed and directed the resident-facing personnel, the true scope of BBI's control over BBC, the financial flows BBI derives from NAS Key West, and the precise corporate relationship between BBI and BBC – lie peculiarly within Defendants' knowledge. Plaintiffs are entitled to serve discovery directed at exactly these

questions, and should be able to depose all the relevant operational personnel to ask who they believed they were working for during the relevant time periods. Discovery is the mechanism the law prescribes for resolving the intertwined facts that a paper record cannot. That process should be completed before any final determination is made on BBI's jurisdictional challenges. *See, e.g., Jackam v. Hosp. Corp. of Am. Mideast*, 800 F.2d 1577, 1582 (11th Cir. 1986) ("As with allegations of a complaint concerning sufficiency of a claim, [plaintiffs] should be entitled to allege facts to support a reasonable inference of jurisdiction within the state and an opportunity for discovery.") (reversing grant of jurisdiction motion for further factual development); *Phoenix Senior Living LLC v. Anniston Assisted Living, LLC*, No. 1:23-cv-02669-JPB, 2024 WL 5671714, at *10 (N.D. Ga. Nov. 18, 2024) (deferring ruling on personal jurisdiction where allegations were "inextricably intertwined with [plaintiff's] alter ego theory and with the merits of this case"); *Forbes v. Concord Advice, LLC*, No. 8:19-cv-2980, 2020 WL 3250232, at *1-2, *7 (M.D. Fla. Apr. 21, 2020) (declining to rule at the motion to dismiss stage where personal jurisdiction was based on alter ego allegations and the determination of the issue also directly implicated the merits of liability).

BBI's supplemental brief presses the contrary view: that on a 12(b)(2) motion the Court must "weigh the evidence" and that Plaintiffs must "prove—not merely allege" jurisdiction. As a general statement of the burden once a defendant submits affidavits, that is correct in many cases. *Future Tech.*, 218 F.3d at 1249. But it omits the limiting principle described above, which is no surprise given that BBI's motion

and supplemental memorandum do not mention these binding and non-binding authorities.

The Court, however, is persuaded by these cases. The duty to weigh evidence and the elevation of a plaintiff's burden to a preponderance standard attach only where the jurisdictional facts are deemed, in the trial court's discretion, separate and apart from the underlying merit allegations. In that case, a court can make a preponderance of evidence finding if it holds a pretrial evidentiary hearing. *AcryliCon,* 985 F.3d at 1364 ("The district court can impose the preponderance-of-the-evidence standard right away, during the pre-trial phase, by conducting an evidentiary hearing."); *Walk Haydel*, 517 F.3d at 241-42.

But where the merits and jurisdictional facts are closely intertwined, such a pretrial hearing is not required under Rule 12(i) and the court can defer for later proceedings. *AcryliCon,* 985 F.3d at 1364 ("Alternatively, the district court can wait to impose a preponderance-of-the-evidence standard until trial. If the court chooses this course, then it reviews the motion to dismiss under a prima facie standard.").

We follow that option here. And on a paper record, with the jurisdictional facts inseparable from the merits, the prima facie standard governs, and disputed inferences run in Plaintiffs' favor. That requires denial of the motion at this stage subject to later factual development and a plenary hearing of the issue at trial or post-trial if necessary. As Judge Huck explained, a court "is inclined to give greater weight . . . to the plaintiff's version" of contested facts, 'particularly when the jurisdictional questions are apparently intertwined with the merits of the case.'" *Nissim*, 351 F.

Supp. 2d at 1346 (quoting *Delong Equip. Co. v. Wash. Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988)). BBI's affidavits may ultimately prove accurate; but they cannot displace Plaintiffs' documentary showing on a paper record on the pending motion. And our review of that paper record reveals a voluminous amount of evidence that Plaintiffs can rely on to make their case, as evidenced by all the many supplemental affidavits and counter-statements of fact that BBI had to engage in during the course of briefing on this motion. BBI does not appreciate, however, that having to marshal so many explanations for the record evidence presented by Plaintiffs only underscores the weakness of its position at this stage of the case.

Finally, the Eleventh Circuit's decision in *Posner v. Essex Insurance Co.*, on which BBI relies for the proposition that a 12(b)(2) movant's affidavits shift the burden, is not to the contrary. 178 F.3d at 1209. *Posner* recognizes the circumstance, detailed above, in which the jurisdictional inquiry can be resolved on the papers because the jurisdictional facts are genuinely separable from the merits. *Id.* at 1214–15. That carve-out has been narrowly cabined; subsequent decisions have distinguished *Posner* repeatedly, declining to extend it where the factual overlap with the merits is substantial. This is *not* a case of separable facts that do not heavily overlap the merits.

In sum, we are not finding that BBI is subject to jurisdiction. Perhaps the resident-facing personnel cited in the Complaint were indeed acting for BBC, not BBI. And it may be the case that BBI did not overwhelmingly dominate and control BBC or use the corporate form improperly. Those questions remain fully open, and BBI

remains free to renew its challenge on a developed record before final judgment. But, on the present record, Plaintiffs have made the prima facie showing the law requires, and the contested facts may not be resolved against them now.

### F.   *The Exercise of Jurisdiction Comports with Due Process*

Because the long-arm statute is satisfied on a prima facie basis, the Court reaches the constitutional question. Specific jurisdiction satisfies due process where (1) the plaintiff's claims arise out of or relate to the defendant's forum contacts; (2) the defendant purposefully availed itself of the forum; and (3) the exercise of jurisdiction comports with fair play and substantial justice. *Mosseri*, 736 F.3d at 1355; *Del Valle*, 56 F.4th at 1275–77.

The first two prongs are met on the prima facie record. Plaintiffs' claims arise directly from the resident-facing conduct—the calls, the complaint responses, the leases—alleged to be BBI's. Purposeful availment is shown under the effects test, which is satisfied where "the tort was intentional, aimed at the forum state, and caused harm that the defendant should have anticipated would be suffered in the forum state," *Del Valle*, 56 F.4th at 1276, and under the minimum-contacts test as well. A parent whose personnel and policies are alleged to have governed housing at a Florida installation, and whose residents were injured there, should reasonably anticipate being haled into court in Florida. *See, e.g., PFM Air,* 751 F. Supp. 2d at 1278-79 (parent was subject to jurisdiction in Florida based on joint venture with its subsidiary that allegedly injured Florida customers; "Florida certainly has an interest in adjudicating a dispute arising in part due to activities carried on within its borders").

BBI's contrary submission relies on *Herederos*, where the Eleventh Circuit held that "[t]he incidental effects of a defendant's actions are not by themselves sufficient to justify jurisdiction." 43 F.4th at 1311. BBI quotes the case accurately, but its facts are remote from ours. *Herederos* involved a Canadian mining company whose only forum connection was that the effects of its foreign operations were felt in the United States. The contacts alleged here are not incidental byproducts of distant operations, as they are primary acts: BBI's own personnel performing BBI's own obligations to Florida residents under documents bearing BBI's name. On the prima facie record, the third prong poses no obstacle: BBI has not argued that litigating in Florida would be unfairly burdensome, and Florida's interest in adjudicating injuries to its residents in housing on its soil is substantial. There is no due process problem in proceeding with jurisdiction over BBI pending further factual development.

### G.    *Jurisdiction Reaches the Entire Case, Not Select Plaintiffs or Claims*

Finally, in the supplemental brief, BBI advances two narrower fallback positions: that any jurisdiction arising from the resident-facing communications can reach only those Plaintiff families who have alleged such contacts, and that it can support only certain claims, like fraud and misrepresentation, but not the breach-of-contract and negligence claims. Plaintiffs respond that both arguments come too late, having surfaced for the first time on supplemental briefing after several rounds of dismissal motions. Plaintiffs' position has merit. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) (arguments not raised in a party's earlier briefing are ordinarily

treated as waived). But the Court need not rest on waiver, because the arguments fail on their merits.

Both positions founder on the doctrine of pendent personal jurisdiction. Once a court has specific jurisdiction over a defendant on one claim, it has jurisdiction over the entire case when "all of the claims ar[i]se from the same jurisdiction generating event." *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1231 (11th Cir. 2023) (*quoting Cronin v. Wash. Nat'l Ins. Co.*, 980 F.2d 663, 671 & n.10 (11th Cir. 1993)). Courts in this District apply that principle where tort and contract claims "arise out of a common nucleus of operative facts," so that jurisdiction established over one set of claims extends to the others. *Exhibit Icons, LLC v. XP Cos.*, 609 F. Supp. 2d 1282, 1299 n.15 (S.D. Fla. 2009). The reason why is obvious: the purpose of the personal-jurisdiction inquiry (ensuring that the defendant has minimum contacts such that suit in the forum comports with fair play and substantial justice) is largely served once sufficient contacts are shown for any claim arising from the same conduct. *SkyHop*, 58 F.4th at 1231.

That doctrine answers BBI's claim-by-claim argument directly. Plaintiffs' claims (negligence, breach of contract, misrepresentation, fraud, and related theories) all arise from a single course of conduct: the leasing, management, and maintenance of NAS Key West housing, and the handling of residents' complaints about hazardous conditions in their homes. The resident-facing communications are not tethered to the fraud counts alone; they are the operational acts from which every claim springs like answering mold and safety complaints, signing leases, and running the helpdesk.

Because all these claims share that nucleus, a prima facie showing of jurisdiction over BBI as to any of them reaches them all.

BBI's reliance on *Argos v. Ciuchini* is thus misplaced. There, the complaint joined two genuinely distinct sets of facts, a business-sale contract dispute and a separate trademark controversy, so that jurisdiction over the one did not carry over to the other as the court expressly acknowledged. 446 F. Supp. 3d 1073, 1083 (S.D. Fla. 2020) ("These claims arise from two separate sets of factual allegations: (1) the contract claim allegations concerning the sale of Argos France to Cosmo; and (2) the various tort claim allegations concerning Defendants' alleged interfering and infringing activities following the creation of Argos Indiana. As explained below, only the first set of allegations sets forth sufficient contacts to hale Defendant Cosmo into this forum."). So it is not just a simple claim-by-claim analysis in the manner BBI believes, but more the groupings of similar facts with similar theories that matter. *Id.* at 1087 ("The Amended Complaint presents the Court with two separate sets of factual allegations — one set giving rise to Plaintiffs' contract claims (Counts VI and VII) and a slightly broader set giving rise to Plaintiffs' remaining tort claims. The Court analyzes Plaintiffs' contract and tort claims separately.").

Here there is one nucleus of relevant facts, not two. If that set of facts gives rise to a contract theory as well as a tort theory, then specific jurisdiction is proper as to both. And here that is precisely what we are faced with in this Master Complaint. BBI's attempt to parse out those allegations more narrowly does not pass muster.

The family-by-family argument fails for a related reason. The long-arm basis the Court has found sufficient under § 48.193(1)(a)(1) is BBI's collective "general course of business activity in the State," *supra* Part II.B, not a separate qualifying contact with each individual household. And the LaCour declaration offers its communications expressly as representative "examples" of a broader practice, LaCour Decl. ¶ 2, supporting the reasonable inference, which the Court must draw in Plaintiffs' favor, that BBI's resident-facing engagement was not confined to the handful of families whose emails happen to appear in the present record. At the prima facie stage, the reach of jurisdiction is not cabined to those families.

BBI's remaining move, which seeks to isolate each undisputed fact (its indirect Florida revenue, the shared officers and departments, the BBI Helpdesk), and observing that no one of them, standing alone, establishes jurisdiction, fares no better. The agency and alter-ego inquiries are multi-factored and expansive; they ask whether all the relevant factors, taken together, show the requisite control and connection. *See Herederos,* 43 F.4th at 1312 (assessing alter ego under the totality of the circumstances). A defendant cannot defeat that collective inquiry by disaggregating it. BBI is right, to be sure, that none of these facts is independently sufficient, and a fuller record may show that even together they fall short. But on the present prima facie record, construing the evidence in Plaintiffs' favor, they reinforce rather than undermine the showing already made.

### III.   *CONCLUSION AND RECOMMENDATION*

BBI asked the Court to decide, on affidavits and without a hearing, that it was a stranger to NAS Key West. The record will not bear that conclusion at this stage. Plaintiffs have come forward with concrete evidence that BBI itself acted in Florida in the very respects that give rise to this suit. BBI's answer that those actors belonged to its subsidiary may prove true. But it is a contested fact, inseparable from the merits, that cannot be resolved against Plaintiffs on this record.

Accordingly Defendant Balfour Beatty Investments, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction [D.E. 161] should be **DENIED**. The matter can be renewed, if appropriate, at a later stage of the case or at trial.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1; *see, e.g.*, *Patton v. Rowell*, 678 F. App'x 898 (11th Cir. 2017); *Cooley v. Comm'r of Soc. Sec.*, 671 F. App'x 767 (11th Cir. 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 8th day of July, 2026.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge